## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT CHARLESTON

**UNITED STATES OF AMERICA**

   **V.**                                  **Criminal No. 2:09-00137**

**JOSEPH CLEVELAND FERRELL and**
**SOUTHERN AMUSEMENT CO., INC.**

### DEFENDANT JOSEPH C. FERRELL'S SENTENCING MEMORANDUM

Joseph C. Ferrell has fully accepted responsibility for his illegal conduct and made restitution. He now respectfully requests that the Court depart from the Sentencing Guidelines and impose a sentence that will take into account his life-threatening medical conditions but will also reflect the seriousness of the offenses.

As explained in letters from Mr. Ferrell's doctors and a summary of Mr. Ferrell's health conditions prepared by a life care planner, Mr. Ferrell has been diagnosed with at least 19 serious medical conditions, the combination of which result in severe chronic pain, loss of mobility, and an impairment of virtually every aspect of his life. These diagnoses include, among others, diabetes, advanced coronary artery disease, severe diabetic neuropathy, severe venous stasis in his lower extremities, and a tendon dysfunction in his right ankle and foot that will require reconstructive surgery and rehabilitation in the near future. In an effort to treat and limit the progression of these conditions, Mr. Ferrell depends on several physicians who have worked together to coordinate a health care plan that includes regular examinations and a carefully monitored medication plan requiring regular blood tests and at least 25 different daily medications. Due to the intensive and interrelated nature of Mr. Ferrell's medical conditions,

any deviation from his health care plan could have a catastrophic effect on his health and be life threatening.

Consistent with revised U.S.S.G. § 5H1.4, Mr. Ferrell respectfully requests that the Court depart downward from the applicable Guideline range and sentence him to a term of probation to be served on home confinement.  Such a sentence would reflect the seriousness of his offenses while permitting Mr. Ferrell to continue to receive necessary medical treatment and monitoring from his team of health care providers and to have at least some hope of slowing down the progression of his chronic medical conditions.

In the alternative, based on Mr. Ferrell's background, his extensive contributions to the community, his medical conditions, and the nature of his offenses, Mr. Ferrell respectfully requests a variant sentence of probation to be served on home confinement pursuant to 18 U.S.C. § 3553(a).

Mr. Ferrell also requests that the Court rule on the following six remaining objections to the Presentence Report ("PSR"):  (1) the PSR erroneously suggests that Mr. Ferrell protected and advanced the interests of Southern Amusement through his role as a Delegate in the West Virginia House of Delegates; (2) the PSR erroneously omits the fact that the Dotsons—who purchased the Kentucky "gray machines" from Mr. Ferrell—are still operating the same "gray machines" with full knowledge of law enforcement authorities; (3) the PSR fails to describe and take into account in sufficient detail Mr. Ferrell's chronic and serious medical conditions; (4) the PSR fails to accurately state Mr. Ferrell's net worth; (5) the PSR fails to accurately state Mr. Ferrell's monthly cash flow; and (6) the Court should not depart upward and impose a fine above the Guideline range.

## I.   Procedural History/Charges

On October 7, 2010, Mr. Ferrell appeared before the Court and pled guilty to two counts of a 40-count Third Superseding Indictment.  Mr. Ferrell pled guilty to Count One, Racketeering, in violation of 18 U.S.C. § 1962(c).  The Racketeering Acts Mr. Ferrell stipulated to were based on the operation of an illegal gambling business in Kentucky and state law bribery under West Virginia law.  He also pled guilty to Count Thirty-Seven, Willful Failure to Collect, Account for and Pay Over Employment Taxes, in violation of 26 U.S.C. § 7202.  Mr. Ferrell has remained released on a $10,000 unsecured bond, has been placed under the supervision of the United States Probation Office, and has remained in full compliance with the conditions of his release. He has accepted responsibility for his conduct and cooperated fully with federal authorities.  He has offered his assistance to federal investigators and remains willing to assist if requested.

Mr. Ferrell also stipulated as part of his plea agreement that he would forfeit the sum of $527,540, which the parties agreed was the amount of property he derived, directly or indirectly, from his violation of 18 U.S.C. § 1962(c).  Mr. Ferrell paid this amount to the United States Government on October 14, 2010.  Mr. Ferrell also stipulated that he owes restitution in the amount of $75,000 to the Internal Revenue Service, and paid this amount on the same date.

## II.   Remaining Objections To PSR

Mr. Ferrell respectfully requests that the Court rule on the following six objections to the PSR:

1.   Mr. Ferrell did not Improperly Advance the Interests of Southern Amusement Through His Role as a Delegate.

Paragraph 25 of the PSR states that Mr. Ferrell, through his role as a West Virginia House of Representatives Delegate, "had the ability to protect the business interests of Southern Amusement by influencing proposed and pending legislation regarding the operation of video

lottery machines."  Mr. Ferrell objected to this paragraph because it erroneously suggests that Mr. Ferrell improperly used his role to advance the interests of Southern Amusement.  The Probation Officer considered the objection but left the objectionable language in the PSR.

The PSR cites no evidence suggesting that Mr. Ferrell in any way improperly influenced Limited Video Lottery legislation.  Nor could it.  To the contrary, and as reflected in the West Virginia House of Delegates Record, Mr. Ferrell even attempted to excuse himself from voting on the passage of the Limited Video Lottery Bill.  He simply did not exert undue influence in the passage of the Limited Video Lottery Act, as suggested in the PSR.

2.    The Dotsons Continue to Operate Gray Machines.

Mr. Ferrell objected to the PSR's omission of the fact that Bridget and Greg Dotson continue to operate the same gray machines that were operated by Mr. Ferrell in Kentucky.  In the stipulation of facts made part of the Plea Agreement, Mr. Ferrell and the Government agreed that the RICO conviction would be based in part on the operation of an illegal gambling business in Kentucky.  That illegal gambling business involved the operation of approximately 30 "gray machines."  Mr. Ferrell sold those "gray machines" to Bridget Dotson in early 2008.  Ms. Dotson continues to operate those machines in Kentucky with the full knowledge of law enforcement officials, and Greg Dotson currently services those machines.

Paragraph 33 of the PSR sets forth the relevant conduct associated with the illegal gambling business, but fails to make clear that the Dotsons continue to operate these same gray machines in the exact same location with the full knowledge of law enforcement officials.  Because this fact bears on the nature and seriousness of the RICO offense, Mr. Ferrell respectfully requests that the Court grant this objection and incorporate this fact into the PSR.

3.      The PSR fails to describe and take into account in sufficient detail Mr. Ferrell's <u>chronic and serious medical conditions.</u>

The PSR describes Mr. Ferrell's physical condition in Paragraphs 124 through 130.  Mr. Ferrell objected to the cursory description of Mr. Ferrell's serious medical conditions and the omission of descriptions of several important limitations caused by these conditions, which Mr. Ferrell faces on a daily basis.  A detailed picture of Mr. Ferrell's health issues is necessary for the Court, in considering sentencing options.  Should Mr. Ferrell be incarcerated, it is critical that this information be included in the PSR so that the Bureau of Prisons ("BOP") has a full understanding of the seriousness and complexity of Mr. Ferrell's medical conditions.  Mr. Ferrell therefore respectfully requests that the Court adopt the full and accurate description of Mr. Ferrell's medical condition in Section V(b) below as part of the PSR.

4.      <u>The Net Worth Analysis Fails to Account for a $4,900,000 Loan.</u>

The Net Worth Analysis states that the fair market value of Southern Amusement is $15,000,000, but fails to subtract from the fair market value a loan recently obtained by Southern Amusement in the amount of $4,900,000 to finance the renewal of its permits.[1]  It is estimated that Southern Amusement will commence payments on this loan in June 2011.  The fair market value of Southern Amusement should be decreased based on the amount of this loan.

5.      <u>The PSR Fails to Accurately State Mr. Ferrell's Monthly Cash Flow.</u>

The Monthly Cash Flow Analysis includes business income but does not include business loans paid by Mr. Ferrell and/or his wife.  Mr. Ferrell, his wife, and business entities owned separately by them have obtained several large loans to pay Mr. Ferrell's forfeiture and

---

[1] (Ex. A, 10/15/10 Change in Terms Agreement; Ex. B, 2/7/11 Promissory Note; Ex. C, 7/10/08 Change In Terms Agreement).  It is counsel's understanding that the loans associated with Exs. B & C do not change the value of Southern Amusement.  The documents are provided so the Court has a complete record of these loan transactions.  Mr. Ferrell will file a separate motion to seal these financial documents, and certain medical documents.  Should the Court grant the Motion to seal, those documents will be filed under seal with the Court.

restitution and to continue financing incomplete business developments. Those loans total $7,439,827 and have monthly payments of $65,185.[2] If business income in the Monthly Cash Flow analysis section is adjusted to account for these loan payments, Mr. Ferrell's monthly business income should be reduced to (-$25,719). This adjustment would decrease their total monthly cash flow to $40,161.[3]

The PSR also fails to adjust Mr. Ferrell's monthly cash flow by the amount he pays the Oaks each month to continue to fund construction. The Oaks is a retail development project in Logan, West Virginia. On average, Mr. Ferrell pays $59,336.63 each month to the Oaks so that the project can continue to be developed.[4] Due to the amount of outstanding debt already owed by the Oaks, failure to continue funding the project would be financially devastating and risk the loss of the dozens of jobs and income the completed project will provide. This adjustment would decrease the monthly cash flow to (-$19,176).

6. Mr. Ferrell disagrees with the conclusion in the PSR that an upward departure in Mr. Ferrell's fine is appropriate.

Mr. Ferrell objects to the Probation Officer's recommendation that the Court depart upward and fine Mr. Ferrell above the Guideline maximum of $75,000. In determining the amount of a fine, the Court shall consider "any restitution or reparation that the defendant has made or is obligated to make."[5] Pursuant to the plea agreement, Mr. Ferrell has already paid $527,540, which is the amount he gained, directly or indirectly, from his illegal conduct. He has

---

[2] These amounts include all loans listed in the "Additional Information" section of the PSR except for the Southern Amusement loans.

[3] The Probation Officer stated in his response to Mr. Ferrell's objections that he refused to include these loan payments in the Monthly Income Analysis because, among other things, "it appears the business should be making it's own payments, not the Ferrells" and that it is "unrealistic" that the Ferrells would have a negative cash flow "[b]ased on the assets and business ventures of the Ferrells." These conclusory comments disregard the fact that both the Ferrells and the businesses are accountable for these loans, and that they must be paid to avoid defaults.

[4] This average was determined at the time documentation was submitted to the Probation Officer. The Ferrells continue to make payments to continue the construction of the Oaks.

[5] U.S.S.G. ¶ 5E1.2(d)(4).

also paid restitution in an amount of $75,000 to the Internal Revenue Service, which represents the entire amount that was owed for taxes he failed to pay. Because he has already paid these stipulated amounts—exceeding $600,000 in total—Mr. Ferrell has already been disgorged of any gain from the offenses, and a fine within the Guideline range would be appropriate.

### III.      U.S.S.G. Mandated Procedure Used To Determine Sentence

The Supreme Court held in *United States v. Booker*, 543 U.S. 220 (2005), that the United States Sentencing Guidelines are no longer mandatory. The Supreme Court has subsequently confirmed that the Guidelines are only the "starting point and initial benchmark" in determining a proper sentence.[6] Relevant to the sentence sought by Mr. Ferrell, "a district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case 'outside of the heartland' to which the Commission intends individual Guidelines to apply."[7]

Following *Booker* and its progeny, courts have struggled to define the procedure that must be followed in applying the discretionary Guidelines. On November 1, 2010, the Sentencing Commission resolved a Circuit split on sentencing procedure by amending U.S.S.G. § 1B1.1, which now mandates a three-step sentencing process.

First, "[t]he court shall determine the kinds of sentence and the guideline range as set forth in the guidelines . . . by applying the provisions of [the United States Sentencing Guidelines Manual]."[8]

Second, "[t]he court shall . . . consider Parts H and K of Chapter Five, Specific Offender Characteristics and Departures, and any other policy statements or commentary in the guidelines

---

[6] *Gall v. United States*, 552 U.S. 38, 49 (2007).
[7] *Rita v. United States*, 551 U.S. 338, 352 (2007).
[8] U.S.S.G. § 1B1.1(a)

that might warrant consideration in imposing sentence."[9]

Finally, "[t]he court shall then consider the applicable factors in 18 U.S.C. 3553(a) taken as a whole" and vary from the guideline range if the court deems the individual circumstances sufficient to do so.[10]  In all cases, the court shall impose a sentence "sufficient, but not greater than necessary, to comply with the purposes of sentencing . . . ."[11]

Following this three-step process, Mr. Ferrell respectfully requests that the Court make the following findings in determining his sentence:

1.    Mr. Ferrell's total offense level is 20, which produces a guideline range of 33 to 41 months;

2.    Due to Mr. Ferrell's atypical and extraordinary health conditions, the Court should depart downward pursuant to U.S.S.G. § 5H1.4 and impose a sentence of probation to be served on home confinement;

3.    Should the Court elect not to depart downward pursuant to §5H1.4 or any other U.S.S.G. section or policy, the Court should impose a variant sentence based on Mr. Ferrell's health, age, character, personal history, and the nature of the offenses that would similarly impose a variant sentence of probation to be served on home confinement.

## IV.    <u>Mr. Ferrell's Guideline Calculations</u>

The parties, as a term of the plea agreement, stipulated to Mr. Ferrell's guideline calculations as follows:[12]

Count One of the Indictment (Racketeering):

<u>USSG § 2B1.1(a)</u>

Base Offense Level                        19

<u>USSG Chapter Three Adjustments</u>

---

[9] U.S.S.G. § 1B1.1(b).
[10] U.S.S.G. § 1B1.1(c).
[11] *See* Comments to U.S.S.G. § 1B1.1.
[12] The parties further stipulated, as required, that the court is not bound by the parties' agreement on guideline calculations.

Aggravating Role

USSG § 3B1.1                                         +4

Adjusted Offense Level                    23

Count Thirty-Seven of the Indictment (Willful failure to pay over employment taxes)

USSG § 2T4.1

Base Offense Level                        14

USSG Chapter Three Adjustments

None                                                  +0

Adjusted Offense Level                    14

**Combined Offense Level                  23**

The Probation Officer similarly found that Mr. Ferrell's combined offense level is 23. Based on Mr. Ferrell's acceptance of responsibility and timely entry of a plea of guilty, the Probation Officer recommended that Mr. Ferrell's offense level should be reduced three levels pursuant to U.S.S.G. § 3E1.1, resulting in a **total offense level of 20**.   A total offense level of 20 has a sentencing guideline range of 33-41 months.   The fine Guideline range is $7,500 to $75,000.

**V.      A Downward Departure Pursuant To §5H1.4 Is Warranted.**

Mr. Ferrell suffers from several serious and debilitating health conditions.  Based on these conditions and a recent amendment to U.S.S.G. § 5H1.4, Mr. Ferrell respectfully requests that the Court depart downward and impose a sentence of probation to be served as home confinement to allow Mr. Ferrell to continue to be treated and monitored by his treating physicians with the hope that he can slow down what has already been a precipitous decline in

his health and quality of life.[13]

> A.  *The Sentencing Commission Recently Amended U.S.S.G. §5H1.4 To Make Physical Condition More Relevant In Determining Whether A Sentencing Departure Is Appropriate.*

Prior to November 1, 2010, U.S.S.G. § 5H1.4 generally discouraged departures based on physical condition, but permitted downward departures in cases where "an extraordinary impairment" existed.  The former version of § 5H1.4 provided, in part:

> Physical condition, or appearance, including physique, <u>is not ordinarily relevant</u> in determining whether a departure may be warranted.  However, an extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.[14]

Even with the limiting language in the first sentence of § 5H1.4, however, the Fourth Circuit regularly found that district courts are authorized to depart from the Guidelines when a defendant suffered from an "extraordinary physical impairment."  For example, in *United States v. Jones*, the Fourth Circuit observed that "[w]here a defendant is unable, due to age and physical condition, to endure a sentence, the Guidelines do permit a downward departure."[15]

The Fourth Circuit upheld a downward departure pursuant to § 5H1.4 in *United States v. Greenwood*.[16]  In *Greenwood*, the district court departed downward and imposed a sentence of probation rather than imprisonment pursuant to § 5H1.4 because the Defendant had lost both of his legs below the knee. The Fourth Circuit upheld the departure and reasoned that a sentence of probation was appropriate because (i) incarceration would have jeopardized the defendant's

---

[13] Under 18 U.S.C. § 3561, a term of probation is statutorily available for Mr. Ferrell's offenses.  18 U.S.C. § 3563(19) further provides that home confinement is a discretionary term of probation.  *See also* U.S.S.G. 5F1.2 ("Home detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment.").

[14] (Emphasis added).

[15] 18 F.3d 1145, 1149 (4th Cir. 1994) (citing U.S.S.G. § § 5H1.1 and 5H1.4).

[16] 928 F.2d 645 (4th Cir. 1991).

treatment and (ii) "[c]onsideration of such an extraordinary medical problem in deciding to impose sentence other than imprisonment is specifically authorized by the Guidelines."[17]  While the Fourth Circuit upheld departures based on physical conditions prior to November 1, 2010, departures were only warranted when the defendant presented with an "extraordinary physical impairment."

Recognizing that courts were decreasing their reliance on departure provisions in the Guidelines Manual in favor of an increased use of variances, the Sentencing Commission recently reexamined Guideline departure provisions, including § 5H1.4.[18]  After "reviewing recent federal sentencing data, trial and appellate court case law, scholarly literature, public comment and testimony, and feedback in various forms from federal judges," the Sentencing Commission amended § 5H1.4 as follows to provide sentencing courts considerably more discretion to depart based on physical condition:

> Physical condition or appearance, including physique, <u>may be relevant</u> in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines.  An extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.[19]

As explained below, Mr. Ferrell's profoundly poor physical condition presents the unusual circumstances contemplated by the Sentencing Commission when it broadened courts' sentencing authority to depart downward based on physical condition.

### B.  Mr. Ferrell Suffers From A Myriad Of Chronic Health Conditions Requiring Constant Monitoring and Care.

---

[17] *Id.* at 645.
[18] U.S.S.G. § 5H1.4, Historical Note.
[19] (Emphasis added).

As detailed in the attached letters provided by Mr. Ferrell's health care providers and the Life Care Plan, Mr. Ferrell suffers from several chronic and debilitating medical conditions. These conditions have worsened considerably over the last few years as a result of Mr. Ferrell's diabetes and advanced cardiac condition. These conditions require extensive care and regular monitoring to maintain Mr. Ferrell's fragile health and to slow down the progression of his medical conditions.

**<u>Diabetes</u>**

Mr. Ferrell has had diabetes mellitus for approximately 10 years. While he was able to keep many of the common effects of diabetes in check for a number of years, this changed in 2004 when he underwent surgery and rehabilitation for the rupture of his right Achilles tendon.[20] Following this surgery, Mr. Ferrell lost much of his mobility and began to put on weight. Predictably, Mr. Ferrell's diabetes, coupled with his decreased mobility and increased weight, precipitated the onset and progression of many of the long-term complications typically associated with diabetes, including cardiovascular disease (both heart and vessel), peripheral vascular disease, neuropathy, eye disorders, and periodontal disease. These related issues are addressed separately below.

Like other diabetics, Mr. Ferrell faces a daily battle to control his diabetes to delay the further progression of diabetes-related complications. He tests his blood sugar two to three times daily using a diabetic tester, takes oral medications, and injects himself daily with insulin.[21] He also requires regular specialized foot care from a podiatrist to reduce the incidence of skin breakdown and infection (which he has already begun to experience in the form of a serious

---

[20] (Ex D, Dr. Cox 1/12/11 letter).
[21] (Ex. E, Life Care Plan, p. 3).

MRSA infection and other infections).[22]   According to Dr. Jeffrey Shook, Mr. Ferrell must soak his feet daily in lukewarm water with mild soap, wear specialized diabetic shoes and socks, and insert specialized padding in his shoes to prevent rubbing.[23]   Treatment of Mr. Ferrell's diabetes also requires a visit with an internist every 4-6 weeks and extensive semi-annual blood work.[24]

### Coronary Artery Disease

Mr. Ferrell has advanced coronary artery disease that has required frequent treatment and surgical procedures, including multiple heart catheterizations.[25]   In August 2010, Mr. Ferrell underwent a routine cardiac stress test that revealed evidence of myocardial ischemia.[26]   Based on this test result, Dr. Bassam Moushmoush, Mr. Ferrell's treating cardiologist, performed heart surgery on him, implanting a stent.[27]   He currently has a 40% to 70% stenosis in his left circumflex artery that will most likely need to be stented.[28]

According to Dr. Moushmoush, Mr. Ferrell continues to suffer symptoms of sharp chest pain and tiredness.[29]   Dr. Moushmoush has also opined that Mr. Ferrell "is at high risk for [a] cardiac event including heart attack and death considering the underlying coronary artery disease and stent placement" and, as a result, that he "needs to be monitored closely for his strength and underlying coronary artery disease."[30]   Mr. Ferrell remains on Plavix and other medications as a result of his surgical procedure and heart condition.   He also receives regular stress tests to monitor his cardiac condition.

---

[22] (Ex. F, Dr. Shook 2/11/11 letter, p. 5).
[23] (*Id.*).
[24] (Ex. E, Life Care Plan, p. 3).
[25] (Ex. G, Dr. Mullen 3/14/11 letter, p. 2).
[26] (Ex. H, Dr. Moushmoush 1/17/11 letter).
[27] (*Id.*).
[28] (Ex. G, Dr. Mullen 3/14/11 letter, p. 3).
[29] (Ex. H, Dr. Moushmoush 1/17/11 letter).
[30] (*Id.*).

## Severe Diabetic Neuropathy

While all of Mr. Ferrell's diagnoses are significant and limiting, the pain associated with his severe diabetic neuropathy has the most profound effect on his daily living.[31] Severe Diabetic Neuropathy is a nerve disorder caused by diabetes.  The National Institute of Neurological Disorders and Strokes explains that neuropathic pain is difficult to control and can seriously affect emotional well-being and overall quality of life.[32]  It is often worse at night, which disrupts sleep and contributes to the emotional issues associated with sensory nerve damage.[33]

Mr. Ferrell's neuropathic pain is constant.[34]  Dr. Shook has commented that Mr. Ferrell has "frequent bouts of severe pain associated with his diabetic neuropathy."[35]  As a result of his neuropathic pain, Mr. Ferrell's daily activities are limited and simple tasks take an inordinate amount of time to complete.  Stiffness and pain in his legs and feet result in Mr. Ferrell requiring up to four hours to get moving in the morning, with the pain being so severe on some days that he is not able to get out of bed.[36]  His neuropathy has also resulted in a loss of sensation in his extremities, leaving him at increased risk for serious infections.[37]  According to Dr. Shook, "[t]here must be constant assessment of shoes and pedal skin to avoid pressure points which can lead to infection."[38]

Mr. Ferrell's Severe Diabetic Neuropathy requires daily use of opiate pain medications.[39] Due to the frequency and severity of Mr. Ferrell's bouts of neuropathic pain, his health care

---

[31] (Ex. E, Life Care Plan, p. 5).
[32] (*Id.*).
[33] (*Id.*).
[34] (*Id.*).
[35] (Ex. F, Dr. Shook 2/11/11 letter, p. 5).
[36] (Ex. E, Life Care Plan, p. 5).
[37] (Ex. F, Dr. Shook 2/11/11 letter, p. 5).
[38] (*Id.*).
[39] (*Id.* at 4).

providers must frequently modify his medications.[40]   "If treatment modification is not completed in a prompt time frame, then Mr. Ferrell will experience more intense and longer lasting discomfort associated with a particular pain episode."[41]

As a result of his severe diabetic neuropathy and other pain-causing conditions described herein, Mr. Ferrell requires a Tempurpedic mattress for pain relief; grab bars, a bath seat, and a hand held shower for safety during bathing; and, on occasion, a wheelchair or electric scooter.[42] In part due to his severe diabetic neuropathy, it is anticipated that Mr. Ferrell will be confined at some time to a wheelchair.

### Chronic Lumbar Back Pain

Mr. Ferrell's chronic lumbar back pain significantly contributes to the functional limitations caused by his severe diabetic neuropathy.  He has long suffered from chronic lumbar pain with radicular pain into his buttocks and legs.[43]  This pain is so severe that he has been on chronic narcotic pain management for years.[44]

Due to Mr. Ferrell's cardiac condition, he is exceptionally limited in the types of surgical procedures that presently can be performed on his back.[45]  Although a spinal cord stimulator would likely provide some relief for Mr. Ferrell's chronic back pain, a stimulator cannot be implanted at this time due to the blood thinners he must take due to his cardiac condition.[46]  As a result, Mr. Ferrell must resort to chronic narcotic pain management to control his lumber back pain.[47]   His pain management program is limited to oral pain management medications and

---

[40] (*Id*.).
[41] (*Id*.).
[42] (*See*, Ex. E, Life Care Plan, p. 5).
[43] (Ex. I, Dr. Bowman 3/17/11 letter, p.1).
[44] (*Id*..).
[45] (*Id*.).
[46] (*Id*.).
[47] (*Id*. at p. 2).

regular sacroiliac joint injections.[48]   Mr. Ferrell's limitations in treatment options have "significantly impaired [his] ability to ambulate and to perform activities of daily living."[49]

Because of the length of time Mr. Ferrell has been on chronic narcotic management, he has developed a narcotic tolerance.[50]  Dr. Richard Bowman predicts that Mr. Ferrell will have to resort to a pump for his narcotic medications as he requires even higher doses of pain medication.[51]   According to Dr. Bowman, it would be "highly improbable and nearly impossible" for Mr. Ferrell to stop taking narcotics and have a reasonable quality of life.[52]  Due to his long-term need for pain medication, Mr. Ferrell receives laboratory blood work and drug screenings every six weeks to monitor drug use and related complications.[53]

**Right Ankle Tibialis Posterior Tendon Dysfunction**

Mr. Ferrell suffers from right ankle tibialis posterior tendon dysfunction.[54]   This condition is the result of attenuation and tearing of his tibialis posterior tendon and has resulted in the significant abduction of his foot (his right foot points further to the right and away from the midline of his body), which causes severe pain and an unstable gait.[55]  As a result of this abnormality, Mr. Ferrell has developed an adult acquired pes lanus deformity (acquired flatfoot).[56]

Due to increased pressure in certain areas of the foot, this condition has caused the breakdown of Mr. Ferrell's skin at pressure points.[57]  This increased pressure and resulting skin

---

[48] (*See* Ex. I, Dr. Bowman 3/17/11letter, p.1; Ex. J Dr. Bowman 9/2/10 treatment note; Ex. K, Dr. Bowman 4/6/11 treatment note).
[49] (Ex. F, Dr. Shook 2/11/11 letter, p. 5).
[50] (Ex. I, Dr. Bowman 3/17/11letter, p.1).
[51] (Ex. J, Bowman 9/2/10 treatment note).
[52] (Ex. I, Dr. Bowman 3/17/11 letter, p.1).
[53] (Ex. E, Life Care Plan, p. 5).
[54] (Ex. F, Dr. Shook 2/11/11 letter, p. 5).
[55] (*Id*. at p. 3).
[56] (*Id*.).
[57] (*Id*.).

breakdown is a serious condition for Mr. Ferrell because it increases his risk of diabetes-related infections.  In fact, as explained, Mr. Ferrell has suffered a number of such infections, including a recent infection between his fourth and fifth toes that required treatment with antibiotics and local wound care.[58]

Mr. Ferrell's ankle and foot deformity also increases his cardiac risk.  According to Dr. Shook, Mr. Ferrell's impaired ability to ambulate decreases his cadence and stride length.[59]  In turn, his body must work harder to perform seemingly ordinary tasks, which places an increased workload on his cardiovascular system.[60]

Dr. Shook has opined that Mr. Ferrell's right ankle condition presents a "significant" disability that affects his ability to function on a day-to-day basis.[61]  He has recommended surgery in the near future to treat this condition.[62]  The surgery would essentially realign his subtalar joint and fuse his joint in a correct position via screw fixation.[63]  While surgery will not entirely correct the condition, it should improve it.  This surgery will be followed up by a 10-week period during which Mr. Ferrell will not be able to place any weight on his right foot. This period will be followed up by a four- to six-week period during which Mr. Ferrell will transition from a cast to his normal orthopedic footwear.[64]  If surgery is delayed, Mr. Ferrell will need much more extensive surgical repair in the future, including a possible fusion of the ankle.[65]  To date, surgery has been delayed as a result of Mr. Ferrell's cardiac condition.

---

[58] (*Id*.).
[59] (*Id*. at p. 5).
[60] (*Id*.).
[61] (*Id*. at p. 3).
[62] (*Id*. at p. 4).
[63] (*Id*. at p. 3).
[64] This information was conveyed by Dr. Shook to counsel.
[65] (Ex. E, Life Care Plan, p. 6).

**<u>Left Ankle Problems</u>**

Mr. Ferrell's left ankle is also significantly compromised.   In 2004, Mr. Ferrell had surgery to repair a full thickness Achilles rupture.[66]  This surgical procedure left Mr. Ferrell with "considerably less than normal" functional motion in his left ankle.[67]   Mr. Ferrell also has a diagnosis of advanced posttraumatic arthritis in his left ankle that has caused significant pain and swelling and limited ambulation.[68]   This injury and other degenerative changes in his left ankle have affected his gait and the overall function of the ankle and require continual treatment.[69]   In the last six months, Dr. Shook has injected Mr. Ferrell's left ankle on two occasions to relieve pain.

**<u>Severe Venous Stasis</u>**

Mr. Ferrell has also been diagnosed with severe venous stasis.  Severe venous stasis is a condition that occurs when the venous wall in the legs are not working effectively, making it difficult for blood to circulate.[70]   In Mr. Ferrell's case, the failure of the blood to circulate has caused the "pooling" of blood in his legs, resulting in hair loss and swelling and discoloration of his legs.[71]   Mr. Ferrell must wear JOBST stockings on both legs to control the effects of his severe venous stasis.[72]

---

[66] (Ex D, Dr. Cox 1/12/11 letter).
[67] (*Id*.).
[68] (*Id*.).
[69] (Ex. F, Dr. Shook 2/11/11 letter, p. 4).
[70] (Cleveland Clinic website,
http://my.clevelandclinic.org/disorders/venous_insufficiency/hvi_chronic_venous_insufficiency.aspx).
[71] (Ex. G, Dr. Mullen 3/14/11 letter, p. 3).
[72] (Ex. F, Dr. Shook 2/11/11 letter, p. 4).

**Dental Problems**

Mr. Ferrell has extensive dental issues that are complicated by his diabetes and his heart condition.[73]  He has at least three teeth that are badly deteriorated and unrestorable, two of which were only recently discovered.[74]  These teeth serve as abutments for fixed dental bridges.[75]  According to Dr. John Falbo, Mr. Ferrell's dentist, Mr. Ferrell's "dental needs have become secondary to his complicated medical condition."[76]  Dr. Falbo also opined that Mr. Ferrell's recently discovered dental problems "complicate [his] dental treatment but also serve as a major complication in his already delicate medical condition."[77]  Mr. Ferrell's dental health will require "constant vigilance" in order for it to become stable.[78]

**Cataracts, Diabetic Retinopathy, and Diabetic Macular Edima**

People with diabetes are at high risk of developing eye complications.[79]  Consistent with Mr. Ferrell's stage of diabetes, he has been diagnosed with cataracts, diabetic retinopathy, and diabetic macular edema.[80]  These disorders are in varying stages of progression.

Mr. Ferrell's cataracts are relatively mild and at this time and only require ongoing monitoring.[81]  However, diabetics that develop cataracts tend to have them develop faster than non-diabetics.[82]

More importantly, Mr. Ferrell has also been diagnosed with diabetic retinopathy and

---

[73] (Ex. L, Dr. Falbo 12/9/10 letter).
[74] (Ex. L, Dr. Falbo 12/9/10 letter; Ex. M, Dr. Falbo 4/11/11 letter).
[75] (Ex. M, Dr. Falbo 4/11/11 letter).
[76] (Ex. L, Dr. Falbo 12/9/10 letter).
[77] (Ex. M, Dr. Falbo 4/11/11 letter).
[78] (Ex. L, Dr. Falbo 12/9/10 letter).
[79] American Diabetes Association website, http://www.diabetes.org/living-with-diabetes/complications/eye-complications/.
[80] (Ex. N, Dr. White letter; Ex. O, Dr. Hatfield 11/29/10 treatment note).
[81] (*Id*.).
[82] American Diabetes Association website, http://www.diabetes.org/living-with-diabetes/complications/eye-complications/.

diabetic macular edema.[83]     Diabetic retinopathy is an eye disease caused by changes in the blood vessels to the retina.[84]  Mr. Ferrell's diabetic retinopathy has advanced to a moderate stage meaning that some blood vessels that nourish the retina are currently blocked.[85]  Over time this condition can worsen and cause vision loss.[86]  He has also been diagnosed as suffering from low grade diabetic maculopathy with retinal leakage.[87]   In general, these conditions require close monitoring and often require frequent treatment with lasers and ocular injections.[88]

### Additional Medical Issues

Undersigned counsel has focused on the 11 previously-described diagnoses that most severely affect Mr. Ferrell's quality of life and that require constant vigilance to prevent further progression of these issues.  Mr. Ferrell, however, suffers from several additional medical issues that also impair his quality of life and require regular care and monitoring.  These additional conditions include hypertension, hyperlipidemia, anemia, peripheral vascular disease, osteoarthritis, benign prostatic hypertrophy, anxiety and depression, gout, and gastric-esophageal reflux.[89]  The brevity with which these conditions have been addressed is not meant to understate their seriousness.

### Summary of Mr. Ferrell's Medical Conditions

As a result of Mr. Ferrell's diabetes and related complications, his advanced coronary artery disease, and his constant and severe pain, his health has steadily declined in the last half decade.  His present state of health is such that he has no fewer than 19 diagnoses for serious medical conditions, each of which requires frequent monitoring and treatment. He currently takes

---

[83] (Ex. N, Dr. White letter; Ex. O, Dr. Hatfield 11/29/10 treatment note).
[84] *See* National Eye Institute website, http://www.nei.nih.gov/health/diabetic/retinopathy.asp.
[85] (*Id.*).
[86] (*Id.*).
[87] (Ex. N, Dr. White letter; Ex. O, Dr. Hatfield 11/29/10 treatment note).
[88] (Ex. N, Dr. White letter).
[89] (Ex. E, Life Care Plan, p. 2).

25 different medications[90] on a daily basis to lessen his pain and to slow the progression of several of his chronic and life-threatening conditions.  These medications, however, only in part address Mr. Ferrell's medical issues.  Despite the best efforts of his team of physicians and the pharmaceutical cocktail he has no choice but to consume every day, he remains at high risk for a cardiac event, faces the inevitable worsening of his diabetes (and its predictable long-term complications), has exceptionally limited mobility, and suffers from constant and severe pain.  He has little hope of these conditions improving, and, in all likelihood, they will worsen.  This prospect has caused Mr. Ferrell to suffer from chronic depression and anxiety.

Importantly, the medications Mr. Ferrell takes are only the "tip of the iceberg" with respect to his well-documented regimen of medical treatment.  According to Ms. Riddick-Grisham, a life care planner, Mr. Ferrell's medical team must "work collaboratively to manage his medical conditions."[91]  She summarizes the medical care he needs as follows:

> It is essential that he have access to the types of specialists who are currently managing his care, and that care and treatment must be well coordinated and communicated with each of his providers. Each of his medical conditions is impacted by the other co-morbid conditions and coordinated care is needed to avoid emergent complications.[92]

To date, Mr. Ferrell has received the frequent treatment and collaboration that Ms. Riddick-Grisham contemplated in the Life Care Plan.  Between September 1, 2010, and April 6, 2011, Mr. Ferrell saw seven different doctors (mostly specialists) on a total of 49 separate

---

[90] Mr. Ferrell currently takes the following daily medications:  Aprazolam (anti-anxiety); Lipitor (cholestoral); Plavix (prevention of blood clots); Glucotrol XL (diabetes); Janumet (diabetes); Levemire Flex Pen (diabetes); Cymbalta (depression); Flomax (improve urination); Klorcon (hypertension); Cozaar (hypertension); Zyloprim (gout); Mobic (pain); Lyrica (neuropathic pain); Opana (pain); Azasite 1% OH Sol 2 (pain); Oxycontin 40 mg (pain); Senekot-S-4 (neuropathic pain); Neurolieve vitamins (neuropathic pain); Ranitidine (gastric reflux); Ambien CR (sleep); Lidoderm patch 5% (eye antibiotic); Augmenten (dental abscess antibiotic); diabetic foot release cream (foot care); and aspirin (stroke prevention).

[91] (Ex. E, Life Care Plan, p. 2).

[92] (Ex. E, Life Care Plan, p. 2).

occasions.[93]   His doctors have risen to the occasion and have worked closely with each other to ensure that he has received the proper medications and treatment.

The extraordinary cost of Mr. Ferrell's health care and medications is also relevant to sentencing decisions.   According to Ms. Grisham, Mr. Ferrell's medications alone cost approximately $6,195 per month.[94]   When medication costs are added to the costs of his medical treatment and other medical supplies, she estimates that his total medical costs over the next three years will exceed $248,000.[95]

3.   *Home Confinement Would Comport With The Sentencing Policy Set Forth In Revised § 5H1.4.*

Revised § 5H1.4 now provides that physical condition "may be relevant in determining whether a departure is warranted" if the condition is "present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines."   That revised Guideline policy further provides:   "An extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment."

Due to the complex and serious nature of Mr. Ferrell's medical conditions, they present themselves to such an "unusual degree" that they should be deemed relevant in determining whether a departure is warranted.   Moreover, considered together, his medical conditions rise to the level of an "extraordinary physical impairment" that warrants a departure that would allow Mr. Ferrell to remain on home confinement for at least three reasons.

First, while the federal prison system and federal medical facilities strive to meet the

---

[93] (Ex. P, List of Doctor Appointments).
[94] (Ex. E, Life Care Plan, p. 2).
[95] (*Id*. at p. 8).This estimate excludes the cost of dental surgery, right foot/ankle x-rays, right foot surgery, possible implantation of a spinal cord stimulator, and the possible assistance of a care giver.   Ms. Riddick-Grisham estimates that these costs would add more than $150,000 to Mr. Ferrell's anticipated medical costs.

medical needs of incarcerated individuals, Mr. Ferrell's complex conditions can be best addressed through continued care from his current health care professionals who already understand the extent and nature of Mr. Ferrell's conditions and have already developed treatment plans.

Second, § 5H1.4 contemplates home confinement in circumstances where a physical impairment would be as efficient, and less costly, than traditional incarceration. That would undoubtedly be true in this case, where Mr. Ferrell's costs of treatment over the next three years could easily exceed $250,000.

Third, it is reasonably expected that Mr. Ferrell's quality of life will continue to decline due to the advancing nature of his medical conditions. The burden of imprisonment would be far more onerous upon Mr. Ferrell than a person with more normal health. Compared to alternative restrictions on his liberty like home confinement, incarceration will almost undoubtedly precipitate an even more rapid decline in his health.

For these reasons, Mr. Ferrell respectfully requests that the Court depart downward pursuant to the Sentencing Guideline policy set forth in § 5H1.4 and impose a sentence of probation with a term of home confinement.

### VII.    In The Alternative, 18 U.S.C. § 3553(a) justifies a Variant Sentence.

Should the Court decline to depart downward pursuant to the policy set forth in § 5H1.4, Mr. Ferrell respectfully moves the Court for a sentencing variance pursuant to the factors set forth in 18 U.S.C. § 3553(a). Based on Mr. Ferrell's personal history, his character, his health, and the nature of the offense, the circumstances of this case are "outside of the heartland" for which the Guidelines are intended to apply, and a variant sentence including a component of

home confinement would be warranted.[96]   The following 18 U.S.C. § 3553(a) factors are relevant and support a finding for a sentence variant.

      A.     Section 3553(a)(1) -  The nature and circumstances of the offense and the history and characteristics of the defendant.

      *1.     Mr. Ferrell's Personal History*

Mr. Ferrell was born and raised in Logan County, West Virginia.  His parents separated when he was young, and he and his younger brother were raised by his mother.  Mr. Ferrell's childhood was difficult as a result of financial pressures his mother faced trying to raise two young sons as a single mother in Southern West Virginia.  When Mr. Ferrell was in the eighth grade, he decided to drop out of school and enter the work force so that he could help his mother pay the bills and feed his family.  As William L. Williams, Jr., a former teacher of Mr. Ferrell's, explained in his letter to the Court, "I watched Joe C. develop from a young man, who came from a broken home, who dropped out of Logan High School [which then included 8th grade], and at that time became the main supporter of his mother and younger brother."[97]  For a number of years, he continued in the roles of primary breadwinner for his family and as a caretaker for his younger brother.

When Mr. Ferrell was 24, he began working for himself.  Given that his education remains limited and, as a result, he has difficulty reading, he has had extraordinary success as a businessman.  He has owned a number of businesses including a car dealership, a coal mining company, a trucking company, retail establishments, and property developments.  These legitimate businesses have employed dozens, if not hundreds, of individuals in Southern West

---

[96] *See Rita*, 551 U.S. at 350.
[97] (Ex. Q, Mr. Williams 4/11/11 Letter; See also Ex. R., Rev. White 2/10/11 Letter ("Joe and his brother Mike had a wonderful mother but not the best of fathers. The family was very poor when Joe and Mike were growing up.  Since that time of hardship, both have done very well as successful businessmen, and Joe as a strong politician")).

Virginia.

In 1995, Mr. Ferrell's wife, Vickie Ferrell, and Eddie Canterbury purchased Southern Amusement Company with money borrowed from local banks and the former owners. These debts were dutifully paid off. From 1995 until recently, Mr. Ferrell was involved in the operation of Southern Amusement. Vickie Ferrell currently owns all outstanding shares of Southern Amusement stock. In 2001, after the passage of the West Virginia Video Lottery Act, Southern Amusement bid on and was awarded permits to operate LVL machines.

Through Southern Amusement's operation of LVL machines, it has made substantial contributions to the economy of West Virginia. Over the last six years alone, Southern Amusements' regulated operation of legal LVL machines has resulted in payments of: (i) $71,857,244 in West Virginia Lottery Tax; (ii) $36,166,758.31 to private retailers for their location share of revenue; (iii) $1,437,143 to counties for their share of the Lottery tax; (iii) and $435,976 to counties for property taxes on the video terminals. The following table illustrates these substantial contributions to West Virginia's economy:

| YEARS | WV Lottery Tax and Fees | Location Share of Revenue | County Share of Lottery Tax | County Property Taxes on Video Terminals |
|---|---|---|---|---|
| 2005 | $9,160,597.86 | $5,436,680.00 | $183,211.96 | $49,197.99 |
| 2006 | $10,019,511.79 | $5,606,874.00 | $200,390.24 | $51,900.41 |
| 2007 | $11,503,371.49 | $5,831,563.55 | $230,067.43 | $126,348.77 |
| 2008 | $12,654,959.95 | $6,179,858.71 | $253,099.20 | $ 95,625.17 |
| 2009 | $14,616,910.44 | $6,750,366.00 | $292,338.21 | $65,905.00 |
| 2010 | $13,901,893.25 | $6,361,416.05 | $278,036.65 | $46,999.01 |
| TOTAL | $71,857,244.78 | $36,166,758.31 | $1,437,143.69 | $435,976.35 |

Additionally, Southern Amusement's legitimate business operations provide jobs, directly or through retailers operating its LVL machines, for approximately 640 individuals in southern West Virginia.[98]

---

[98] Mr. Ferrell's Limited Video Lottery machines are operated in approximately 125 establishments. Each

Mr. Ferrell has also made substantial contributions to the local economy and the development of the Logan County area through the leadership role he played in the start up of the Logan County Airport and as the former chairman of the Logan County Airport Authority. As local pilot Denver Stacy stated in his letter to the Court: "[t]he airport, opened on a reclaimed strip mine in Stollings, WV, has greatly improved the safety of aviation in the coalfields of West Virginia and has undoubtedly prevented many tragedies."[99]

In sum, although Mr. Ferrell has transgressed the law (for which he has fully accepted full responsibility), he has also managed—through legitimate means—to overcome the dire financial circumstances he faced as a child to become a successful businessman. His legitimate businesses have made substantial contributions to local development and the West Virginia economy as a whole.

2.      *Mr. Ferrell's Character*

While Mr. Ferrell has succeeded in business, he has not forgotten what it means to be poor in Southern West Virginia. As described in the letters written in his support, Mr. Ferrell has given generously to individuals in need in his community. As Stan Morgan states in his letter, "Mr. Ferrell has been a very generous person to the people of Logan County. In our community, it is a well-known fact, that Mr. Ferrell is a generous donor and that if a church, civic organization, school or family is in need of help, whether monetarily or otherwise, Mr. Ferrell has always been there to lend a hand."[100]   He further states:  "I feel that there is a side to Mr. Ferrell that is not generally known by people outside Logan County; he is very generous, he is

---

of those establishments employs approximately 5 employees.  Southern Amusement itself employs 15 employees.
[99] (Ex. S, Mr. Stacy 2/3/11 letter).
[100] (Ex. T, Mr. Morgan 2/22/11 letter).

extremely compassionate and he is an immensely charitable person."[101]

In a conversation with counsel, Stan Morgan gave a pertinent example of Mr. Ferrell's generosity.  He explained that on one occasion, Mr. Ferrell saw a young child without a coat on a cold, wet day.  Mr. Ferrell approached Mr. Morgan and gave him a $100 bill.  He asked Mr. Morgan to use the money to buy the young child a coat but implored him not to let anyone know that Mr. Ferrell had given him the money to do so.

Mr. Stacey, in his letter, further explained the quiet nature with which Mr. Ferrell provided support to those in need:  "Mr. Ferrell has shown incredible generosity towards local families with medical conditions in dire need of air travel.  Upon learning of medical conditions affecting children or adults, Mr. Ferrell has on many occasions anonymously covered the expenses to have me fly them to hospitals around the country."[102]

Tim DiPiero, attorney and board member of the Charleston Chapter of the Fellowship of Christian Athletes, similarly commented in his letter to the Court:  "For the past few years, Mr. Ferrell has been one of our largest supporters.  Whenever I have called upon him for contributions on some of our special projects, he has responded favorably and given generously. He has never told me, 'no!'"[103]

Upon reviewing the letters in support of Mr. Ferrell in their totality, they tell a story of a man who has succeeded in life but has not forgotten what it is like to struggle to put food on the table or to meet other basic needs.  Whenever possible, Mr. Ferrell has assisted others in his community who face the same struggles he faced as a child and a young man.

---

[101] (*Id.*).
[102] (Ex. S, Mr. Stacy 2/3/11 letter).
[103] (Ex. U, Mr. Dipiero 4/21/11 Letter).

3.      *Nature of the Offenses*

Mr. Ferrell fully accepts responsibility for his illegal conduct.  However, the nature of the offenses provides additional support for a variant sentence.

a.      18 U.S.C. § 1962(c) (RICO)

All RICO convictions are serious offenses.  However, in this case, the conduct upon which Mr. Ferrell's RICO conviction is based makes his offense "outside of the heartland" of the typical RICO conviction.

In the stipulation of facts, Mr. Ferrell and the Government agreed that the RICO conviction would be based on part of Racketeering Act 11 and on Racketeering Act 12.  With respect to Racketeering Act 11, Mr. Ferrell stipulated that he engaged in an illegal gambling business in Kentucky.  That illegal gambling business involved the operation of approximately 30 "gray machines" in Kentucky.

It is undersigned counsel's understanding that "gray machines" in Kentucky are viewed by law enforcement officials in the same way that "gray machines" in West Virginia were viewed prior to the passage of the Limited Video Lottery Act.  They were tolerated by law enforcement officials, and individuals were rarely, if ever, prosecuted.[104]  The fact that the Dotsons continue to operate the exact same gray machines upon which Mr. Ferrell's RICO charge is based—in the same establishment—with the full knowledge of law enforcement officials supports this conclusion.  While Mr. Ferrell's operation of the gray machines was a violation of Kentucky law, the circumstances surrounding the operation of those machines—in an admittedly gray area of the law—is  distinguishable from typical racketeering activity.

---

[104] Counsel could not find a single published opinion that has cited the relevant Kentucky Statutes dealing with "gambling devices" since 1973.

Racketeering Act 12 is based on the illegal bribery of a West Virginia state official.  This Racketeering Act is specifically based on money given to Carolyn Kitchen when she worked as a West Virginia Lottery Investigator.  Mr. Ferrell fully accepts that he violated West Virginia law and Lottery policy by giving Ms. Kitchen cash, but two circumstances similarly make this Racketeering Act outside of the Sentencing Guideline "heartland."

First, as set forth in Mr. Ferrell's stipulation of facts, he knew Ms. Kitchen for a long period of time before she became a Lottery Inspector.  During this time, Mr. Ferrell regularly gave her small gifts and treated her to dinners.  After she became a Lottery Inspector, he continued this practice.  Although he knew that she was not permitted to accept gifts, he made a serious error of judgment and continued to give her cash gifts in violation of the law so that she would make herself available to service his machines.  Although this conduct violated the law, this factor distinguishes this case from other bribery cases where defendants did not have preexisting relationships with the individuals who accepted money.

Second, regardless of whether Ms. Kitchen received money from Mr. Ferrell, she was on call at all times and obligated to service his machines 24 hours a day, seven days a week.  Consequently, the State of West Virginia had no actual losses associated with the occasions Ms. Kitchen serviced Mr. Ferrell's machines after hours and failed to seek overtime.  In fact, if Southern Amusement's revenue increased as a result of Ms. Kitchen's availability to service the LVL machines, the State of West Virginia likewise benefited through an increase in its share of Lottery revenue.

These acts, while they contravened 18 U.S.C. § 1962(c), are not as egregious as typical racketeering activity.  Accordingly, Mr. Ferrell's conduct falls "outside of the heartland," making a variance appropriate in this case.

       b.      26 U.S.C. § 7202(a)(2) (failure to collect and pay employment taxes)

Mr. Ferrell pled guilty to failing to collect and pay over $75,000 in payroll taxes. He has fully accepted responsibility for this conduct by pleading guilty and paying $75,000 in restitution to the Internal Revenue Service. Importantly, this offense considered alone has a much lower Guideline range than the RICO offense, with a Guideline range of only 10-16 months.[105] Should the Court elect not to depart pursuant to § 5H1.4, Mr. Ferrell respectfully requests that the Court, in considering whether to impose a variant sentence, take into account the nature of this tax offense and the fact that Mr. Ferrell has fully paid his restitution.

       B.      18 U.S.C. 3553(a)(2)(D) – The need for the sentence imposed to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner possible.

As explained at length, Mr. Ferrell suffers from a number of debilitating medical conditions that require frequent and expensive medical care and monitoring. For all of the reasons discussed herein, a sentence with a component of home confinement would be the most effective manner in which Mr. Ferrell could continue to receive the medical care necessary from his team of health care providers for him to avoid the acceleration of his chronic and serious medical conditions.

## VIII.   Conclusion

Mr. Ferrell has recently experienced a significant decline in his quality of life as a result of the progression of his diabetes, his advanced cardiac condition, and his other chronic and painful medical conditions. The exceptional medical care he has received from his team of doctors has undoubtedly staved off a more rapid decline in his fragile medical condition. So that he can continue to receive the same quality of healthcare from the medical care providers who

---

[105] The total offense level after acceptance of responsibility would be 12.

are already familiar with his complex medical conditions, Mr. Ferrell respectfully requests that the Court depart downward and sentence him to a term of probation to be served on home confinement.  This approach would remove from the Government the very significant burden of maintaining Mr. Ferrell's medical regimen while nonetheless making clear to Mr. Ferrell and the rest of the community that illegal acts have serious consequences.  In the alternative, Mr. Ferrell respectfully requests that the Court impose a variant sentence with a component of home confinement that would give him access to the medical care he needs.

**Respectfully submitted,**
**Joseph Cleveland Ferrell**
**By Counsel,**

*/s/Benjamin L. Bailey*
Benjamin L. Bailey (VVV Bar ID # 200)
Christopher S. Morris (WV Bar ID # 8004)
Rodney A. Smith (WV Bar ID # 9750)
Bailey & Glasser, LLP
209 Capitol Street
Charleston, West Virginia 25301
(304) 345-6555
(304) 342-1110 *facsimile*
*Counsel for Joseph Cleveland Ferrell*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### AT CHARLESTON

**UNITED STATES OF AMERICA**

**V.**                                              **Criminal No. 2:09-00137**

**JOSEPH CLEVELAND**
**FERRELL and**
**SOUTHERN AMUSEMENT CO., INC.**

### <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies the **"DEFENDANT JOSEPH C. FERRELL'S SENTENCING MEMORANDUM"** was served upon counsel of record, via the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following counsel of record on this 26th day of April, 2011:

> Hunter P. Smith, Jr., Esq.
> Assistant U. S. Attorney
> 4000 United States Courthouse
> 300 Virginia Street, East
> Charleston, West Virginia 25301

> <u>*/s/Benjamin L. Bailey*</u>
> Benjamin L. Bailey (WV Bar ID # 200)