




# THE FEDERAL BUREAU OF PRISON'S EFFORTS TO MANAGE INMATE HEALTH CARE

U.S. Department of Justice
Office of the Inspector General
Audit Division

Audit Report 08-08
February 2008



# THE FEDERAL BUREAU OF PRISONS' EFFORTS TO MANAGE INMATE HEALTH CARE

## EXECUTIVE SUMMARY

The Federal Bureau of Prisons (BOP) is responsible for confining federal offenders in prisons that are safe, humane, cost-efficient, and secure.  As part of these duties, the BOP is responsible for delivering medically necessary health care to inmates in accordance with applicable standards of care.

As of November 29, 2007, the BOP housed 166,794 inmates in 114 BOP institutions at 93 locations.[1]  During FY 2007, the BOP obligated about $736 million for inmate health care.  The BOP provides health care services to inmates primarily through:  (1) in-house medical providers employed by the BOP or assigned to the BOP from the Public Health Service, and (2) contracted medical providers who provide either comprehensive care or individual services.

To control the rising cost of health care, since the early 1990s the BOP has implemented initiatives aimed at providing more efficient and effective inmate health care.  The BOP's on-going initiatives include assigning most inmates to institutions based on the care level required by the inmate, installing an electronic medical records system that connects institutions, implementing tele-health to provide health care services through video conferencing, and implementing a bill adjudication process to avoid costly errors when validating health care-related invoices.  We include a discussion of these cost-cutting initiatives and the effect the initiatives have had on controlling inmate health care costs in the Findings and Recommendations section of this report.

**OIG Audit Approach**

The Department of Justice Office of the Inspector General (OIG) initiated this audit to determine whether the BOP:  (1) appropriately contained health care costs in the provision of necessary medical, dental, and mental health care services; (2) effectively administered its medical

---

[1]  Appendix V contains a list of the Bureau of Prisons (BOP) institutions.  The BOP housed an additional 33,354 inmates in privately managed, contracted, or other facilities. For the purposes of this audit, we focused on the medical care provided to inmates housed in BOP facilities.

services contracts; and (3) effectively monitored its medical services providers.

We performed audit work at BOP headquarters and at the following BOP institutions:  the United States Penitentiary (USP) Atlanta (Georgia), USP Lee (Virginia), Federal Medical Center (FMC) Carswell (Texas), Federal Correctional Complex (FCC) Terra Haute (Indiana), and FCC Victorville (California).  In addition, we surveyed the 88 BOP locations where we did not perform on-site work.  The details of our testing methodologies are presented in the audit objectives, scope, and methodology contained in Appendix I.

This audit report contains 3 finding sections.  The first finding discusses the BOP's efforts to contain the growth of health care costs and to deliver necessary health care to inmates in a cost-effective manner.  The second finding discusses the BOP's administration of medical services contracts.  The third finding discusses the BOP's efforts to monitor its medical services providers, both in-house and contract staff.

**Results in Brief**

We found that the BOP has implemented or begun numerous cost containment initiatives since fiscal year (FY) 2000 that appear to have helped it contain inmate health care costs.  Although the BOP generally did not maintain analytical data to assess the impact that the individual initiatives had on health care costs, our audit found that the BOP has kept the growth of inmate health care costs at a reasonable level compared to national health care cost data reported by the Departments of Health and Human Services and Labor.

However, we also determined that each of the BOP institutions we tested did not always provide recommended preventive health care to inmates.  Our audit found that for almost half of the preventive health services we tested, more than 10 percent of the sampled inmates did not receive the medical service.

In addition, OIG audits of BOP medical contracts have found multiple contract-administration deficiencies, such as inadequate review and verification of contractor billing statements.  Several of the contract-administration deficiencies appeared to be systemic.  While the BOP had taken action to address individual deficiencies at local institutions, we also found that other BOP institutions lacked appropriate controls in the deficiency areas identified by prior OIG contract audits.

We also identified weaknesses in the BOP's monitoring of health care providers.  Specifically, the BOP:  (1) did not develop agency-wide guidance to correct apparent systemic problems found during medical-related internal reviews and external audits; (2) did not provide health care providers with current authorization to practice medicine on BOP inmates through privileges, practice agreements, or protocols; (3) had not performed required initial and renewal peer reviews for providers; and (4) had not implemented an effective performance measurement system related to the provision of health care at BOP institutions.

In our report, we make 11 recommendations regarding the BOP's provision of medical care for inmates.  These recommendations include: establishing procedures to assess whether individual initiatives are cost-effective and producing the desired results; determining the necessity of performing medical services that generally were not performed by most BOP institutions; providing guidance and procedures to all BOP institutions for performing certain contract administration functions related to inmate health care; and ensuring that privileges, practice agreements, or protocols are established for all practitioners, as applicable.

The remaining sections of this Executive Summary describe in more detail our audit findings.

## Cost Containment

Since FY 2000, the BOP has implemented or developed at least 20 initiatives designed to improve the delivery of health care to inmates, improve the administration and management of health care, and reduce or contain rising health care costs.  As of December 2007, the BOP had implemented 11 of these initiatives and was in the process of implementing the remaining 9 initiatives.

In the following table, we provide a description of four of the BOP's major initiatives.  Appendix II contains a description of the 20 initiatives.

| Initiative | Description |
|---|---|
| Medical Designations Program | This initiative involves:  (1) assigning each inmate a care level from 1 to 4, with 1 being the healthiest inmates and 4 being inmates with the most significant medical conditions; (2) assigning each BOP institution a care level designation from 1 to 4 based on the inmate care level that the institution is staffed and equipped to handle; (3) staffing each institution based on its designated care level; and (4) moving inmates between institutions to match each inmate's care level to the care level of the institution. |
| Medical Staff Restructuring | Under this initiative, the BOP established staffing guidelines for Care Level 1, 2, and 3 institutions.  Because institution staffing did not always match the care level staffing guidelines, the BOP had to move medical staff throughout the BOP to implement the guidelines. Institutions that had staff in positions contrary to the guidelines were required to either move the staff to another facility or reassign the staff to another authorized position in the facility. |
| Tele-medicine | This initiative involves the remote delivery of health care using telecommunications technologies such as video-conferencing. |
| Electronic Medical Records | This initiative involves automating the medical records for inmates.  The initial system included the capability to: (1) track comprehensive history and physical examination information, (2) schedule inmate medical visits when required, and (3) track medical-related supplies and equipment issued to inmates.  The BOP subsequently added a pharmacy module to the system to manage the medications provided to inmates. |

We attempted to determine the effect that the BOP's initiatives had on inmate health care costs.  However, while the initiatives had a primary or secondary purpose of reducing or containing health care costs, the BOP could not provide either preliminary cost-benefit analyses or any post-implementation analyses to identify costs reduced or contained by these initiatives.  BOP officials believed that preliminary cost-benefit analyses had been performed, but said the documentation of the analyses was no longer available.  As for post-implementation analyses, BOP officials told us that the BOP does not collect and maintain cost-related data that would allow it to analyze the cost-effectiveness of each of its health care initiatives.  As a result, we recommend that the BOP collect cost-related data for each initiative and use the data collected to analyze whether the initiatives are providing the anticipated cost benefits.

Because the BOP did not maintain cost data for its health care initiatives, we were also unable to assess the impact of each initiative

individually.  Instead, we analyzed the overall effect of the BOP's initiatives on total medical costs.  We compared the BOP's per capita health care costs for calendar years 2000 through 2006 to similar data reported by the Department of Health and Human Services (HHS) and the Department of Labor (DOL).  We found that although the BOP experienced growth in excess of the HHS national average for medical costs and the DOL Consumer Price Index (CPI) for medical costs during some of the earlier years of our review period, the BOP's growth rates since 2002 have declined significantly, even though the growth rates in the HHS national average and the DOL CPI have not.  The following graph shows the results of our comparison.

**Comparison of the Growth Rates of Health Care Costs for BOP HHS, and DOL Health Care Data for Calendar Years 2000 through 2006[2]**



**Source:** BOP Office of Research and Evaluation, BOP Budget Execution
Branch, Department of Health and Human Services, and Department of Labor

The above comparison indicates that the BOP has been effective in containing the growth of health care costs.

---

[2]  The BOP's, the Department of Health and Human Services' (HHS) and the Department of Labor's (DOL) per capita health care medical costs are not fully comparable. The BOP's medical per capita costs include costs for services not included in HHS's and the DOL's per capita medical costs and vice versa.  Even though the costs are not fully comparable between the three measures, we believe the cost measures are sufficiently similar for comparison purposes.  The HHS national average cost data was obtained from the HHS report, *National Health Expenditures Aggregate, Per Capita Amounts, Percent Distribution, and Annual Percent Change by Source of Funds: Calendar Years 2005 – 1960* (January 2007).  An updated report showing cost data for 2006 was not available.

**Preventive Health Care**

The BOP periodically develops program statements to disseminate policy on a variety of BOP programs.  Appendix VI contains a brief description of the BOP program statements related to the provision of medical, dental, and mental health services to inmates.

The BOP has also established 16 clinical practice guidelines containing diagnostic procedures for specific medical areas, such as preventative health care, coronary artery disease, and hypertension.  The Introduction section of this audit report contains a list of the 16 medical areas covered by the clinical practice guidelines.  While the guidelines have not been incorporated into the BOP's program statements as policy, the BOP Medical Director told us that BOP institutions are expected to provide the services in the guidelines to the inmates.  The Medical Director also told us that the institutions have discretion in whether to follow the guidelines on a case-by-case basis.  However, BOP institutions must request and receive approval from the Medical Director to not implement a specific guideline requirement.

To determine whether the institutions were providing expected medical services to inmates, we selected and tested specific medical services listed in the BOP's Preventive Health Care Clinical Practice Guideline.  We chose this particular BOP guideline because:

- It addressed care for all inmates, instead of only inmates with specific illnesses;

- It included diagnostic procedures for 9 of the 11 chronic conditions addressed in the other 15 guidelines;

- It contained clearly defined medical services that could be reasonably tested;

- Health promotion and disease prevention is a primary objective of the BOP's efforts to contain costs; and

- The BOP Medical Director told us that testing of the preventive health care guideline would provide useful information to the BOP because its per capita cost of providing health care should be reduced by implementing a good preventive health program, and he expects the institutions to provide the services contained in the guideline.

We specifically selected and tested 30 medical services contained in the preventive health care guideline, including whether:  (1) inmates received a measles, mumps, and rubella vaccine; (2) inmates received a hepatitis A vaccine; (3) inmates received a cholesterol check in the last 5 years; (4) female inmates received a chlamydia test; and (5) female inmates received a bone density screening test.[3]

To perform our testing of the 30 medical services, we selected a sample of 1,110 of the 14,026 inmates assigned to 5 BOP locations as of March 24, 2007, as shown in the table below.  Appendix IV contains an explanation of our sampling methodology.

**Inmate Population and Inmates Sampled**

| BOP Facility | Inmate Population as of March 24, 2007 | Inmates Sampled |
|---|---|---|
| USP Atlanta (Georgia) | 2,494 | 251 |
| USP Lee (Virginia) | 1,808 | 133 |
| FCC Terra Haute (Indiana) | 3,343 | 249 |
| FMC Carswell (Texas) | 1,677 | 127 |
| FCC Victorville (California) | 4,704 | 350 |
| Totals | 14,026 | 1,110 |

Source:  OIG sample from BOP inmate population data

For each inmate sampled, we reviewed the inmate's medical record and determined whether the inmate received the 30 preventive services, as applicable.  The 30 services were not applicable to all inmates sampled for reasons such as certain services applied to only female inmates, certain services were only for inmates over a certain age, and other services applied only if the inmate had certain risk factors.  To validate our testing, we asked a Health Services Unit official at each of the facilities tested to confirm our results and ensure that we had not overlooked the provision of any service.

While the BOP guideline suggests that all inmates should receive the applicable services, we recognize that 100 percent compliance is unlikely given the movement of inmates between prisons, staffing shortages, and other reasons.  Therefore, we noted a deficiency when 10 percent or more of the inmates for whom the service was applicable had not received it.

As demonstrated in the following two charts, the combined results for all 5 locations showed that for 16 of the 30 services tested, 90 percent or more of the inmates received the preventive service as appropriate.  For the

---

[3]  Appendix III shows all 30 medical services we tested.

remaining 14 services, more than 10 percent of the sampled inmates did not receive the medical service.[4]  For example, 94 percent of the inmates who should have received a cardiovascular risk calculation had not received one in the last 5 years, as recommended by BOP guidelines.  Additionally, 87 percent of the sampled inmates needing a measles, mumps, and rubella vaccine had not received this service.

### Overall Results of the OIG's Testing of Medical Services Provided to Inmates[5]



| Medical Service Tested | Inmates Tested | Yes | No |
|---|---|---|---|
| 1. Inmate medical history provided by inmate at intake | 1,044 | 99% | 1% |
| 2. Medical assessment completed by medical practitioner at intake | 1,044 | 99% | 1% |
| 3. New inmate tested for tuberculosis or previous test for transferred inmate confirmed, within 48 hours of intake | 1,043 | 99% | 1% |
| 4. Inmate received rapid plasma regain test during intake screening to test for syphilis | 403 | 92% | 8% |
| 5. Female inmate tested for chlamydia | 25 | 36% | 64% |
| 6. Female inmate received a measles/mumps/rubella vaccine | 128 | 81% | 19% |
| 7. Inmate received a complete physical within 14 days of intake | 1,044 | 95% | 4% |
| 8. Inmate received a pneumococcal vaccine | 93 | 74% | 23% |
| 9. Inmate received an annual influenza vaccine | 210 | 71% | 29% |
| 10. Inmate born after 1956 received a measles/ mumps/rubella vaccine | 932 | 13% | 87% |
| 11. Inmate received a tetanus vaccine in the last 10 years | 1,042 | 50% | 49% |
| 12. Inmate received a hepatitis A vaccine | 263 | 57% | 42% |
| 13. Inmate received a hepatitis B test or vaccine | 343 | 90% | 9% |
| 14. Inmate received a hepatitis C test | 267 | 91% | 8% |

---

[4]  The percentages in the chart are based on the number of inmates for whom the service was applicable.

[5]  Some percentages in the chart total less than 100 percent because documentation was not available to determine if the service was performed for some inmates.



**Source:**  OIG testing of BOP medical records

    We found that the institutions either did not usually provide or were inconsistent in providing 18 of the 30 medical services we tested.  For example, the cardiovascular risk calculation was rarely performed in the 5 institutions we tested.  Moreover, as shown in the chart below, we found that the percentage of applicable inmates not receiving a cholesterol check within the past 5 years ranged from 68.1 percent at USP Lee to 8.3 percent at FMC Carswell.  This disparity in medical service provision indicates a need for better BOP headquarters oversight and guidance.

ix



**Source:** OIG testing of BOP medical records

We asked officials at each of the five locations for an explanation of why some services were not provided to a significant number of inmates. FMC Carswell medical officials declined our requests for an explanation, stating that BOP headquarters would provide a response after we issued our report. The following are examples of explanations given to us by officials from the other four locations.

- The vaccine was not always available to give to the inmate.

- The officials believed that a requirement applicable to all inmates only applied to women.

- The officials used alternative methods in place of certain services.

- The officials considered the service unnecessary.

- The inmates failed to return the test cards.

- The officials overlooked the requirement.

- The officials believed the procedures were too costly.

- Staffing inadequacies and scheduling constraints precluded the officials from providing the service.

Another factor that could have contributed to expected medical services not being provided consistently is that four of the five institutions had not fully implemented the Primary Care Provider Teams (PCPT) as required by the BOP's patient care policy. Under the PCPT model, each inmate is assigned to a medical team of health care providers and support staff who are responsible for managing the inmate's health care needs. The

x

PCPT model is designed to provide inmates with better and more consistent medical care because the inmate is examined by the same provider team each time the inmate requires medical attention.  If the same provider team examines an inmate during each visit, the inmate should be less likely to miss some services because the provider team would be familiar with the services previously provided to the inmate.  According to the BOP's Preventive Health Care Clinical Practice Guideline, the most efficient and cost-effective way to implement the guideline is to assign appropriate responsibilities to each PCPT member.  However, we found that only the FMC Carswell had implemented the PCPT concept.  The other four institutions had not fully implemented the PCPT concept primarily because of limited staffing.

## Contract Administration

The BOP relies on contractors to provide a substantial amount of medical services to inmates, and the OIG periodically performs audits of the BOP's comprehensive medical contracts.  From August 2004 through March 2007, the OIG issued nine audit reports on BOP medical contracts.  Appendix X contains a summary of these audits.  Eight of the nine OIG contract audits identified major internal control deficiencies.  The deficiencies included management control weaknesses pertaining to calculating medical service discounts, reviewing and verifying contractor invoices and billing statements, paying bills, and managing the overall administration of the contracts.  The audits indicated several of the weaknesses were systemic, such as:

- Six of the contract audits found weaknesses in verifying and reviewing the accuracy of invoices for medical services provided by the contract providers.

- Five of the contract audits found weaknesses in obtaining supporting documentation for contractor billing statements.

- Four of the contract audits found errors in the Medicare or diagnostic-related groups discount rates.

- Three of the contract audits found that the contractor did not provide the services stated in the contract, and the contractor's performance reports were either inaccurate or submitted in an untimely fashion.

The audits usually found that the identified weaknesses were attributable to the lack of written procedures and other internal controls.  As of November 2007, the BOP had implemented corrective actions for all the

recommendations in seven of the nine contract audits.  For the other two audits the BOP agreed to take corrective actions concerning our recommendations, and those actions were either completed or in progress as of November 2007.  In response to six of the nine audits, the BOP strengthened management controls by establishing written procedures for processing and monitoring contract medical claims.  However, these actions were limited to correcting the deficiencies only at the institutions where the deficiencies were found.

As part of this larger audit of BOP medical services we tested whether the BOP as a whole had strengthened controls related to the deficiencies identified in the contract audits.  We interviewed BOP officials at the five BOP locations tested.  For the remaining 88 BOP locations, we sent survey questionnaires and asked whether the institutions had established management control procedures for their comprehensive medical contracts, including:

- reviewing contractor invoices for accuracy,

- ensuring contractor invoices are supported by adequate documentation,

- ensuring that invoice discounts are properly applied,

- ensuring that contractor performance reports are complete and accurate, and

- ensuring that contractor timesheets are verified by a BOP employee.

We found that up to seven BOP institutions lacked critical controls for certain contract administration functions, and about half the institutions with critical controls had not documented the procedures associated with the controls.

Our analysis of survey responses found that 77 of the 88 BOP institutions surveyed had comprehensive medical service contracts.  Generally, officials at each institution responded that they had established internal control procedures for administering its contracts.  However, we found that about half the institutions had not formalized these procedures in written policy for the controls we tested, as noted in the chart below.

**Controls Established by BOP Institutions for
Comprehensive Medical Services Contracts**

| Contract Administration Function | Number of Institutions | | | |
| --- | --- | --- | --- | --- |
| | Procedures not Established | Procedures Established | Procedures Established but not Written | Percent of Established Procedures not Written |
| Reviewing contractor invoices for accuracy | 1 | 76 | 39 | 51% |
| Ensuring contractor invoices are supported by documentation | 3 | 74 | 36 | 49% |
| Ensuring invoice discounts are properly applied | 7 | 70 | 34 | 49% |
| Ensuring contractor performance reports are complete and accurate | 2 | 75 | 35 | 47% |
| Ensuring contractor timesheets are verified by a BOP employee | 2 | 75 | 43 | 57% |

**Source:** BOP responses to OIG survey questionnaire

The lack of written procedures increases the risk that appropriate controls will not be fully and consistently implemented, especially when staff assignments and duties change. We found during our medical service contract audits that the lack of management controls resulted in questionable payments to contractors, and we believe it is possible based on these results that similar errors may have occurred for medical contracts in other BOP facilities. It is essential that the BOP strengthen controls over administering its contracts by providing guidance and procedures to its institutions to help ensure that systemic deficiencies are corrected BOP-wide.

**Monitoring Health Care Providers**

The BOP has established numerous mechanisms to monitor its health care providers. Some of the mechanisms include:

- conducting internal program reviews to determine whether each institution is properly implementing BOP policies, including policies related to inmate health care;

- granting clinical privileges and establishing practice agreements and protocols based on health care providers' qualifications, knowledge, skills, and experience;[6]

- conducting peer reviews of health care providers to review the current knowledge and skills of the providers; and

- requiring each institution to accumulate and report performance data on a quarterly basis for specific health-related areas.

The primary purpose of these monitoring mechanisms is to improve the quality and efficiency of health care delivered to inmates by: (1) identifying and correcting deficiencies in the provision of health care, and (2) authorizing duties for health care providers commensurate with their skills and capabilities.

Our audit found that the BOP corrects deficiencies at the institutions at which deficiencies are found, but generally does not develop and issue agency-wide guidance to correct systemic deficiencies found during internal program reviews. We also found that the BOP allowed several health care providers to practice medicine without valid authorizations. Additionally, providers had not had their medical practices evaluated by a peer as required by BOP policy. Moreover, while institutions were accumulating and reporting data on health-related performance measures, the BOP does not develop agency-wide corrective actions when the performance is below target levels. These issues are summarized in the following sections.

*Program Reviews*

The BOP's Program Review Division monitors health care services provided to inmates through periodic reviews generally conducted once every 3 years, or more frequently if significant problems are identified. From FYs 2004 to 2006, the Program Review Division conducted 110 health care program reviews at 88 BOP locations. We analyzed the 110 review reports and determined that 40 of the 110 reviews found medical services deficiencies. The Program Review Division required institutions to certify completion of corrective actions for the deficiencies identified.

The Program Review Division also prepared quarterly summary reports of the program reviews. The summary reports identified the most frequent deficiencies found during the reviews and were distributed to the Chief

---

[6] Clinical privileges and practice agreements authorize the specific clinical or dental duties that health care providers may provide to BOP inmates.

Executive Officers within the BOP, including the Health Services Division Medical Director.  However, a senior Health Services Division official told us that the BOP probably would not change its policy when program reviews find problems in a certain area, but it might provide training to improve staff knowledge and compliance.  The official told us that the Health Services Division relies on the BOP Regional Offices and institutions to correct identified problems.

We analyzed the 40 BOP reviews and found that 25 different medical services were not provided to inmates and 14 of the 25 deficiencies were noted at multiple institutions.  For example, as shown in the table on page 32 of this report, the Program Review Division found inmates with chronic care conditions who were not monitored as required at 16 institutions.  Also, the reviews found inmates who were not monitored for psychotropic medical side effects at 11 institutions.  We believe the BOP should use the program summary reports prepared by the Program Review Division to develop or clarify agency-wide guidance on systemic weaknesses and issue the guidance to all BOP institutions.

*Privileges, Practice Agreements, and Protocols*

In the provision of inmate health care, BOP institutions use the following health care providers.

- **Licensed independent practitioners** are medical providers authorized by a current and valid state license to independently practice medicine, dentistry, optometry, or podiatry.

- **Non-independent practitioners** are graduate physician assistants (certified or non-certified), dental assistants, dental hygienists, nurse practitioners, and unlicensed medical graduates.

- **Other practitioners** are those not included in the above categories and include clinical nurses and emergency medical technicians.

To improve the quality of medical care that these medical providers provide to inmates, the BOP:  (1) grants clinical privileges to licensed independent practitioners based on the practitioner's qualifications, knowledge, skills, and experience; (2) establishes practice agreements between its licensed independent practitioners and its non-independent practitioners, such as mid-level practitioners; (3) establishes protocols that must be followed by other health care providers; and (4) performs periodic peer reviews of all providers who function under clinical privileges or practice agreements.

The BOP grants clinical privileges to its in-house and contracted practitioners. Clinical privileges are the specific duties that a health care provider is allowed to provide to BOP inmates. BOP policy states that clinical privileges can be granted for a period of not more than 2 years, and that newly employed physicians can be granted privileges for a period of not more than 1 year. Practitioners are prohibited from practicing medicine within the BOP until they have been granted privileges to do so by an authorized BOP official.

The individual institutions establish practice agreements between their licensed independent practitioners and their non-independent practitioners. Practice agreements delegate specific clinical or dental duties to non-independent practitioners under a licensed independent practitioner's supervision and are valid for no more than 2 years. Non-independent practitioners are prohibited from providing health care within the BOP until a practice agreement has been established.

The BOP's other health care providers, such as clinical nurses and emergency medical technicians, must work under protocols approved by licensed independent practitioners. A protocol is a plan for carrying out medical-related functions such as a patient's treatment regimen.

To determine whether the BOP maintained current privileges, practice agreements, and protocols for each of its practitioners, we included relevant questions in our survey questionnaire sent to 88 BOP institutions. Based on the responses to our questionnaires, we identified 134 practitioners out of 1,536 (9 percent) who were allowed to provide medical services to BOP inmates without current BOP privileges, practice agreements, or protocols.

**BOP Medical Practitioners without Current
Privileges, Practice Agreements, or Protocols**

| Type of Authorizing Document | Practitioners Requiring Authorizing Document | Practitioners without Authorizing Document | Percent without Authorizing Document |
|---|---|---|---|
| Privileges | 680 | 72 | 11% |
| Practice Agreement | 466 | 42 | 9% |
| Protocol | 390 | 20 | 5% |
| Totals | 1,536 | 134 | 9% |

**Source:** Responses by BOP institution officials to OIG survey questionnaire

Based on this data, it is apparent that BOP officials do not fully understand the type of authorization different health care providers should receive, or ensure that the health care providers have them.

Allowing practitioners to provide medical care to inmates without current privileges, practice agreements, or protocols increases the risk that the practitioners may provide medical services without having the qualifications, knowledge, skills, and experience necessary to correctly perform the services.  In addition, the BOP could be subjected to liability claims by inmates if improper medical services are provided by these practitioners.

*Peer Reviews*

BOP policy requires that BOP health care providers have a periodic peer review.  A peer is defined as another provider in the same discipline (physician, dentist, mid-level practitioner, or others) who has firsthand knowledge of the provider's clinical performance.  The peer review should evaluate the professional care the provider has given using a sample of the provider's primary patient load and comment on specific aspects of the provider's knowledge and skills, such as actual clinical performance, judgment, and technical skills.  BOP health care providers who are privileged or working under a practice agreement must have at least one peer review every 2 years.  Each Clinical Director, Chief Dental Officer, and Clinical Psychiatrist must also have a peer review at least once every 2 years.

In our survey questionnaire sent to 88 BOP institutions, we requested the last peer review date for all providers with privileges or practice agreements.  For the 891 such providers, the responses to the questionnaire indicated that 430 (48 percent) had not received a current peer review.  We asked BOP officials about the lack of peer reviews.  The officials responsible for more than half of the non-current peer reviews did not provide an explanation.  The officials responsible for the remaining non-current peer reviews cited the following reasons.

- The officials rely on contractors to do peer reviews.

- The officials believed that the peer review requirement did not apply to mid-level practitioners, dental assistants, or dental hygienists.

- The officials relied on performance reviews instead of doing the required peer reviews.

Without a current peer review, the BOP has a higher risk of providers giving inadequate professional care to inmates, thus subjecting the BOP to formal complaints and lawsuits.  Also, if inadequate professional care goes

undetected, the providers may not receive the training or supervision needed to improve the delivery of medical care.

*Performance Measures*

The BOP has also established national performance measures for health care to include annual targets or goals for management of: (1) hypertension, (2) cholesterol, (3) diabetes, (4) HIV, (5) tuberculosis, (6) asthma, (7) breast cancer, (8) cervical cancer, and (9) pregnancy. The BOP institutions voluntarily report results for these performance measures to the BOP Health Services Division on a quarterly basis.

In our survey questionnaire, we asked institution officials if they had completed the performance measure calculations for the nine performance measures for calendar year 2004 through the first quarter of calendar year 2007. The following table details the 99 responses from officials at the 88 BOP locations.[7]

| Performance Measure Calculations Completed for Calendar Year | BOP Response | | | |
|---|---|---|---|---|
| | Yes | No | Not Applicable | No Response |
| **2004** | 59 | 28 | 10 | 2 |
| **2005** | 77 | 14 | 4 | 4 |
| **2006** | 87 | 11 | 0 | 1 |
| **2007** (1st Quarter) | 90 | 7 | 1 | 1 |

**Source:** BOP responses to OIG survey questionnaires

Based on the responses, the number of institutions not completing the performance measure calculations decreased each year since 2004. However, when asked why the calculations were not always completed, BOP officials usually could not provide an explanation and said that the person who was responsible for completing the calculations was no longer at the institution. The officials who did provide an explanation usually attributed not completing the performance measure calculations to staffing shortages.

We also analyzed the performance measure reports from the BOP and found that the institutions often did not meet the target levels established for the nine target goals. For the nine health care performance measures we tested, we found that the institutions reported performance below the target level for more than 20 percent of the quarters reported for seven of

---

[7] The total responses (99) to our survey questions was more than the 88 BOP locations surveyed because 6 of the locations surveyed submitted separate responses for the 17 BOP institutions at the locations. Performance measures were not applicable for some institutions primarily because the institutions are new and were not active for the years tested.

the nine performance measures.  For example, for the clinical management of lipid level measure, 79 institutions reported results for 723 quarters between January 1, 2004 and March 31, 2007.  The results reported were below the target level for 437 (60 percent) of the quarters reported.  In another example related to the clinical management of diabetes, the 79 institutions reported below target level performance for 285 (39 percent) of the 729 quarters reported.

We discussed with BOP Health Services Division officials their review of and response to the performance reports.  The officials told us that they review the reports, perform a trend analysis, and summarize the results in the Office of Quality Management's Annual Report.  However, the officials also told us that institution participation in reporting the performance measures is voluntary and they do not develop agency-wide corrective actions when the performance is below target levels.  We believe it is essential that the BOP take corrective actions when performance is below targets to help ensure that inmates are provided adequate medical care.

In addition, we found that instructions are needed to help ensure performance data are consistently accumulated and reported.  The BOP did not provide institutions with instructions on accumulating and reporting such data.  According to a BOP Health Services Division official, the institutions are inconsistent in how they accumulate and report performance data.  If this is the case, the summary data compiled by the BOP may not be meaningful.  This BOP Health Services Division official also told us that because of the inconsistencies in data reported, the BOP is developing a training program to educate institution staff on how to properly accumulate and report performance data.  According to the Chief of the BOP's Quality Management Section, a meeting was held in December 2007 with the institution Health Services Administrators to discuss the collecting of national performance measure data.  Another meeting is planned for January 2008 to discuss with Regional Medical Directors any adjustments needed to the performance measurement system.

## Conclusion and Recommendations

In general, we found that in comparison to other national health care cost indices, the BOP was successful at containing the growth of inmate health care costs.  However, our audit concluded that the BOP could make improvements to help ensure that:  (1) inmates are provided recommended preventative medical care, (2) contract administration deficiencies are addressed BOP-wide, and (3) monitoring of medical service providers is strengthened.  If the deficiencies we noted in these areas are not corrected, we believe the BOP could experience:

- higher costs for providing health care,

- decreases in the quality of health care,

- a higher number of medical-related complaints from inmates, and

- greater liability for lack of adequate medical care.

To assist the BOP in improving medical care for inmates, we made 11 recommendations to the BOP.  These recommendations include: (1) establishing procedures for collecting and evaluating data for current and future health care initiatives to assess whether individual initiatives are cost-effective and producing the desired results; (2) reviewing the medical services that the OIG and the BOP's Program Review Division identified as not always provided to inmates and determining whether the medical services are necessary or whether the medical service requirement should be removed from the program statements or clinical practice guidelines, as appropriate; (3) providing additional guidance to the institutions to ensure that medical services deemed necessary are provided to the inmates, (4) providing additional guidance and procedures to all BOP institutions for performing certain contract administration functions; (5) developing and issuing agency-wide guidance to correct systemic deficiencies found during internal program reviews; and (6) ensuring that privileges, practice agreements, or protocols are established for all practitioners, as applicable.

# TABLE OF CONTENTS

**Page**

**INTRODUCTION** ............................................................. 1
   Health Care Responsibilities............................................ 2
   Health Care Costs ...................................................... 3
   Controlling Health Care Costs ......................................... 4
   The Provision of Health Care Services ................................ 4
   Necessary Medical Care ................................................ 5
   BOP Policy Guidance.................................................... 8
   Prior Audits, Inspections, and Reviews ............................... 9
   OIG Audit Objectives and Approach .................................. 14

**FINDINGS AND RECOMMENDATIONS**............................. 15

   **1.  HEALTH CARE DELIVERY AND COST IMPACT**...................... 15
   Improving the Delivery of Health Care to Inmates ................... 15
   Cost Impact of the BOP's Health Care Initiatives.................... 21
   Providing Medical Services to Inmates............................... 24
   Conclusion ............................................................ 34
   Recommendations...................................................... 35

   **2.  BOP CONTRACT ADMINISTRATION** ............................... 37
   Conclusion ............................................................ 42
   Recommendation ...................................................... 42

   **3.  MONITORING BOP HEALTH CARE PROVIDERS** ................... 45
   The BOP's Program Review Results................................... 46
   The BOP's Credential Verification, Privileges, and Practice
      Agreement Program ............................................... 47
   The BOP's Health Care Performance Measures.................... 51
   Conclusion ............................................................ 54
   Recommendations...................................................... 55

**STATEMENT ON COMPLIANCE WITH LAWS AND REGULATIONS** .... 57

**STATEMENT ON INTERNAL CONTROLS**........................... 59

**ACRONYMS AND ABBREVIATIONS** ............................... 62

**APPENDIX I – Audit Objectives, Scope, and Methodology** ............. 63

**APPENDIX II – BOP Initiatives since FY 2000 to Improve the Effectiveness and Efficiency of Inmate Health Care** ................. 67

**APPENDIX III – Medical Services Selected for Testing from the BOP's Preventive Health Care Clinical Practice Guideline** .......... 73

**APPENDIX IV – Sample Methodology** .......................................... 77

**APPENDIX V – BOP Institutions and Inmates Housed as of November 29, 2007** ................................................................ 79

**APPENDIX VI – Summary of BOP Program Statements Related to the Provision of Medical, Dental, and Mental Health Services** ..................................................................................... 85

**APPENDIX VII – Results of the OIG's Testing of the Provision of Medical Care at BOP Institutions** .......................................... 89

**APPENDIX VIII – The BOP's Health Care Performance Measures** .. 99

**APPENDIX IX – Types of BOP Institutions** ................................... 101

**APPENDIX X – Department of Justice, Office of the Inspector General Audits of BOP Medical Contracts from August 2004 through March 2007** ............................................................... 103

**APPENDIX XI – The BOP's Response to the Draft Audit Report** .... 111

**APPENDIX XII – Office of the Inspector General, Audit Division, Analysis and Summary of Actions Necessary to Close the Report** ................................................................................... 117

# INTRODUCTION

The Federal Bureau of Prisons (BOP) is responsible for confining federal offenders in prisons and community-based facilities.  As of November 29, 2007, the BOP housed 166,794 inmates in 114 BOP institutions at 93 locations.  In addition, the BOP housed 33,354 inmates in privately managed, contracted, or other facilities.[8]

The BOP institutions include Federal Correctional Institutions (FCI), United States Penitentiaries (USP), Federal Prison Camps (FPC), Metropolitan Detention Centers (MDC), Federal Medical Centers (FMC), Metropolitan Correctional Centers (MCC), Federal Detention Centers (FDC), the United States Medical Center for Federal Prisoners (MCFP), and the Federal Transfer Center (FTC).  When multiple institutions are co-located, the group of institutions is referred to as a Federal Correctional Complex (FCC).  Some institutions are located within federal correctional complexes that contain two or more institutions.  Appendix IX describes the various types of BOP facilities.  Appendix V contains a list of the BOP institutions.  The map below depicts the location of BOP facilities.



**Source:**  OIG mapping of BOP facilities based on data provided by the BOP

---

[8]  This audit focused on the medical care provided to only those inmates housed in Bureau of Prison (BOP) facilities.

**Health Care Responsibilities**

As part of the BOP's responsibility to house offenders in a safe and humane manner, it seeks to deliver medically necessary health care to its inmates in accordance with proven standards of care. This responsibility stems from a 1970s court case *Estelle* v. *Gamble,* in which the U.S. Supreme Court concluded that an inmate's right to medical care is protected by the U.S. Constitution's Eighth Amendment guarantee against cruel and unusual punishment.[9] The Supreme Court concluded that "deliberate indifference" – purposefully ignoring serious medical needs of prisoners – constitutes the inappropriate and wrongful infliction of pain that the Eighth Amendment forbids.[10]

According to BOP Program Statement P6010.02 Health Services Administration, the BOP's responsibility for delivering health care to inmates is divided among the following BOP headquarters, regional offices, and local institution officials.

- **Director of BOP**: The Director has overall authority to provide for the care and treatment of persons within the BOP's custody. The Director has delegated this authority to the Assistant Director, Health Services Division (HSD).

- **Assistant Director, HSD**: The Assistant Director, HSD, is responsible for directing and administering all activities related to the physical and psychiatric care of inmates. The Assistant Director has delegated this authority as it pertains to clinical direction and administration to the BOP Medical Director.

- **Medical Director**: The Medical Director is the final health care authority for all clinical issues and is responsible for all health care delivered by BOP health care practitioners.

- **Regional Health Services Administrators**: The Regional Health Services Administrators in the BOP's six regional offices are responsible for responding to health care problems at all institutions within their region. The Administrators also advise the Regional

---

[9] *Estelle* v. *Gamble*, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

[10] "Your Right to Adequate Medical Care," in *A Jailhouse Lawyer's Manual* (New York: Columbia University, School of Law, Chapter 18, page 494, which cited the following reference: *Estelle* v. *Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251, 260 (1976) (citing *Gregg* v. *Georgia*, 428 U.S. 153, 173, 97 S. Ct. 2909, 2925, 49 L. Ed. 2d 859, 874 (1976)).

Director and Deputy Regional Director in all matters related to health care delivery.

- **Institution Officials**:  The responsibility for the delivery of health care to inmates at the institution level is divided among various officials, staff, contractors, and others.  Each institution has a Health Services Unit (HSU) responsible for delivering health care to inmates.  The organization of the HSUs varies among institutions depending upon security levels and missions, but each HSU ordinarily has a Clinical Director and a Health Services Administrator who report to the Warden or Associate Warden.  The Clinical Director is responsible for oversight of all clinical care provided at the institution.  The Health Services Administrator implements and directs all administrative aspects of the HSU at the institution.  Both the Clinical Director and the Health Services Administrator have responsibilities related to the supervision and direction of health services providers at the institution.

**Health Care Costs**

The BOP funds inmate health care through its Inmates Care and Programs appropriation.  The BOP does not budget a specific amount for health care services.  As inmates require medical care, the BOP provides funding for these services and obligates funds for health care as expenses occur.  From fiscal year (FY) 2000 through FY 2007, the BOP obligated about $4.7 billion to inmate health care.  The following chart shows the BOP's annual health care obligations during this period.

**BOP Health Care Costs**
**FYs 2000 through 2007**



**Source:**  BOP Budget Execution Branch

**Controlling Health Care Costs**

To control the rising cost of health care, since the early 1990s the BOP has implemented several initiatives aimed at providing more efficient and effective inmate health care.  These initiatives include:  (1) sharing health care resources with other federal agencies such as the Veterans Administration, (2) establishing medical reference laboratories within the BOP for routine laboratory analysis, and (3) obtaining medical equipment through the Defense Supply Center at General Services Administration pricing.

On-going BOP initiatives include:  (1) assigning most inmates to institutions based on the care level required by the inmate, (2) installing an electronic medical records system that connects institutions, (3) implementing tele-health to provide health care services through video conferencing, and (4) implementing a bill adjudication process to avoid costly errors when validating invoices.  We include a discussion of these cost-cutting initiatives and the effect the initiatives have had on controlling inmate health care costs in the Findings and Recommendations section of this report.

**The Provision of Health Care Services**

The BOP provides health care services to inmates primarily through in-house medical providers employed by the BOP or assigned to the BOP from the Public Health Service (PHS) and contracted medical providers who supply either comprehensive or individual medical services.

*In-house Medical Providers*

The HSUs at each of the BOP's 114 institutions provide routine, ambulatory medical care.  These units provide care for patients with moderate and severe illnesses, including hypertension and diabetes, as well as care for patients with serious medical conditions, such as Human Immunodeficiency Virus (HIV) infection and Acquired Immunodeficiency Syndrome (AIDS).  HSU outpatient clinics provide diagnostic and other medical support services for inmates needing urgent and ambulatory care.  The HSUs are equipped with examination and treatment rooms, radiology and laboratory areas, dental clinics, pharmacies, administrative offices, and waiting areas.  The HSUs are staffed by a combination of BOP health care employees and PHS personnel consisting of physicians, dentists, physician assistants, mid-level practitioners, nurse practitioners, nurses, pharmacists, psychiatrists, laboratory technicians, x-ray technicians, and administrative

4

personnel.  At each institution, the Clinical Director directs the clinical care of inmates and supervises the BOP and PHS health care staff.

As part of its internal health care network, the BOP operates several medical referral centers (MRC) that provide advanced care for inmates with chronic or acute medical conditions.  The MRCs provide hospital and other specialized services to inmates, including full diagnostic and therapeutic services and inpatient specialty consultative services.  Inpatient services are available only at MRCs.  BOP medical personnel refer inmates to the MRCs or an outside community care provider when the inmates have health problems beyond the capability of the HSU.

*Contracted Medical Providers*

When the BOP's internal resources cannot fully meet inmates' health care needs, the BOP awards comprehensive and individual contracts to supplement its in-house medical services.  Comprehensive contracts provide a wide range of services and providers, while individual contracts usually provide specific specialty services.

The comprehensive contracts and individual contracts exceeding $100,000 are awarded by the BOP's Field Acquisition Office in Grand Prairie, Texas.  The individual contracts not exceeding $100,000 are awarded by each institution's contracting personnel.

According to data provided to the OIG by officials at the 114 BOP institutions, as of May 2007 these institutions had 108 comprehensive services contracts or blanket purchase agreements and 343 individual services contracts.  From the beginning of the contracts through May 2007, BOP officials reported total expenditures of more than $249 million related to these 451 contracts and agreements.[11]

## Necessary Medical Care

According to BOP Program Statement P6010.02 Health Services Administration, the BOP is responsible for delivering health care to inmates in accordance with proven standards of care without compromising public safety concerns.  The BOP's Patient Care policy delineates the following five categories of health care services provided to inmates.  In this audit, we could not associate how much of the BOP's medical obligations related to

---

[11]  The length of the BOP's medical contracts varied, but most of the contracts included a base year and 4 option years.  Accordingly, the expenditures related to the 451 active contracts and agreements covered the time each contract began through May 2007.

each of these categories because the BOP does not segregate medical cost data by these categories.

- **Medically Necessary – Acute or Emergent**.  Services in this category cover medical conditions that are of an immediate, acute, or emergent nature, which without care may be life threatening or would cause rapid deterioration of the inmate's health or significant irreversible loss of function.  Conditions in this category warrant immediate treatment that is essential to sustain life or function.  Examples of conditions considered acute or emergent include, but are not limited to:

  - myocardial infarction;
  - severe trauma such as head injuries;
  - hemorrhage;
  - stroke;
  - precipitous labor or complications associated with pregnancy; and
  - detached retina, sudden loss of vision.

- **Medically Necessary – Non-emergent**.  Services in this category cover medical conditions that are not immediately life-threatening, but without care the inmate has a significant risk of:

  - serious deterioration leading to premature death;
  - significant reduction in the possibility of repair later without present treatment; or
  - significant pain or discomfort, which impairs the inmate's participation in activities of daily living.

  Examples of conditions considered medically necessary – non-emergent include but are not limited to:

  - chronic conditions (diabetes, heart disease, bipolar disorder, schizophrenia);
  - infectious disorders in which treatment allows for a return to previous state of health or improved quality of life (HIV, tuberculosis); and
  - cancer.

- **Medically Acceptable – Not Always Necessary**.  Services in this category cover medical conditions that are considered elective procedures that may improve the inmate's quality of life.  Examples in this category include, but are not limited to:

- o joint replacement;
- o reconstruction of the anterior cruciate ligament of the knee; and
- o treatment of non-cancerous skin conditions, such as skin tags and lipomas.

These therapeutic interventions always require review by the institution's Utilization Review Committee to determine whether the proposed treatment should be approved.[12] The factors that should be considered in approving the proposed treatment include, but are not limited to:

- o the risks and benefits of the treatment,
- o available resources,
- o natural history of the condition, and
- o the effect of the intervention on inmate functioning in activities of daily living.

- **Limited Medical Value**. Services in this category cover medical conditions for which treatment provides little or no medical value, are not likely to provide substantial long-term gain, or are expressly for the inmate's convenience. Procedures in this category are usually excluded from the scope of services provided to BOP inmates. Examples in this category include, but are not limited to:

- o minor conditions that are self-limiting,
- o cosmetic procedures, or
- o removal of non-cancerous skin lesions.

Any treatment in this category that a health care provider recommends and the Clinical Director feels is appropriate requires review by the institution's Utilization Review Committee.

- **Extraordinary**. Services in this category cover medical interventions that are deemed extraordinary because they affect the life of another individual, such as organ transplantation, or are considered investigational in nature.

---

[12] Every BOP institution is required to have a Utilization Review Committee, chaired by the institution's Clinical Director, that reviews various aspects of inmate health care, such as the need for outside medical, surgical, and dental procedures; requests for specialist evaluations and treatments with limited medical value; and considerations for extraordinary care.

Any treatment provided in this category requires the BOP Medical
Director's review and approval with notification to the Regional
Director.

**BOP Policy Guidance**

The BOP provides policy and guidance to BOP institutions primarily in
the form of program statements.  As of October 2007, the BOP had
20 program statements related to the management and administration of
health care.  Appendix VI contains a summary of these program statements.
In addition to the program statements, the BOP has established the
following 16 clinical practice guidelines describing specific medical, dental,
and mental health services that BOP management expects to be provided to
inmates.

- Preventive Health Care
- Management of Asthma
- Management of Coronary Artery Disease
- Management of Major Depressive Disorder
- Detoxification of Chemically Dependent Inmate
- Diabetes
- Gastroesophageal Reflux Disease Dyspepsia and Peptic Ulcer
  Disease
- Management of Headaches
- Viral Hepatitis
- Management of Human Immunodeficiency Virus (HIV)
- Hypertension
- Management of Lipid Disorders
- HIV, Hepatitis-B, Hepatitis-C, Human Bites and Sexual Assaults
- Management of Methicillin-Resistant Staphylococcus Aureus (MRSA)
  Infections
- Management of Tuberculosis (TB)
- Management of Varicella Zoster Virus Infections

The Preventive Health Care guideline contains procedures that BOP
management officials expect to be provided to all inmates.  The other
15 guidelines address a particular health condition and contain procedures
specific to servicing that condition.  The Preventive Health Care guideline,

which was updated in April 2007, contains the preventive health and diagnostic procedures found in 9 of the other 15 guidelines, but it does not contain the specific procedures related to treatment of the health conditions covered by the other guidelines.  The Preventive Health Care guidelines also do not contain the preventive health procedures from four guidelines that are not considered chronic care (MRSA Infections, Headaches, Varicella Zoster Virus Infections, and Detoxification of Chemically Dependent Inmates); and two guidelines that are considered chronic care (Asthma and Gastroesophageal Reflux Disease Dyspepsia and Peptic Ulcer Disease).

For this audit, we focused on the procedures in the BOP's Preventive Health Care guideline because:

- It addressed care for all inmates and not just inmates with specific illnesses;

- It contained medical services that BOP management officials expected to be performed at all institutions; and

- According to the BOP, health promotion and disease prevention is a primary objective of the BOP in its efforts to contain costs.

**Prior Audits, Inspections, and Reviews**

Several previous audits, inspections, and reviews by the Department of Justice (DOJ) Office of the Inspector General (OIG) and the Government Accountability Office (GAO) have reported on the provision of health care by the BOP.  These audits, inspections, and reviews are briefly summarized below.

*Office of the Inspector General Reports*

Individual Audits of BOP Contracts for Medical Services

From August 2004 through March 2007, the OIG issued nine audit reports on BOP contracts for medical services.  The OIG identified major internal control deficiencies for eight of the nine medical services contract audits.  The deficiencies included weaknesses in procedures or processes for calculating discounts, reviewing and verifying invoices and billings, paying bills, and managing the overall administration of the contracts.  Finding 2 and Appendix X of this report contain more details about the results of these audits.

Audit of BOP Pharmacy Services

In a November 2005 report on pharmacy services within the BOP, the OIG reported on the BOP's efforts to:  (1) reduce increasing costs of its prescription medications; (2) ensure adequate controls and safeguards over prescription medications; and (3) ensure its pharmacies complied with applicable laws, regulations, policies, and procedures.[13]  The OIG found numerous deficiencies, including the:

- BOP's cost-benefit analysis of its prescription medication program contained errors and incorrect assumptions that could result in increased prescription medication costs rather than savings;

- BOP needed to improve efforts to reduce prescription medication costs associated with waste;

- BOP was not adequately accounting for and safeguarding prescription medications;

- BOP lacked adequate internal controls for purchasing prescription medications, including ordering, receiving, and paying; and

- BOP pharmacies did not always comply with applicable policies and procedures for dispensing and administering prescription medications.

The OIG made 13 recommendations for improving the administration of the BOP's pharmacy services.  The recommendations sought to ensure that:

- a cost-benefit analysis is conducted for all cost savings initiatives,

- institutions accurately account for and safeguard prescription medications,

- institutions implement controls over ordering and receiving prescription medications, and

- institutions comply with applicable laws and BOP policies.

---

[13]  Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons Pharmacy Services,* Audit Report Number 06-03 (November 2005).

The BOP agreed with the audit recommendations.  The BOP implemented corrective action for each recommendation and the OIG closed the audit report based on the BOP's corrective actions.

Inspection of Inmate Health Care Costs in the BOP

In November 1996, the OIG reported on factors contributing to inmates' health care costs and the BOP's initiatives to contain these costs.[14] The OIG also reported on the BOP's corrective actions in response to the Department of Justice's FY 1992 Management Control Report.[15]  The OIG found the following.

- The BOP had implemented numerous inmate health care cost containment initiatives to combat rising costs and to meet the health care demands of a growing inmate population.

- The BOP's initiatives kept per capita costs from rising significantly.

- The BOP's costs for community provider services, medical guard escort services, and salaries continued to increase in spite of containment efforts; and the BOP needed to take additional actions to control some costs.

The OIG recommended that the BOP:

- ensure that appropriate institutions are utilizing contract guard services,

- instruct the wardens to review their mid-level practitioner and nurse staffing and restructure where appropriate, and

- pursue the proposal of charging inmates a co-payment fee for medical services.

---

[14]  Department of Justice, Office of the Inspector General, *Inmate Health Care Costs in the Bureau of Prisons*, Inspections Report Number I-97-01 (November 1996).

[15]  The Federal Managers Financial Integrity Act of 1982 (Act) required the head of each executive agency to prepare a statement indicating that the agency's systems of internal accounting and administrative control either fully or do not fully comply with the requirements of the Act.  If the control systems do not fully comply with the Act, the agency head is required to include a report, called a Management Control Report, identifying any material weaknesses in the agency's systems of internal accounting and administrative control and the plans and schedule for correcting the weakness.

The BOP generally agreed with the recommendations.  The BOP also took corrective action on each recommendation and the OIG closed the inspection report based on the BOP's corrective actions.

*Government Accountability Office Reports*

GAO Testimony Regarding BOP Medical Cost Containment

In April 2000, GAO staff testified to Congress that the BOP had initiated cost containment efforts such as restructuring medical staffing, obtaining discounts through bulk purchases, leveraging resources through cooperative efforts with other governmental entities, and privatizing medical services.  The BOP also had placed tele-medicine in eight facilities and planned to equip all the BOP facilities during FY 2000.[16]

The GAO staff also testified that planned cost-saving measures required legislative action.  These measures consisted of a $2 fee for each health care visit requested by a prisoner (as a deterrent to unnecessary visits), and a Medicare-based cap on payments to community hospitals that treat inmates.[17]  The GAO recommended that the BOP negotiate more cost-effective contracts with community hospitals that could require bidders to propose a "Medicare federal rate" adjusted by markups or discounts, which was expected to simplify the comparison of prices under consideration.[18]

Report on Inmates Access to Health Care

In a February 1994 report, the GAO reported on the adequacy of the BOP's medical services and the effectiveness of its medical service's quality assurance program.[19]  The GAO reviewed care for inmates with special medical needs, the BOP's quality assurance systems, qualification of BOP physicians and of other health care providers used by the BOP, and the

---

[16]  Tele-medicine is a method of providing health care from a remote location using technology such as video conferencing modified to include peripheral devices that produce images of diagnostic quality.

[17]  The BOP implemented the $2 fee for inmate health care visits as discussed in more detail on page 20 of this report.

[18]  The "Medicare federal rate" is a common or standard benchmark rate for specific medical services identified in Medicare diagnosis-related groups.

[19]  U.S. General Accounting Office, *BUREAU OF PRISONS HEALTH CARE, Inmates' Access to Health Care Is Limited by Lack of Clinical Staff,* GAO/HEHS-94-36 (February 1994), 1.

BOP's consideration of cost effective alternatives to meet rising needs for medical services.  The GAO found the following.

- Inmates with special needs, including women, psychiatric patients, and patients with chronic illnesses, were not receiving all of the health care services they needed because of staffing shortages.

- Quality assurance programs identified actual and potential quality-of-care problems, but did not always include corrective action.

- Physician assistants in the BOP lacked generally required education and certification and were not adequately supervised.

- The BOP was planning a major hospital acquisition program without fully assessing whether inmates' medical needs justified the acquisition and without planning how to recruit and retain the clinical staff necessary to operate these facilities.

The GAO recommended that the BOP:

- prepare a needs assessment of the medical services required by inmates and determine the medical services it can efficiently and effectively provide in-house;

- determine the most cost-effective approaches to providing appropriate health care to current and future inmate populations;

- revise the BOP's hiring standards for physician assistants to conform to current community standards of training and certification; and

- re-emphasize to the wardens of medical referral centers the importance of taking corrective action on identified quality assurance problems.

While the BOP did not agree with the GAO's conclusion regarding the medical care it is able to provide to inmates in the facilities GAO visited, the BOP agreed with the GAO's specific findings.  The BOP agreed to take corrective action on first two recommendations.  However, the BOP believed that the intent of the GAO's remaining two recommendations was being dealt with through existing systems and plans.  The GAO did not fully agree with the BOP's position on the last two objectives and indicated in the report that the BOP still needed to take additional actions on these issues.

**OIG Audit Objectives and Approach**

The OIG initiated this audit to determine whether the BOP: (1) appropriately contained health care costs in the provision of necessary medical, dental, and mental health care services; (2) effectively administered its medical services contracts; and (3) effectively monitored its medical services providers.

We performed audit work at BOP headquarters and at the following BOP institutions: the USP Atlanta (Georgia), USP Lee (Virginia), FMC Carswell (Texas), FCC Terra Haute (Indiana), and FCC Victorville (California). In addition, we surveyed the 88 BOP locations where we did not perform on-site work. The details of our testing methodologies are presented in the audit objectives, scope, and methodology contained in Appendix I.

This audit report contains 3 finding sections. The first finding discusses the BOP's efforts to contain the growth of health care costs and to deliver necessary health care to inmates. The second finding discusses the BOP's administration of medical services contracts. The third finding discusses the BOP's efforts to monitor its medical services providers, both in-house and contract staff.

# FINDINGS AND RECOMMENDATIONS

## 1. HEALTH CARE DELIVERY AND COST IMPACT

The BOP has implemented multiple cost containment strategies over the past several years to provide health care to inmates in a more effective and efficient manner.  However, the BOP generally did not maintain analytical data to assess the impact that the individual initiatives had on health care costs.  Yet, our audit found that the BOP has kept the growth of inmate health care costs at a reasonable level compared to national health care cost data reported by the Departments of Health and Human Services and Labor.  With respect to inmate health care, we found that BOP institutions did not always provide recommended preventive medical services to inmates.  We also found that BOP institutions did not consistently provide medical services recommended by BOP guidelines to inmates.

### Improving the Delivery of Health Care to Inmates

Since FY 2000, the BOP has implemented or developed at least 20 initiatives designed to improve the administration, management, and delivery of health care to inmates, and to reduce or contain rising health care costs.  As of December 2007, the BOP had fully implemented 11 initiatives, while the remaining 9 were in progress.  The following sections summarize 10 of the BOP's initiatives and discuss their cost impact.  Appendix II contains a complete list of the initiatives identified by the BOP and a brief description of each initiative.

*Medical Designations Program*

BOP officials assign each inmate a medical classification or care level based on the inmate's individual health condition.  Care levels range from *Care Level 1* for the healthiest inmates to *Care Level 4* for inmates with the most serious medical conditions.

- **Care Level 1** inmates are less than 70 years old and are generally healthy but may have limited medical needs that can be easily managed by clinician evaluations every 6 months.  Sub-specialty care is limited in that it is not regularly required and is completed in less than 3 months.  This care level includes inmates with stable mental-health conditions requiring chronic care appointments and individual psychology or health services contacts no more than once every 6 months.  The acute services required, such as crisis

15

intervention, are less than 3 months duration, occur no more than every 2 years, and can be resolved without hospitalization.

- **Care Level 2** inmates are stable outpatients with chronic illnesses requiring at least quarterly clinician evaluations.  These inmates independently perform daily living activities.  The care level includes inmates with mental health conditions that can be managed through chronic care clinics or individual psychology or health services contacts no more frequently than monthly to quarterly. The acute services required, such as crisis intervention, are less than 3 months duration, occur no more than every 2 years, and can be resolved without hospitalization.

- **Care Level 3** inmates are fragile outpatients with medical conditions that require daily to monthly clinical contact.  These inmates may have chronic or recurrent mental illnesses or ongoing cognitive impairments that require daily to monthly psychiatric health services or psychology contacts to maintain outpatient status.  These inmates may also require assistance in performing some activities of daily living, but do not require daily nursing care. Inmates in this care level may periodically require hospitalization to stabilize the inmate's medical or mental health condition.

- **Care Level 4** inmates have acute medical or chronic mental health conditions resulting in severe impairments to physical and cognitive functioning.  These inmates require services at Medical Referral Centers (MRC), such as the BOP's Federal Medical Centers (FMC), and may require varying degrees of nursing care.

In addition to assigning each inmate a care level based on overall health, effective in 2004 the BOP also assigned a medical designation to each institution.  The medical designation corresponds with the medical classification of the inmates that the institution is staffed and equipped to handle.  Appendix V shows the care level designation for each BOP institution.  Designating institution care levels has three advantages for the BOP.  First, it allows the BOP to establish guidelines for the number and mix of medical staff to assign to each facility consistent with the care level population at each facility.  Second, it allows the BOP to evaluate every inmate for appropriateness of placement and to initiate movement of inappropriately housed inmates through routine transfers rather than waiting until the inmate experiences a crisis requiring direct air or ground transportation at a higher cost.  Third, it allows the BOP to consolidate inmates with similar medical conditions at facilities where appropriate services and providers are available.

16

To coordinate its placement of inmates in institutions commensurate with their care levels, the BOP developed the following phased implementation plan.

- Phase I – classify individual inmates as Care Level 1, 2, 3, or 4.

- Phase II – designate institutions as Care Level 1, 2, 3, or 4, and establish beds and staffing at each institution.

- Phase III – realign health care staff as needed.

- Phase IV – final implementation to include movement of inmates to the appropriate care level institutions.

As of October 1, 2007, the BOP was in Phase IV of the implementation plan.  According to a BOP management official, all Care Level 3 inmates who could be moved from Care Level 1 facilities had been moved.  Some inmates could not be moved for custody reasons, such as an inmate that must be housed in a maximum security facility.  According to this BOP official, such exceptions were rare.  As of June 2007, the BOP was in the process of identifying and prioritizing the movement of Care Level 3 inmates out of Care Level 2 facilities.  According to the BOP official, approximately 1,200 Care Level 3 inmates remained to be moved.  The BOP plans to complete Phase IV by December 2008.

*Medical Staff Restructuring*

During FY 2005, the BOP established staffing guidelines for Care Level 1, 2, and 3 institutions.  Since the existing staffing of the institutions did not always match the care level staffing guidelines, the BOP had to move medical staff throughout the BOP to implement the guidelines.  Institutions that had staff in positions contrary to the guidelines were required to either move the staff to another facility that needed them or reassign the staff to another authorized position in the facility.  According to a BOP management official, this process resulted in approximately 144 staff members in the Health Services Units throughout the BOP being transferred to another facility or reassigned to another position.  This process also freed up a number of positions that were returned to the BOP's Health Services Division and subsequently redistributed to institutions that were understaffed.

*Tele-medicine*

Tele-medicine involves the remote delivery of health care using telecommunications technologies.  For example, a psychiatrist may provide psychiatric services via video conferencing equipment to inmates throughout the BOP.  From September 1996 to December 1997, the BOP participated in a demonstration project to test the use of tele-medicine in three of its institutions.  Based on the success of the demonstration project, during FY 2000, the BOP purchased videoconferencing equipment for every facility.  Since that time the BOP has purchased videoconferencing equipment for each new institution.  The BOP primarily uses tele-medicine to provide psychiatry and radiology services.  A BOP management official told us that in the future the BOP plans to expand the use of tele-medicine to other disciplines, including orthopedics, wound care, physical therapy, social services, nutritional counseling, psychology, dentistry, cardiology, dermatology, podiatry, obstetrics and gynecology, and oncology.  As of September 2007, the BOP had not developed a specific schedule for the expansion.  The BOP believes that tele-medicine can make medical services more readily available while also containing and even reducing medical costs.

*Electronic Medical Records*

Through automation of inmate medical records, the BOP expects to reduce the paper records being produced, decrease the number of lost records, diminish the need to fax records from place to place, and improve the review and analysis of medical data.  In March 2006, the BOP began actively using its Bureau Electronic Medical Record (BEMR) system.  The initial BEMR system included the capability to:  (1) track comprehensive medical history and physical examination information, (2) schedule inmate medical visits when required, and (3) record medical-related supplies and equipment issued to inmates.  The BOP subsequently added a pharmacy module to the system (BEMRx) to manage the medications provided to inmates.

As of October 30, 2007, the BOP had deployed the BEMR system to 63 institutions, of which 24 included the BEMRx pharmacy module.  The BOP plans to deploy the electronic medical records system to the rest of its facilities by September 30, 2008.  The BOP also plans that the completed

18

BEMR electronic medical records system will include access to the tele-radiology archive and the Laboratory Information System.[20]

*Medical Claims Adjudication*

The BOP developed an initiative to target medical claims adjudication to ensure that medical claims are properly paid and that the BOP complies with the requirements of the Prompt Payment Act. Past OIG audits of BOP medical contracts identified systemic contract-administration deficiencies and erroneous contractor billings. In response to those findings, in April 2004 the BOP began researching the use of third-party medical claims processing services. In October 2004, the BOP received a presentation by the Department of Veterans Affairs (VA) regarding the medical claims processing services it provides to other government agencies. From February 2005 to December 2005, the VA's Financial Services Center demonstrated the viability of the VA services in adjudicating ("testing") the accuracy of medical payment vouchers previously paid at nine BOP institutions. The VA's Financial Services Center determined that the BOP had overpaid as much as $325,000 for the payments tested.

After the VA test, the BOP developed a Statement of Work defining requirements for medical claims adjudication services. In July 2006, the BOP issued a Request for Information asking interested vendors to submit information about the medical claims processing services they could provide for the BOP. The vendor responses indicated that the services sought are readily available and can be acquired through contracting actions. Beginning in July 2006, the BOP refined its requirements and finalized the Statement of Work in September 2007. The BOP expects to award a contract for medical claims adjudication services early in calendar year 2008.

*Medical Reference Laboratory*

Medical Reference Laboratories (MRL) perform laboratory tests of patient specimens. A doctor or nurse usually collects the specimen and sends it to the MRL for testing. The MRL then performs the requested tests on the specimen and returns the test results to the requestor. In 2001, the BOP established a mandatory MRL system at the following federal medical centers:

---

[20]  The tele-radiology archive stores digital radiographic images and associated interpretations without the risk of damage or loss applicable to film-based radiographs. The Laboratory Information System stores laboratory test results which can be retrieved by BOP personnel much quicker and easier than having the results mailed or faxed to them.

- United States Medical Center for Federal Prisoners, Springfield, Illinois;

- Federal Medical Center, Rochester, Minnesota; and

- Federal Medical Center, Butner, North Carolina.

This initiative was designed to contain or reduce health care costs by having medical staff at non-medical center institutions collect and ship specimens to one of the three MRLs where the laboratory tests could be performed by BOP staff at a lower cost than through individual contracts for laboratory services at each BOP institution.

*Medical Equipment*

The BOP also implemented an initiative in 1997 requiring that a senior official at BOP headquarters approve all purchases of medical equipment with a single item value of more than $1,000.  The BOP subsequently raised the approval threshold to $5,000.  To obtain approval, the requesting institution must submit a Major Equipment Justification and include evidence that the institution researched alternatives to find the best value for the equipment being acquired.  This helps ensure that BOP institutions are not frivolous with equipment requests and spending.  Under the initiative, the BOP also consolidates like purchases submitted for approval, which permits better pricing on bulk purchases through one of the Department of Defense's Defense Supply Centers.  The Defense Supply Centers primarily purchase items such as food, clothing and textiles, pharmaceuticals, medical supplies, construction items, and other equipment to support the U.S. military.  The centers also use their purchasing power to obtain such items for other federal agencies at a lower cost.

*Inmate Co-payment*

In October 2005, the BOP began requiring inmates to pay a $2 co-payment fee for certain types of medical evaluations.  The BOP does not charge indigent inmates a co-payment fee.  The BOP also does not charge inmates for certain medical services such as visits related to a chronic medical condition, preventive health visits, or evaluations related to pregnancy.  The BOP designed the initiative to reduce the number of unnecessary inmate-initiated medical visits.  A BOP analysis of data for the first 6 months of implementation showed a 33-percent reduction in the number of inmate-initiated medical visits as compared to the 6-month period prior to implementation.

*Medical Coverage*

Prior to January 2005, the BOP required 24-hour on-site medical coverage at all institutions. In January 2005, the BOP discontinued the requirement and instead required each institution to have a plan in place for providing emergency and urgent care services when needed. According to BOP Program Statement P6031.01 Patient Care, the plan should include a team of first responders trained to use the automatic external defibrillator and perform cardiopulmonary resuscitation. According to a BOP management official, this change allowed institutions to reassign staff to the day shift when inmates require the most medical care. This BOP official said that the reduction in premium pay for the overnight periods resulted in significantly reduced staffing costs.

*Staffing Provider Teams*

The BOP traditionally provided health care to inmates based on a "military" model using the concept of sick call and same day treatment. Under this concept, inmates were evaluated by an available provider that day. According to BOP officials, this led to inmates "practitioner shopping" where they would go from provider to provider for treatment of the same complaints. In 2005, the BOP began implementing the Patient Care Provider Team concept where inmates are assigned to a primary provider team that manages both the chronic and episodic care of the inmate. The BOP designed this approach to improve the consistency of treatment and eliminate the ability of the inmate to consume valuable staff resources by practitioner shopping. According to a BOP management official, implementation of this concept has reduced duplicate diagnostic tests, consultations, and treatments, thereby reducing overall medical costs.

## Cost Impact of the BOP's Health Care Initiatives

One of the primary purposes of the BOP's health care initiatives was to reduce or contain health care costs. However, the BOP could not provide us with cost benefit analyses for its 20 health care initiatives. Therefore, we were unable to assess the cost benefits of BOP initiatives on an individual basis. We were, however, able to analyze the BOP's overall inmate medical costs during our review period.

*Efforts to Measure Cost Benefits of BOP Health Care Initiatives*

For the 20 health care initiatives listed in Appendix II, we asked BOP officials for any cost-benefit analyses to justify implementation of the initiatives and any post-implementation analyses to determine their cost

impact.  Although the initiatives usually had a primary or secondary purpose of reducing or containing health care costs, the BOP could not provide documentation of any preliminary cost-benefit analyses or any post-implementation analyses to identify costs reduced or contained.

BOP management officials believed that preliminary cost-benefit analyses had been performed for many of the initiatives, but the analyses would have been done by BOP staff previously responsible for the initiatives and the documentation of the analyses was no longer available.  As for post-implementation analyses, BOP management officials told us that the BOP does not collect and maintain cost-related data that would allow it to analyze the cost-effectiveness of its individual health care initiatives.

While we are encouraged by the BOP's efforts to develop new initiatives to improve health care for inmates and to reduce and contain health care costs, we believe the BOP should collect cost-related data for each initiative and analyze the collected data to determine whether the initiatives are providing the anticipated cost benefits.  Without such analyses, the BOP may expend funds on initiatives that are not cost-effective.

*Cost Impact of the BOP's Health Care Initiatives*

Absent cost data for individual health care initiatives, we analyzed the overall effect of the BOP's initiatives on total medical costs.  For calendar years (CY) 2000 through 2006, we compared the BOP's per capita health care costs to the national average per capita cost for medical expenses as reported by the Department of Health and Human Services' (HHS) National Health Statistics Group and to the Consumer Price Index (CPI) for Medical Care published by the Department of Labor's (DOL) Bureau of Labor Statistics.  As shown in the following graph, we found that although the BOP experienced growth in health care costs in excess of the HHS national average and DOL CPI for some of the earlier years of our review period, the BOP's growth rates since 2002 have declined significantly while the growth rates in the HHS national average and the DOL CPI have not.

**Comparison of the Growth Rates of Health Care Costs for BOP, HHS, and DOL Health Care Data for Calendar Years 2000 through 2006[21]**



**Source:** BOP Office of Research and Evaluation, BOP Budget Execution Branch, Department of Health and Human Services, and Department of Labor

We recognize that the BOP's, HHS's, and DOL's per capita health care medical costs are not exactly comparable.  The BOP's medical per capita costs include costs for services not included in the HHS's and the DOL's per capita medical costs and vice versa.  For instance, the BOP's medical per capita costs include costs for medical guard escort services, airlift expenditures, and costs for replacement equipment, while the HHS's and the DOL's per capita medical costs do not include these items.  In contrast, the HHS's and the DOL's medical per capita costs include cost for health insurance, home health care, and over-the-counter drugs, while the BOP's per capita medical costs do not include these items.  Even though the costs are not fully comparable between the three measures, we believe the cost measures are sufficiently similar for comparison purposes and show that the BOP appears to be controlling the growth in health care costs.

---

[21] The BOP's, the Department of Health and Human Services' (HHS) and the Department of Labor's (DOL) per capita health care medical costs are not fully comparable. The BOP's medical per capita costs include costs for services not included in HHS's and the DOL's per capita medical costs and vice versa.  Even though the costs are not fully comparable between the three measures, we believe the cost measures are sufficiently similar for comparison purposes.  The HHS national average cost data was obtained from the HHS report, *National Health Expenditures Aggregate, Per Capita Amounts, Percent Distribution, and Annual Percent Change by Source of Funds: Calendar Years 2005 – 1960* (January 2007).  An updated report showing cost data for 2006 was not available.

**Providing Medical Services to Inmates**

In addition to analyzing the BOP's efforts to contain health care costs, we also evaluated whether the BOP was providing inmates with expected preventive medical services.  Both our audit testing and reviews by the BOP's Program Review Division found that BOP institutions do not always provide expected preventive medical services to inmates.

*OIG Testing*

As discussed in the Introduction, the BOP established 16 Clinical Practice Guidelines providing guidance to its institutions concerning health care services for inmates.  The BOP Medical Director considered the guidelines to be "best medical practices" and told us that while the guidelines have not been incorporated into the BOP's program statements as policy, he expects BOP institutions to provide these services to inmates.[22] The Medical Director also informed us that institutions have discretion to depart from the guidelines on a case-by-case basis.  However, institutions must request and receive approval from the Medical Director to not implement a specific guideline requirement.

To determine whether institutions were providing these medical services to inmates, we selected and tested services listed in the BOP's Preventive Health Care Clinical Practice Guideline.  We chose this particular BOP guideline because:

- It addressed care for all inmates, instead of only inmates with specific illnesses;

- It included diagnostic procedures for 9 of the 11 chronic conditions addressed in the other 15 guidelines;

- It contained clearly defined medical services that could be reasonably tested;

- Health promotion and disease prevention is a primary objective of the BOP's efforts to contain costs; and

- The BOP Medical Director told us that our testing of the preventive health care guideline would provide useful information to the BOP

---

[22]  The BOP publishes its mandatory policies and procedures in program statements. The BOP also publishes clinical practice guidelines that contain specific procedures and tests that the BOP expects its providers to follow when providing medical care to inmates.

because its per capita cost of providing health care should be reduced by implementing a good preventive health program, and he expects the institutions to provide the services in the guideline.

We identified 30 specific preventive health care services in the BOP's Preventive Health Care Clinical Practice Guideline with clearly defined requirements that allowed for testing whether the services were provided. Appendix III shows the 30 services we tested, which included whether: (1) inmates received a measles, mumps, and rubella vaccine, (2) inmates received a hepatitis A vaccine, (3) inmates received a cholesterol check in the last 5 years, (4) female inmates received a chlamydia test, and (5) female inmates received a bone density screening test.

To perform our testing of the 30 medical services, we selected a sample of 1,110 of the 14,026 inmates assigned to 5 BOP facilities as of March 24, 2007, as shown in the table below.  Appendix IV contains an explanation of our sampling methodology.

**Inmate Population and Inmates Sampled**

| BOP Facility | Inmate Population as of March 24, 2007 | Inmates Sampled |
|---|---|---|
| USP Atlanta (Georgia) | 2,494 | 251 |
| USP Lee (Virginia) | 1,808 | 133 |
| Federal Correctional Complex Terra Haute (Indiana) | 3,343 | 249 |
| Federal Medical Center Carswell (Texas) | 1,677 | 127 |
| Federal Correctional Complex Victorville (California) | 4,704 | 350 |
| Totals | 14,026 | 1,110 |

**Source:**  OIG sample from BOP inmate population data

For each inmate sampled, we reviewed the inmate's medical record and determined whether the inmate received the 30 preventive services, as applicable.  The 30 services were not applicable to all inmates sampled because certain services applied only to female inmates, the services applied only to inmates over a certain age, and the services applied only if the inmate had certain risk factors.  To validate our testing, we asked a Health Services Unit official at each of the facilities tested to confirm our results and ensure that we had not overlooked the provision of any service.

As shown in the following two charts, the combined results for all 5 locations showed that, for 16 of the 30 services tested, 90 percent or more of the inmates received the preventive service as appropriate.  For the remaining 14 services, more than 10 percent of the sampled inmates did not

receive the medical service.[23]  For example, 94 percent of the inmates who should have received a cardiovascular risk calculation had not received one in the last 5 years as required by BOP policy.  Additionally, 87 percent of the sampled inmates needing a measles, mumps, and rubella vaccine had not received this service.

### Overall Results of the OIG's Testing of Medical Services Provided to Inmates[24]



| Medical Service Tested | Inmates Tested | Yes | No |
|---|---|---|---|
| 1. Inmate medical history provided by inmate at intake | 1,044 | 99% | 1% |
| 2. Medical assessment completed by medical practitioner at intake | 1,044 | 99% | 1% |
| 3. New inmate tested for tuberculosis or previous test for transferred inmate confirmed, within 48 hours of intake | 1,043 | 99% | 1% |
| 4. Inmate received rapid plasma regain test during intake screening to test for syphilis | 403 | 92% | 8% |
| 5. Female inmate tested for chlamydia | 25 | 36% | 64% |
| 6. Female inmate received a measles/mumps/rubella vaccine | 128 | 81% | 19% |
| 7. Inmate received a complete physical within 14 days of intake | 1,044 | 95% | 4% |
| 8. Inmate received a pneumococcal vaccine | 93 | 74% | 23% |
| 9. Inmate received an annual influenza vaccine | 210 | 71% | 29% |
| 10. Inmate born after 1956 received a measles/ mumps/rubella vaccine | 932 | 13% | 87% |
| 11. Inmate received a tetanus vaccine in the last 10 years | 1,042 | 50% | 49% |
| 12. Inmate received a hepatitis A vaccine | 263 | 57% | 42% |
| 13. Inmate received a hepatitis B test or vaccine | 343 | 90% | 9% |
| 14. Inmate received a hepatitis C test | 267 | 91% | 8% |

---

[23]  The percentages in the chart are based on the number of inmates for whom the service was applicable.

[24]  Some percentages in the chart total less than 100 percent because documentation was not available to determine if the test was performed for some inmates.



| Medical Service Tested | Inmates Tested | Yes/No Percentages |
|---|---|---|
| 15. Inmate received an HIV-1 test | 381 | 93% Yes / 6% No |
| 16. Inmate received an HIV-2 test | 130 | 98% Yes / 2% No |
| 17. Inmate received a tuberculosis test in the past year | 869 | 98% Yes / 2% No |
| 18. Inmate received a chronic care evaluation in the last 6 months | 339 | 98% Yes / 2% No |
| 19. Inmate received a cholesterol check in the last 5 years | 678 | 71% Yes / 29% No |
| 20. Inmate received a cardiovascular risk calculation in the last 5 years | 402 | 6% Yes / 94% No |
| 21. Inmate received a fasting plasma glucose test in the last 3 years | 324 | 84% Yes / 12% No |
| 22. Inmate received a current blood pressure check | 1,043 | 96% Yes / 4% No |
| 23. Inmate received a current body mass index calculation | 1,036 | 12% Yes / 88% No |
| 24. Inmate received a fecal occult blood test | 189 | 46% Yes / 54% No |
| 25. Inmate received a vision screening test | 58 | 93% Yes / 7% No |
| 26. Inmate received a hearing screening test | 35 | 51% Yes / 49% No |
| 27. Inmate received an abdominal ultrasound test | 6 | 100% Yes |
| 28. Female inmate received a papanicolaou test (PAP smear) | 142 | 99% Yes / 1% No |
| 29. Female inmate received a current mammogram | 89 | 100% Yes |
| 30. Female inmate received a bone density screening test | 8 | 38% Yes / 62% No |

**Source:** OIG testing of BOP medical records

We could not determine if some services were provided because information was either not recorded or was missing from the inmates' medical records. Appendix VII contains our test results at each of the five BOP facilities. For each BOP location tested, the following chart presents the percentages of inmates not receiving a calculation for cardiovascular risk. As the chart shows, inmates at all five facilities rarely received this service.



**Source:** OIG testing of BOP medical records

Medical staff at three of the five institutions told us that they usually did not perform this service because they considered the service unnecessary or they use an alternate method to evaluate the inmate for this condition. Medical staff at another institution told us they did not perform this service because of staffing inadequacies and scheduling constraints. Officials at the other institution, FMC Carswell, declined to provide us with an explanation for not performing these services, stating that BOP headquarters would respond to the finding after we issued our report.

We also found a large inconsistency among the institutions in providing other medical services. For example, as shown in the chart below, we found that the percentage of applicable inmates not receiving a cholesterol check within the past 5 years ranged from 68 percent at USP Lee to 8 percent at FMC Carswell. This disparity indicates a need for better BOP headquarters oversight and guidance of the extent to which institutions implement expected services.



**Source:** OIG testing of BOP medical records

In another example, as shown in the following chart, we found that the percentage of applicable inmates not receiving a tetanus vaccine in the past 10 years ranged from 72 percent at USP Lee to 5 percent at USP Atlanta.



**Source:** OIG testing of BOP medical records

Additional inconsistencies between the five institutions can be seen by reviewing our results in Appendix VII.  These include large inconsistencies among the institutions in performing tests for chlamydia, hepatitis C, HIV, vision, and hearing; and providing vaccines for pneumonia; influenza; and measles, mumps, and rubella.

We asked officials at each of the five institutions for an explanation of why some services were not provided to a significant number of inmates. The explanations provided by institution officials are discussed below.

**USP Atlanta.**  USP Atlanta officials did not give us an explanation for why inmates were not provided a cholesterol test and a fasting glucose test, but gave the following explanations for not supplying other medical services to inmates.

- Influenza vaccine – Officials told us that the vaccine was not always available.

- Measles, Mumps, and Rubella vaccine – Officials said they believed that the requirement only applied to women.

- Cardiovascular risk calculation – Officials told us that they used alternative methods for determining cardiovascular risk.

- Body Mass Index calculation – Officials said they considered this calculation unnecessary.

29

- Fecal Occult Blood test – Officials told us that the inmates share the responsibility for completion of this test and that generally the inmates fail to return the test cards.

- Hearing Screening – Officials said that there was no occupational risk at the institution, and they overlooked the requirement for screening inmates age 65 and over.

Health Services Unit management officials at USP Atlanta said they viewed the Preventive Health Care Clinical Practice Guideline as a recommended, but not mandatory, regimen of health care practices and had identified certain tests or procedures that they did not consider necessary and therefore did not perform routinely. The USP Atlanta had not requested and received a waiver from the BOP Health Services Division to deviate from any of the guidelines.

USP Atlanta had not yet implemented BOP's Primary Care Provider Teams (PCPT), and this may have contributed to expected medical services not being provided. Under the PCPT model, each inmate is assigned to a medical team of health care providers and support staff who are responsible for managing the inmate's health care needs. The PCPT model is designed to provide inmates with better and more consistent medical care because the inmate is examined by the same provider team each time the inmate requires medical attention. The inmate should be less likely to miss some services because the provider team would be familiar with the services previously provided the inmate. According to the BOP's Preventive Health Care Clinical Practice Guideline, the most efficient and cost-effective way to implement the guideline is to assign appropriate responsibilities to each PCPT member. However, USP Atlanta officials told us that as a result of limited staffing they have been unable to establish the Primary Care Provider Teams.

After we performed audit tests at USP Atlanta, we met with the BOP's Medical Director and other management officials from the BOP's Health Services Division to clarify the BOP's expectations for institutional compliance with the Preventive Health Care Clinical Practice Guideline. BOP management officials told us that because of frequent changes in the guidelines and the lengthy process to change or update BOP policy in its program statements, they did not incorporate the clinical practice guidelines into the BOP's program statements. However, the Medical Director told us that he considers the clinical practice guidelines to be "best medical practices" and he expects the institutions to follow the guidelines when providing medical care to inmates. The Medical Director said that institution officials could use discretion and professional judgment when determining

whether to follow the guidelines on a case-by-case basis.  However, the Medical Director told us that if institution officials decide not to follow a guideline on an institution-wide basis, then the institution officials must request and receive his approval to do so.  The USP Atlanta had not done so.

**USP Lee.**  USP Lee medical officials told us that they did not provide routine tests and vaccines because of the cost of the procedures and the overall good health of USP Lee's Care Level 1 population.  USP Lee officials said that they rely heavily on the inmates' responsibility for improving their health and seeking preventive health care.  As was the case at USP Atlanta, medical officials at USP Lee also had not fully implemented the PCPT and did not use the Preventive Health Care Model.  Medical personnel at USP Lee told us that they had not fully implemented the PCPT because USP Lee was a Care Level 1 facility and its staff was limited.

**FCC Terre Haute.**  FCC Terre Haute medical officials told us that they did not provide routine tests and vaccines because of staffing inadequacies and scheduling constraints.  The medical officials at FCC Terre Haute also had not fully implemented the PCPT because of staffing shortages and did not use the Preventive Health Care Model.

**FMC Carswell.**  FMC Carswell medical officials declined our requests for an explanation of why certain services were not provided to inmates.  The officials said that BOP headquarters would provide a response after we issued our report.  Medical officials at FMC Carswell had implemented PCPT.  Officials told us while staff members and inmates were assigned to provider teams, nurses had to assist on multiple teams because of the limited number of nurses on staff.  As a result of our audit, staff at FMC Carswell identified areas for improvement, such as providing a chlamydia test to all females who were under 25 years of age.  This institution began providing the chlamydia test in accordance with the Clinical Practice Guideline immediately following our site visit.

**FCC Victorville**.  FCC Victorville medical officials told us that they did not provide routine tests and vaccines because it was too costly due to its large inmate population.  For instance, because of the high cost for vaccines, FCC Victorville generally provided vaccines such as tetanus to inmates with open injuries rather than every 10 years as required by the guideline.  Medical officials at FCC Victorville also had not fully implemented the PCPT.  Medical staff had assigned inmates to a mid-level practitioner, but staffing of provider teams was not complete.  As a result of our audit, staff at Victorville began implementing additional practices, such as bone density screening for female inmates, in accordance with the Preventive Health Clinical Practice Guideline.

31

*Testing by the BOP's Program Review Division*

The BOP's Program Review Division also has identified instances where institutions did not provide required medical services to inmates.  The Program Review Division performs reviews at BOP institutions, generally on a 3-year cycle, to determine whether the institutions are in compliance with a variety of BOP policies.  As part of these reviews, the teams determine whether the institution provided certain required medical services to inmates.

From FYs 2004 through 2006, the BOP's Program Review Division conducted 110 reviews at 88 locations.  Of the 110 reviews, 40 reviews (36 percent) identified a total of 25 required medical services that institutions did not always provide to inmates.  The following table shows the number of institutions that did not provide certain services.

| Medical Service not Provided | Number of Institutions Where Problem Found |
|---|---|
| 1. Inmates with chronic care conditions were not monitored as required. | 16 |
| 2. Some inmates were not monitored for psychotropic medical side effects. | 11 |
| 3. The Hepatitis-B vaccine was not offered to inmates in a high-risk work detail. | 8 |
| 4. Inmates did not receive adequate dental screening. | 7 |
| 5. Inmates did not receive a gynecological examination. | 6 |
| 6. HIV positive inmates did not receive counseling. | 5 |
| 7. Inmates admitted at a local hospital were not adequately monitored by a medical doctor. | 5 |
| 8. Inmates did not receive a timely intake physical. | 3 |
| 9. HIV positive inmates did not receive recommended vaccine. | 3 |
| 10. Inmates did not receive a baseline liver function test before isoniazid treatment. | 2 |

32

| Medical Service not Provided | Number of Institutions Where Problem Found |
|---|---|
| 11. Inmate physicals were missing vital signs. | 2 |
| 12. Inmates taking TB medications were not monitored for side effects. | 2 |
| 13. Tests ordered by physicians were not completed. | 2 |
| 14. Isoniazid treatment for latent tuberculosis was not extended when treatment was missed. | 2 |

**Source:** OIG analysis of BOP program review reports

*Potential Effect of Not Providing Services*

For a variety of reasons, inmates should be provided the medical services that BOP policies require or that BOP management expects. If expected medical services are not provided, an inmate's medical condition may worsen and the BOP may be faced with much higher medical treatment costs for an extended period of time.

During FYs 2004 through 2006, the BOP received 12,960 medical-related complaints. The BOP granted relief for 1,970 of these complaints. Over the same period, 6,030 medical-related complaints were appealed to the BOP's regional offices and 2,987 complaints were appealed to BOP headquarters. The BOP granted relief for 202 and 9 of these complaints, respectively.

For the same 3-year period, decisions were made on 233 medical-related lawsuits and appeals against the BOP. Of the 233 lawsuits and appeals, 221 were dismissed, 1 was decided favorably for the BOP, and 11 were settled out of court for a total of $2,036,790. The 11 settlements involved 3 claims of wrongful deaths and 8 claims of inadequate, improper, or negligent medical care. In a recent case, an inmate died 6 days after his first chronic care visit to a BOP medical provider. The BOP's mortality review for this case indicated that the inmate did not receive appropriate medical care during his incarceration. Specifically, upon intake at the facility on November 27, 2006, the inmate was referred to the chronic care clinic based on a history of severe scoliosis and chronic low back pain. However, the inmate was not seen in the chronic care clinic until 5 months later on April 27, 2007. A follow-up Electrocardiogram (EKG) was performed on May 1, 2007, and noted to be abnormal. However, the EKG results were not reviewed by a medical doctor until May 3, 2007, the day the inmate died of a heart attack.

**Conclusion**

The BOP has implemented numerous health care initiatives aimed at reducing or containing health care costs.  We were able to evaluate the BOP's overall health care costs, and we found that the BOP has done well in effectively controlling the overall rate of increase in its per capita health care costs, particularly when compared to national health care cost data reported by the Departments of Health and Human Services and Labor.  However, the BOP did not maintain cost data to measure the effect of its individual initiatives on specific and overall medical service costs.  Therefore, we could not determine the cost effectiveness of BOP health care initiatives on an individual basis.  We recommend that the BOP begin collecting and analyzing cost data for its medical services to determine the effectiveness of each of its initiatives in controlling and reducing the costs of specific medical services and overall inmate health care.  Without such analysis, the BOP cannot determine which initiatives are most effective and which are not producing desired results.

Additionally, we found that BOP institutions did not always provide inmates with the medical services expected by BOP management and identified in BOP guidance.  Our review, as well as evaluations performed by the BOP's Program Review Division, identified medical services that BOP institutions did not always provide to inmates.  The BOP Medical Director stated that he expects the institutions to provide these medical services to inmates.

The failure to correct these deficiencies could lead to higher costs for providing health care, decreases in the quality of health care provided, exacerbation of inmate medical conditions, medical-related complaints and lawsuits from inmates, and BOP liability for lack of adequate medical care.

We recommend that the BOP review the required medical services that the OIG and the BOP's Program Review Division determined were not provided consistently to inmates and decide whether the BOP still considers these services necessary.  If the BOP deems any of the services unnecessary, it should remove them from the guidelines that recommend the services be provided.  For services that the BOP determines are necessary, the BOP should develop a mechanism to ensure its institutions are consistently complying with BOP policy concerning these medical services.

34

**Recommendations**

We recommend that the BOP:

1.  Establish procedures for collecting and evaluating data for each current and future health care initiative to assess whether individual initiatives are cost-effective and producing the desired results.

2.  Review the medical services that the OIG and the BOP's Program Review Division identified as not always provided to inmates and determine whether those medical services are necessary, or whether the medical service requirement should be removed from the clinical practice guidelines.

3.  Issue clarifying guidance to the institutions regarding the medical services that BOP decides are necessary for BOP medical providers to perform.

## 2.  BOP CONTRACT ADMINISTRATION

Prior OIG audits of BOP medical contracts have identified multiple contract-administration deficiencies, such as inadequate review and verification of contractor invoices and inadequate supporting documentation for billings.  Several of these deficiencies appeared to be systemic.  The deficiencies primarily resulted from inadequate or non-existent guidance or procedures regarding critical management controls over these contracts. After these previous audits, the BOP took action to address individual deficiencies at the institutions we audited.  However, in this audit we found that other BOP institutions lacked appropriate controls in the same areas identified by our prior contract audits, which indicates the existence of systemic weaknesses that are not being adequately addressed by the BOP.

From August 2004 through March 2007, the OIG issued the following nine audit reports on BOP medical contracts.  Appendix X contains summaries of these audits.

**OIG Audits of BOP Medical Contracts**
**August 2004 through March 2007**

| Report Title and Number | Institution | Month and Year Issued |
|---|---|---|
| The Bureau of Prisons' Contract with the Parkview Medical Center for the Acquisition of Medical Services (J40604c-030), Audit Report  GR-60-04-008 | FCI Florence | August 2004 |
| Correctional Medical Services' Compliance with the Federal Bureau of Prisons' Contract J21451c-009, Audit Report GR-70-04-009 | FCI Fort Dix | September 2004 |
| The Federal Bureau of Prisons' Contract with Medical Development International for the Acquisition of Medical Services at its Leavenworth, Kansas Facilities (Contract No. DJB40804003), Audit Report GR-60-05-003 | USP Leavenworth | February 2005 |
| The Federal Bureau of Prisons' Medical Services Contract with Wayne Memorial Hospital, Jesup, Georgia (Contract J30703c-020), Audit Report GR-40-05-006 | FCI Jesup | April 2005 |
| The Federal Bureau of Prisons' Contract Number DJB21602-004 with Salem Community Hospital in Salem, Ohio, Audit Report GR-50-05-012 | FCI Elkton | June 2005 |

| Report Title and Number | Institution | Month and Year Issued |
|---|---|---|
| The Federal Bureau of Prisons' Medical Services Contract with Hospital Corporation of America - HealthONE, L.L.C., Contract No. J40303c-146, Audit Report GR-60-06-006 | FCI Englewood | March 2006 |
| The University of Massachusetts Medical School and UMass Memorial Health Care, Incorporated's Compliance with the Federal Bureau of Prisons' Contract DJB20507032, Audit Report GR-70-06-006 | FMC Devens | March 2006 |
| The Federal Bureau of Prisons' Medical Services Contract with John C. Lincoln Health Network Contract No. DJB60803144, Audit Report GR-60-06-009 | FCI Phoenix | August 2006 |
| The Bureau of Prisons' Management of the Medical Services Contract with Medical Development International, Butner, North Carolina, Contract No. DJB10611-00, Audit Report GR-40-07-003 | FCC Butner | March 2007 |

**Source:** OIG Audit Reports

Eight of the nine OIG contract audits identified major internal control deficiencies. The deficiencies included management control weaknesses pertaining to calculating medical service discounts, reviewing and verifying invoices and billings, paying bills, and managing the overall administration of the contracts. Based on the results of these audits, the following weaknesses appeared to be systemic.

- Six of the contract audits found weaknesses in verifying and reviewing the accuracy of invoices for medical services provided by the contract providers.

- Five of the contract audits found weaknesses in obtaining supporting documentation for contractor billings.

- Four of the contract audits found errors in the Medicare or diagnostic-related groups discount rates.

- Three of the contract audits found that the contractor did not provide the services stated in the contract, and the contractor's performance reports were either inaccurate or submitted in an untimely fashion.

The OIG contract audits identified about $12.3 million in questionable payments to the contractors. The audits usually found that the identified

weaknesses were attributable to the lack of written procedures and other internal controls.

As of November 2007, the BOP's Program Review Division said that corrective actions had been implemented for all recommendations in seven of the nine contract audits. For the other two audits, the BOP agreed to take corrective actions on our recommendations, and those actions were either completed or in progress as of November 2007.

In response to six of the nine audits, the BOP strengthened management controls by establishing written procedures for processing and monitoring contract medical claims. However, these actions were limited to correcting the deficiencies only at the institutions where the deficiencies were found. We found no indication that the corrective actions on the systemic weaknesses found in these audits were shared with other BOP institutions. Further, as discussed on page 19, in response to OIG findings on BOP's payment of medical claims, the BOP began an initiative in 2004 designed to ensure medical claims are properly paid. However, the BOP does not expect to award a contract for medical claims adjudication services until early in calendar year 2008. We found no indication that the BOP issued any interim guidance agency-wide to address the problems the OIG found with paying medical claims.

To address the OIG audit findings nationally, BOP officials told us that the following actions have been taken.

- The BOP's Field Acquisition Office staff visit institutions about 2 to 3 months after the award of a comprehensive medical contract to provide contract orientation, bill verification training, and a contract administration briefing.

- The BOP issued a memorandum to its regional directors and chief executive officers in February 2005 to heighten awareness of recurring findings in OIG audits. The BOP included a Contract Administration Checklist with the memorandum, but stated that use of the checklist was optional.

- The BOP provided training to almost 200 BOP institution contracting staff at Advanced Procurement Training classes that covered comprehensive medical contracts, contract administration guidance, and recurring findings in OIG audits.

As part of this larger audit of BOP medical services we tested other BOP institutions for controls related to the deficiencies identified in our nine

individualized BOP contract audits.  Internal control is a major part of managing an organization.  It includes the plans, methods, and procedures used to meet missions, goals, and objectives and, in doing so, supports performance-based management.  Internal controls on all transactions and other significant events need to be clearly documented, and the documentation should be readily available for examination.  The documentation should appear in management directives, administrative policies, or operating manuals and may be in paper or electronic form.  In addition, the documentation and records should be properly managed and maintained.

We interviewed BOP officials at the five BOP institutions where we conducted fieldwork during this audit and sent survey questionnaires to the remaining 88 BOP institutions.  Through the interviews and surveys we inquired if BOP institutions had established internal control procedures for their comprehensive medical services contracts, including:

- reviewing contractor invoices for accuracy,

- ensuring contractor invoices are supported by adequate documentation,

- ensuring that invoice discounts are properly applied,

- ensuring that contractor performance reports are complete and accurate, and

- ensuring that contractor timesheets are verified by a BOP employee.

If the institutions responded that procedures were established, we asked whether the procedures were in writing.  Despite the training conducted and the guidance issued by the BOP, we found that up to seven BOP institutions lacked critical controls for certain contract administration functions.  We also found that approximately half the institutions with critical controls had not documented the procedures associated with the controls.  Our analysis of survey responses found that 77 of the 88 BOP institutions surveyed had comprehensive medical service contracts.  Generally, officials at each institution responded that they had established internal control procedures for administering their institution's contracts.  However, we found that about half the institutions had not formalized these procedures in written policy for the controls we tested, as noted in the chart below.

40

**Controls Established by BOP Institutions for
Comprehensive Medical Services Contracts**

| Contract Administration Function | Number of Institutions | | | |
| --- | --- | --- | --- | --- |
| | Procedures not Established | Procedures Established | Procedures Established but not Written | Percent of Established Procedures not Written |
| Reviewing contractor invoices for accuracy | 1 | 76 | 39 | 51% |
| Ensuring contractor invoices are supported by documentation | 3 | 74 | 36 | 49% |
| Ensuring invoice discounts are properly applied | 7 | 70 | 34 | 49% |
| Ensuring contractor performance reports are complete and accurate | 2 | 75 | 35 | 47% |
| Ensuring contractor timesheets are verified by a BOP employee | 2 | 75 | 43 | 57% |

**Source:** BOP responses to OIG survey questionnaire

The lack of written procedures increases the risk that appropriate controls will not be fully and consistently implemented, especially when staff assignments and duties change. In the nine individual contract audits, failure to effectively implement the five controls had multiple effects. For example, in one audit of a major medical services contract, the OIG found that the BOP did not adequately review contractor invoices for accuracy, ensure contractor invoices were supported by documentation, and assure contractor timesheets were verified by a BOP employee. As a result of these weaknesses, the audit identified $2,428,345 in questioned costs related to:

- instances in which invoices contained transactions that were not within the billings' service period;

- transactions for which the contractor billed the BOP at a rate higher than specified in the contract;

- transactions in which the contractor billed the BOP for a cardiologist's reading of echocardiography results, which was not covered by the contract;

- transactions for timesheets that were either miscalculated, overstated, understated, or unsupported;

41

- transactions where the hours billed for contractor employees were greater than the hours recorded in the institution's contractor time logs;

- transactions where the hours billed were for contractor employees whose names did not appear in the contractor time logs; and

- inadequate support for billings for "on call" services provided under the contract.

Similar weaknesses were noted in the other contract audits. In short, if controls are not established, documented, and applied BOP-wide to address these contract administration functions, the BOP could experience similar negative effects on its medical contracts all across the BOP, such as paying contractor invoices that contain unallowable or unsupported costs.

## Conclusion

This audit, along with prior OIG audits of individual BOP medical contracts, found that BOP institutions lacked adequate management controls to ensure the effective administration of critical medical service contract functions. The absence of such controls appears to stem from BOP headquarters not identifying systemic weaknesses and implementing the necessary policies and internal control procedures to remedy the issues. We found in our individual BOP medical contract audits that the lack of management controls resulted in the BOP making questionable payments to contractors. In total, the OIG contract audits identified about $12.3 million in questionable payments to the contractors. We believe our findings in this review and in the individual audits on BOP medical contract administration illustrate the likelihood that similar weaknesses exist in medical contracts in other BOP institutions that we have not audited. We recommend that the BOP strengthen controls by providing guidance and procedures to its institutions to help ensure that systemic deficiencies are corrected throughout the BOP.

## Recommendation

We recommend that the BOP:

4. Strengthen management controls to ensure proper administration of BOP medical contracts by providing guidance and procedures to all BOP institutions for:

- reviewing contractor invoices for accuracy,

- ensuring contractor invoices are supported by adequate documentation,

- ensuring that invoice discounts are properly applied,

- ensuring that contractor performance reports are complete and accurate, and

- ensuring that contractor timesheets are verified by a BOP employee.

## 3.  MONITORING BOP HEALTH CARE PROVIDERS

The BOP monitors its health care providers by performing program reviews of institution operations, reviewing medical provider skills and qualifications and providing authorization documents based on the review results, and requiring institutions to accumulate and submit to BOP headquarters data on health-related performance measures.  However, while the BOP corrected deficiencies at the specific institutions where its program reviews found weaknesses, it did not develop and issue guidance to correct systemic deficiencies found during the reviews.  Additionally, we determined that the BOP allowed some health care providers to practice medicine without valid authorizations.  Also, health care providers did not have their practices peer reviewed to ensure the quality of their medical care as required by BOP policy.  Moreover, while BOP institutions accumulated and reported data on health-related performance measures, the methods used to do so were inconsistent and the data was not analyzed to evaluate the performance of BOP institutions.

The BOP uses numerous mechanisms to monitor its health care providers.  Some of the mechanisms include:

- conducting internal program reviews to determine whether each institution is properly implementing BOP policies, including policies related to inmate health care;

- granting clinical privileges and establishing practice agreements and protocols based on health care providers' qualifications, knowledge, skills, and experience;[25]

- conducting peer reviews of health care providers to assess the competency of the providers; and

- requiring each institution to accumulate and report performance data on a quarterly basis for specific health-related areas.

The primary purpose of these monitoring mechanisms is to help ensure the quality and efficiency of health care delivered to inmates by identifying and correcting deficiencies in the provision of health care, and in

---

[25]  Clinical privileges and practice agreements authorize the specific clinical or dental duties that health care providers may provide to BOP inmates.

authorizing duties for health care providers commensurate with their skills and capabilities.

## The BOP's Program Review Results

Program Statement P1210.23, Management Control and Program Review Manual, requires that the BOP's Program Review Division perform a comprehensive review of each program or operation at each BOP institution in accordance with published program review guidelines. The program reviews are generally conducted once every 3 years, or more frequently if the reviews identify overall performance that is less than a certain level. Program Review Guideline G6000I.04, Health Services, provides the specific review steps for the Program Review Division to complete when performing a program review of the health services function at BOP institutions.

From FYs 2004 to 2006, the Program Review Division conducted 110 program reviews of health care at 88 BOP locations. We reviewed the resulting reports and determined that the Program Review Division consistently identified deficiencies related to inmate health care. As discussed in Finding 1 of this report, 40 of the 110 reviews found medical services deficiencies.

In response to these reviews, the Program Review Division required institutions to certify completion of corrective actions addressing the deficiencies it identified. The Program Review Division also prepared quarterly program summary reports that identified the most frequent deficiencies found during the program reviews. The Division provided the summary reports to all BOP Chief Executive Officers, including the BOP Health Services Division Medical Director. However, a senior Health Services Division official told us that the BOP probably would not change policy when program reviews find problems in a certain area, but it may provide training to improve staff knowledge and compliance. The official said the Division relies on the BOP Regional Offices and institutions to correct the problems.

We analyzed the 40 BOP reviews and found that 25 different medical services were not provided to inmates and that 14 of the 25 deficiencies were identified for multiple institutions. For example, as shown in the table on page 32, the Program Review Division found inmates with chronic care conditions that were not monitored at 16 BOP institutions as required by BOP policy. Also, the reviews found inmates that were not monitored for psychotropic medical side effects at 11 institutions.

We recommend that the BOP use the program summary reports to develop or clarify guidance to correct systemic deficiencies identified during the internal program reviews.

## The BOP's Credential Verification, Privileges, and Practice Agreement Program

In providing inmate health care, BOP institutions employ or contract for the following health care providers.

- **Licensed independent practitioners** are medical providers authorized by a current and valid state license to independently practice medicine, dentistry, optometry, or podiatry.

- **Non-independent practitioners** are graduate physician assistants (certified or non-certified), dental assistants, dental hygienists, nurse practitioners, and unlicensed medical graduates.

- **Other practitioners** are those not included in the above categories and include clinical nurses and emergency medical technicians.

The BOP's Program Statement P6027.01 provides guidance for implementing the BOP's Health Care Provider Credential Verification, Privileges, and Practice Agreement Program.  Under this program, the BOP: (1) grants clinical privileges to licensed independent practitioners based on the practitioner's qualifications, knowledge, skills, and experience; (2) establishes practice agreements between its licensed independent practitioners and its non-independent practitioners, such as mid-level practitioners; (3) establishes protocols that must be followed by other health care providers, such as clinical nurses and emergency medical technicians; and (4) performs peer reviews of all providers who function under clinical privileges or practice agreements.

*Privileges, Practice Agreements, and Protocols*

The BOP grants clinical privileges to its in-house and contracted practitioners.  Clinical privileges are the specific duties that a health care provider is allowed to provide to BOP inmates.  The following authority is assigned to grant institution specific clinical privileges.

- The BOP Medical Director grants privileges for institution physicians designated as the Clinical Director, including a physician who is appointed as Acting Clinical Director while the permanent position is vacant.  The BOP Medical Director also grants privileges for Clinical

47

Specialty Consultants and Chief Dental Officers.  The Medical Director delegated privilege-granting authority for the Chief of Psychiatry at BOP institutions to the BOP's Chief Psychiatrist.

- The institution's Clinical Director grants privileges for other licensed independent practitioners who deliver medical health care at the institution, including contractors, consultants, and those involved in tele-health.

- The BOP Chief Dental Officer grants privileges for all institution Chief Dental Officers.

- The institution Chief Dental Officer grants privileges for institution dentists.

BOP policy states that clinical privileges can be granted for a period of not more than 2 years, and that newly employed physicians can be granted privileges for a period of not more than 1 year.  Independent practitioners are prohibited from practicing medicine within the BOP until they have been granted privileges to do so by an authorized BOP official.

The individual institutions establish practice agreements between licensed independent practitioners and non-independent practitioners. Practice agreements delegate specific clinical or dental duties to non-independent practitioners under a licensed independent practitioner's supervision and are valid for no more than 2 years.  Non-independent practitioners include graduate physician assistants, nurse practitioners, and unlicensed medical graduates who must be directly supervised by a licensed independent practitioner.  BOP policy prohibits non-independent practitioners from providing health care within the BOP until a practice agreement has been established.

The BOP's other health care providers, such as clinical nurses and emergency medical technicians, must work under protocols approved by licensed independent practitioners.  A protocol is a plan for carrying out medical-related functions such as a patient's treatment regimen.

To determine whether the BOP maintained current privileges, practice agreements, and protocols for each of its practitioners, we sent survey questionnaires to 88 BOP institutions.  We asked BOP staff at each location to provide the date and a copy of the latest:  (1) privilege-granting document for licensed independent practitioners, (2) practice agreement for non-independent practitioners, and (3) protocol for other health care providers.  We analyzed the BOP responses to identify instances when the

48

appropriate authorization document was either not provided to new medical providers or not renewed for existing medical providers.  We identified 134 practitioners who did not have current privileges, practice agreements, or protocols as shown in the following table.

**BOP Medical Practitioners without Current Privileges, Practice Agreements, or Protocols**

| Type of Authorizing Document | Practitioners Requiring Authorizing Document | Practitioners without Authorizing Document | Percent without Authorizing Document |
|---|---|---|---|
| Privileges | 680 | 72 | 11% |
| Practice Agreement | 466 | 42 | 9% |
| Protocol | 390 | 20 | 5% |
| Totals | 1,536 | 134 | 9% |

**Source:** Responses by BOP institution officials to OIG survey questionnaire

We also found that 28 of the 42 practitioners without a current practice agreement had medical service privileges authorized.  These practitioners were non-independent practitioners who should not require privileges based on the BOP's policy.  While there may be rare instances where it is appropriate to grant non-independent practitioners privileges instead of practice agreements, the large number of practitioners incorrectly authorized indicates that BOP institution officials did not have a good understanding of BOP policies regarding medical practitioner authorization. We also noted a similar situation for 9 of the 20 practitioners without current protocols.  These nine practitioners had been granted privileges or were given practice agreements instead of protocols as required by BOP policy.  In addition, the BOP's response to our survey questionnaires showed that 267 practitioners were provided multiple levels of authority.  For example, 146 practitioners were provided both practice agreements and privileges.  Again, we believe this indicates that BOP staffs at the institutions do not consistently understand BOP authorization policies.

Based on the responses we received from BOP institution officials regarding why the practitioners did not have current privileges, practice agreements, or protocols, we believe that confusion exists among the officials as to which type of authorization different health care providers should receive.

Allowing practitioners to provide medical care to inmates without current privileges, practice agreements, or protocols increases the risk that the practitioners may provide medical services without having the qualifications, knowledge, skills, and experience necessary to correctly perform the services.  As a result, the BOP could be subjected to liability

claims by inmates if improper medical services are provided by these practitioners.

The BOP should ensure that practitioners are properly authorized to provide medical care to inmates. To accomplish this, it is essential that the BOP establish privileges, practice agreements, or protocols for all practitioners, as applicable. The BOP must also reevaluate and renew the privileges, practice agreements, and protocols in a timely manner. Moreover, the BOP must emphasize the importance of valid privileges, practice agreements, or protocols and not allow practitioners without current authorizations to practice medicine in BOP institutions.

*Peer Reviews*

BOP policy requires that BOP health care providers have a periodic peer review. A peer is defined as another provider in the same discipline (physician, dentist, mid-level practitioner, or others) who has firsthand knowledge of the provider's clinical performance. Using a sample of the provider's primary patient load, the peer reviewer should evaluate the professional care the provider has given and comment on the provider's:

- actual clinical performance;

- appropriate utilization of resources;

- participation in, and results of, performance improvement activity;

- clinical judgment; and

- technical skills.

BOP health care providers who are privileged or working under a practice agreement must have at least one peer review every 2 years. Each Clinical Director, Chief Dental Officer, and Clinical Psychiatrist must also have a peer review at least once every 2 years.

In our survey questionnaire sent to 88 BOP institutions, we asked the BOP to provide the date of the last peer review for all providers who were privileged or working under practice agreements. For the 891 such providers, the responses to the questionnaire indicated that 430 (48 percent) had not received a peer review within the past 2 years.

We asked BOP officials about the lack of peer reviews. The officials responsible for more than half of the non-current peer reviews did not

provide an explanation.  The officials responsible for the remaining non-current peer reviews cited the following reasons.

- The officials rely on the contractors to do peer reviews.

- The officials believed that the peer review requirement did not apply to mid-level practitioners, dental assistants, or dental hygienists.

- The officials relied on other types of performance reviews instead of doing the required peer reviews.

Without current peer reviews, the BOP has a higher risk of not detecting circumstances where providers may not be giving adequate medical care to inmates.  If inadequate professional care goes undetected, the providers may not receive the training or supervision needed to improve the delivery of medical care.  Moreover, inadequate care by a practitioner without a current peer review also increases the risk of BOP liability arising from any formal complaints or medical malpractice suits filed by inmates.

**The BOP's Health Care Performance Measures**

The BOP has also established national performance measures for health care, including annual targets or goals, for management of: (1) hypertension, (2) cholesterol, (3) diabetes, (4) HIV, (5) tuberculosis, (6) asthma, (7) breast cancer, (8) cervical cancer, and (9) pregnancy. Appendix VIII shows how each performance measure is calculated and the target percentage, or goal, that BOP established each performance measure.

A BOP official told us that the BOP had not established written procedures to be followed by institutions in accumulating and submitting performance measure data to headquarters.  According to the official, the institutions have been asked since 2004 to submit quarterly reports containing data for the performance measures to BOP's Health Services Division.  However, the official noted that compliance to this request was voluntary.

In our survey questionnaire, we asked institution officials if they had completed the performance measure calculations for the nine performance measures for calendar year 2004 through the first quarter of calendar year 2007.  The following table details the 99 responses from officials at the 88 BOP locations.

51

| Performance Measure Calculations Completed for Calendar Year | BOP Response[26] | | | |
|---|---|---|---|---|
| | Yes | No | Not Applicable | No Response |
| **2004** | 59 | 28 | 10 | 2 |
| **2005** | 77 | 14 | 4 | 4 |
| **2006** | 87 | 11 | 0 | 1 |
| **2007** (1st Quarter) | 90 | 7 | 1 | 1 |

**Source:** BOP responses to OIG survey questionnaires

Based on the responses, institutions completing the performance measure calculation increased each year since 2004.  We followed up with BOP officials for institutions that did not complete performance measure calculations and the officials usually could not provide an explanation for why the measures were not completed and said that the person who was responsible for completing the calculations was no longer at the institution. Officials who did provide an explanation usually attributed not completing the performance measures to staffing shortages.

In our survey, we also asked the BOP to provide a copy of the performance measure reports completed.  We analyzed performance measure reports and found that BOP institutions often did not meet the target levels established for the nine target goals.  For the 9 health care performance measures we tested, we found that the institutions reported performance below the target level for more than 20 percent of the quarters reported for 7 of the 9 performance measures as shown in the following table.

| Performance Measure | Number of Reporting Institutions | Number of Quarters Reported | Number of Quarters Below Target | Percentage of Quarters Below Target |
|---|---|---|---|---|
| **Clinical Management of Hypertension** | 79 | 728 | 153 | 21% |
| **Clinical Management of Lipid Level** | 79 | 723 | 437 | 60% |
| **Clinical Management of Diabetes – HbA1C Level** | 79 | 729 | 285 | 39% |
| **Clinical Management of HIV/ Ribonucleic Acid Level** | 79 | 723 | 184 | 25% |

[26]   The 99 total responses to our survey questions was more than the 88 BOP locations surveyed because 6 of the locations surveyed submitted separate responses for the 17 BOP institutions at the locations.  Performance measures were not applicable for some institutions primarily because the institutions are new and were not active for the years tested.

| Performance Measure | Number of Reporting Institutions | Number of Quarters Reported | Number of Quarters Below Target | Percentage of Quarters Below Target |
|---|---|---|---|---|
| Completion of Isoniazid Treatment | 79 | 602 | 169 | 28% |
| Asthma Related Hospitalization or Mortality | 79 | 601 | 51 | 8% |
| Breast Cancer Screening | 13 | 131 | 27 | 21% |
| Cervical Cancer Screening | 13 | 131 | 27 | 21% |
| Pregnancy Test at Intake | 13 | 131 | 13 | 10% |

**Source:** OIG analysis of BOP performance data

We asked a BOP official at the Health Services Division if the division staff review the performance reports submitted and take action to help the institutions improve their performance and reach target levels. The official informed us that the Office of Quality Management staff receive the performance reports, perform a trend analysis of the results, and summarize the results in the Office of Quality Management's Annual Report. However, the official also told us that institution participation in reporting the performance measures is voluntary and they do not develop agency-wide corrective actions when the performance is below target levels. We concluded that unless BOP officials more closely monitor the performance data submitted and take actions to help the institutions improve performance in areas not meeting target levels, the institutions will likely continue to not provide the expected level of health care to inmates.

The BOP official also stated that instructions have not been provided to the institutions on how to properly accumulate and report data related to the performance measures. Consequently, a BOP Health Services Division official said that the institutions are inconsistent in how they accumulate and report performance data. We were informed by this official that the BOP is developing a training program to educate institution staff on how to properly accumulate and report performance data. According to the Chief of the BOP's Quality Management Section, a meeting was held in December 2007 with the institution Health Services Administrators to discuss collecting of national performance measure data. Another meeting is planned for January 2008 to discuss with Regional Medical Directors any adjustments needed to the performance measurement system.

**Conclusion**

The BOP monitors its health care providers through various methods such as performing program reviews of institution operations, reviewing medical provider skills and qualifications and providing authorization documents based on the review results, and requiring institutions to accumulate and submit to BOP headquarters data on health-related performance measures.  We found that the BOP has corrected deficiencies at the institutions where deficiencies were found, but it does not generally develop and issue guidance to correct systemic deficiencies found during the reviews.  We believe that unless BOP-wide guidance is issued for systemic deficiencies identified through program reviews, deficiencies existing at other BOP institutions likely will remain uncorrected.

We also found that the BOP allowed health care providers to practice medicine without valid authorizations.  Allowing practitioners to provide medical care to inmates without current privileges, practice agreements, or protocols increases the risk that the practitioners may provide medical services without having the qualifications, knowledge, skills, and experience necessary to correctly perform the services.  In addition, the BOP could be subjected to liability claims by inmates if improper medical services are provided by these practitioners.

In addition, providers have not had their medical practices evaluated by a peer as required by BOP policy.  Without a current peer review the BOP has a higher risk of providers giving inadequate professional care to inmates.  Also, if inadequate professional care goes undetected, the providers may not receive the training or supervision needed to improve the delivery of medical care.

Institutions report performance measure data to BOP's Office of Quality Management, which performs trend analyses of the results and summarizes the results in its annual report.  However, a senior official told us that the BOP does not develop agency-wide corrective actions when the performance is below target levels.  We believe it is essential that the BOP take corrective actions when performance is below targets to help ensure that inmates are provided adequate medical care.

**Recommendations**

We recommend that the BOP:

5.  Develop a process to use the program summary reports prepared by the Program Review Division to develop or clarify agency-wide guidance on systemic deficiencies found during program reviews.

6.  Ensure initial privileges, practice agreements, or protocols are established for all practitioners, as applicable.

7.  Ensure privileges, practice agreements, and protocols are revaluated and renewed in a timely manner.

8.  Ensure that practitioners are not allowed to practice medicine in BOP institutions without current privileges, practice agreements, or protocols.

9.  Ensure that peer reviews of all providers are performed within the prescribed timeframes.

10. Until the training program on accumulating and reporting performance data is implemented, issue guidance to all institutions on how to accumulate and report data for the health care performance measures to ensure consistency in the way institutions collect and report performance data.  Once the training program is fully developed, ensure that appropriate institution staff receive the training.

11. Establish a process for reviewing the health care performance measures reported by institutions that includes actions that will be taken when institutions are not meeting the target performance levels.

# STATEMENT ON COMPLIANCE WITH
# LAWS AND REGULATIONS

The Federal Managers Financial Integrity Act of 1982 requires agencies to establish and maintain internal controls to provide assurance that agency funds are safeguarded against waste, loss, unauthorized use, or misappropriation. The Office of Management and Budget Circular No. A-123, Management's Accountability and Control defines management's responsibilities related to internal control. The BOP's controls for providing necessary medical care to inmates are established primarily by BOP program statements and clinical practice guidelines. To obtain reasonable assurance that the BOP complied with laws and regulations that, if not complied with, could have a material effect on the BOP's provision of health care to inmates, we tested the BOP's compliance with BOP's guidelines for providing inmate health care contained in the following BOP program statements and clinical practice guidelines.

- P1210.023 Management Control and Program Review

- P6010.02, Health Services Administration

- P6013.01, Health Services Quality Improvement

- P6027.01, Health Care Provider Credential Verification, Privileges, and Practice Agreement Program

- P6031, Patient Care

- P6190.03, Infectious Disease Management

- P6270.01, Medical Designations and Referral Services for Federal Prisoners

- Preventive Health Care Clinical Practice Guideline

Except for instances of noncompliance identified in the Findings and Recommendations section of this report, we did not identify any other instances of noncompliance with the policies we tested.

# STATEMENT ON INTERNAL CONTROLS

In planning and performing our audit of the BOP's Efforts to Manage Inmate Health Care, we considered the BOP's internal controls for the purpose of determining our auditing procedures.  The evaluation was not made for the purpose of providing assurance on the internal control structure as a whole; however, as shown below, we noted certain matters that we consider reportable conditions under generally accepted government auditing standards.[27]

### Finding I

- The BOP did not maintain documentation of any preliminary cost-benefit analyses or post-implementation analyses to identify costs reduced or contained for its health care initiatives.

- The BOP's institutions did not always provide recommended preventative medical services to inmates.

### Finding II

- The BOP institutions had not established controls to ensure that contract administration deficiencies found during OIG audits of medical contracts at other BOP institutions were corrected.

- The BOP had not addressed agency-wide the systemic deficiencies found during OIG audits of BOP medical contracts.

### Finding III

- The BOP had not addressed agency-wide the systemic deficiencies found during the Program Review Division's program reviews at BOP institutions.

- The BOP had not established effective controls to ensure that BOP health care providers were provided privileges, practice agreements, or protocols as required by BOP policy.

---

[27]  Reportable conditions involve matters coming to our attention relating to significant deficiencies in the design or operation of the internal control structure that, in our judgment, could adversely affect the ability of the BOP to administer health care to inmates.

- The BOP had not established effective controls to ensure that BOP health care providers received an internal peer review as required by BOP policy.

- The BOP had not established an effective system for monitoring institution progress against performance measures and taking actions when performance was below target levels.

Because we are not expressing an opinion on the BOP's overall internal control structure, this statement is intended solely for the information and use of the BOP in managing inmate health care.

# ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| Act | Federal Managers Financial Integrity Act of 1982 |
| AIDS | Acquired Immunodeficiency Syndrome |
| BEMR | Bureau Electronic Medical Records |
| BEMRx | Bureau Electronic Medical Records Pharmacy Module |
| BOP | Federal Bureau of Prisons |
| CD | Clinical Director |
| CMS | Correctional Medical Services |
| COSTEP | Commissioned Officer Student Training Extern Program |
| CPI | Consumer Price Index |
| CY | Calendar Year |
| DOL | Department of Labor |
| FCC | Federal Correctional Complex |
| FCI | Federal Correctional Institute |
| FDC | Federal Detention Center |
| FMC | Federal Medical Center |
| FPC | Federal Prison Camp |
| FSC | Financial Services Center |
| FSL | Federal Satellite Low |
| FTC | Federal Transfer Center |
| FY | Fiscal Year |
| GAO | Government Accountability Office |
| HbA1C | Hemoglobin A1C test |
| HealthONE | Hospital Corporation of America-HealthONE, L.L.C. |
| HHS | Department of Health and Human Services |
| HIV | Human Immunodeficiency Virus |
| HSD | BOP's Health Services Division |
| HSU | Health Services Unit |
| MCC | Metropolitan Correctional Center |
| MDC | Metropolitan Detention Center |
| MDI | Medical Development International |
| MED | Medium Security |
| MRC | Medical Referral Centers |
| MRI | Magnetic Resonance Imaging |
| MRL | Medical Referral Laboratory |
| MRSA | Methicillin-Resistant Staphylococcus Aureus |
| OIG | Office of the Inspector General |
| PAP | Papanicolaou Test |
| PCPT | Primary Care Provider Team |
| PHS | Public Health Service |
| PMC | Parkview Medical Center |
| TB | Tuberculosis |
| UMass | Joint venture between the University of Massachusetts *Medical School and UMass Memorial Health Care, Incorporated* |
| USMCFP | United States Medical Center for Federal Prisoners |

| USP | United States Penitentiary |
| VA | Department of Veterans Affairs |
| WMH | Wayne Memorial Hospital |

**APPENDIX I**

## Audit Objectives, Scope, and Methodology

### Objectives

The objectives of this audit were to determine whether the BOP: (1) appropriately contained health care costs in the provision of necessary medical, dental, and mental health care services; (2) effectively administered its medical services contracts; and (3) effectively monitored its medical services providers.

### Scope and Methodology

We performed the audit in accordance with *Government Auditing Standards* and included tests and procedures necessary to accomplish the objectives.  We performed the audit from January 16, 2007, to November 14, 2007.  We conducted fieldwork at the following locations:

| | |
|---|---|
| BOP Headquarters | Washington, D.C. |
| USP Atlanta | Atlanta, Georgia |
| FMC Carswell | Forth Worth, Texas |
| USP Lee | Jonesville, Virginia |
| FCC Terre Haute | Terre Haute, Indiana |
| FCC Victorville | Victorville, California |

*Health Care Costs*

To determine whether the BOP appropriately contained health care costs we:

- obtained and analyzed health care cost data from FYs 2000 to 2007 to identify long-term trends in costs;

- identified the major BOP cost containment initiatives since FY 2000;

- reviewed each BOP initiative to identify the original implementation plan, budget, and anticipated impact on costs and then assessed the implementation of each initiative; and

- evaluated the cumulative effect of the initiatives on health care costs.

*Medical Care Services Provided*

We initially determined that the BOP's Preventive Health Care Clinical Practice Guideline included the appropriate provisions to use in testing the BOP's overall inmate health care.  We selected this guideline as the basis for our testing because it:

- addressed care for all inmates, instead of just inmates with specific illnesses;

- included the diagnostic procedures for all but 2 of the chronic conditions addressed in the other 15 guidelines;

- contained definitive and finite medical services that could be tested for completion, while testing of services in the other 15 guidelines would require medical expertise; and

- is a primary objective of the BOP in its efforts to contain costs and promote health and prevent disease.

From the medical procedures listed in the guideline, we developed a list of 30 medical procedures to test.  We selected a preliminary statistical sample of 251 inmates at USP Atlanta, because our sample was representative of the inmates incarcerated there.  We reviewed the medical records of the inmates in our sample and determined if they received the applicable service required based on age or medical need.  To validate our testing, we asked a USP Atlanta Health Service Unit official to verify the results of our review to ensure that we had not overlooked any reference to the provision of any medical service tested.  Our preliminary test results showed that inmates did not receive all the necessary health care services, and we expanded our testing to include other BOP institutions.

For our expanded audit testing, we selected 859 additional inmates at 4 additional BOP locations within 4 of the BOP's regions.  Including the preliminary sample reviewed at USP Atlanta, our sample consisted of 1,110 inmates at 5 BOP locations in 5 BOP regions.  Appendix IV explains our sampling methodology.  The sample size we tested at each location is shown in the following table.

| Location of Institutions | Sample Size |
|---|---|
| USP  Atlanta | 251 |
| USP  Lee | 133 |
| FCC Terre Haute | 249 |
| FMC Carswell | 127 |
| FCC Victorville | 350 |
| Total | 1,110 |

**Source:** OIG sample from BOP inmate population data

*Medical Services Contractor Oversight*

To determine whether the BOP effectively administered its medical services contracts we:

- reviewed previous OIG audits of comprehensive BOP medical services contracts and identified similar conditions and causes of contract administration deficiencies existing at multiple BOP institutions;

- interviewed personnel at five BOP institutions and determined if the causes for the deficiencies also existed at those BOP facilities;

- used a questionnaire to survey all other BOP institutions to determine if the causes for the deficiencies also existed at those institutions; and

- determined whether the BOP developed and issued policies and procedures to address any systemic deficiencies.

To determine whether the BOP effectively monitored its medical services providers we:

- evaluated the BOP's review process for monitoring contractor performance at the national, regional, and institutional levels;

- determined whether the five BOP institutions selected for testing had implemented adequate monitoring processes of their health care providers;

- surveyed BOP institutions through a questionnaire to determine if they had implemented adequate monitoring processes for health care providers;

- assessed whether the BOP's monitoring system for health care is capable of detecting the types of deficiencies identified in this and prior OIG audits; and

- determined whether the BOP performed trend analyses of its program review findings to identify systemic deficiencies and issued BOP-wide guidance to address the weaknesses.

**APPENDIX II**

# BOP Initiatives since FY 2000 to Improve the Effectiveness and Efficiency of Inmate Health Care

| Initiative | Description |
|---|---|
| 1. Medical Designations Program | This initiative involves:  (1) assigning each inmate a care level from 1 to 4, with 1 being the healthiest inmates and 4 being inmates with the most significant medical conditions; (2) assigning each BOP institution a care level designation from 1 to 4 based on the care level of inmates the institution is staffed and equipped to handle; (3) staffing each institution based on its designated care level; and (4) moving inmates between institutions to match each inmate's care level to the care level of the institution. |
| 2. Medical Staff Restructuring | Under this initiative, the BOP established staffing guidelines for Care Level 1, 2, and 3 institutions.  Because the existing staffing of the institutions did not always match the care level staffing guidelines, the BOP had to move medical staff throughout the BOP to implement the guidelines.  Institutions that had staff in positions contrary to the guidelines were required to either move the staff to another facility or reassign the staff to another authorized position in the facility. |
| 3. Tele-medicine | This initiative involves the remote delivery of health care using telecommunications technologies, such as video-conferencing. |
| 4. Electronic Medical Records | This initiative involves automating the medical records for inmates.  The initial system included the capability to: (1) track comprehensive history and physical examination information, (2) schedule inmate medical visits when required, and (3) track medical-related supplies and equipment issued to inmates.  The BOP subsequently added a pharmacy module to the system to manage the medications provided to inmates. |
| 5. Medical Claims Adjudication | This initiative is designed to ensure the BOP properly pays medical claims and complies with requirements of the Prompt Payment Act.  In April 2004, the BOP began researching the feasibility of using third-party medical claims processing services.  The BOP developed a Statement of Work defining its requirements for medical claims adjudication services and in July 2006, the BOP issued a Request for Information asking interested commercial vendors to submit specific information about the claims processing services they provide.  From July 2006 to September 2007, the BOP refined its requirements and finalized the Statement of Work in September 2007. The BOP expects to award a contract for the medical claims adjudication services early in calendar year 2008. |

| Initiative | Description |
|---|---|
| 6. Medical Reference Laboratory | In 2001, the BOP established a Medical Reference Laboratory (MRL) system at the:  (1) United States Medical Center for Federal Prisoners, Springfield, Illinois; (2) Federal Medical Center, Rochester, Minnesota; and (3) Federal Medical Center, Butner, North Carolina.  This initiative was designed to contain or reduce health care costs by enabling non-medical facilities within the BOP to collect and ship specimens to one of the three MRLs, where the laboratory tests could be performed at a lower cost than through individual contracts throughout the country. |
| 7. Medical Equipment | The BOP implemented this initiative in 1997 requiring that a senior official at BOP headquarters approve all purchases of medical equipment with a single item value of more than $1,000.  BOP subsequently raised the threshold to $5,000.  To obtain approval, the requesting institution must submit a Major Equipment Justification and include evidence that the institution researched alternatives to find the best value for the equipment being acquired.  This helps ensure that BOP institutions are not frivolous with equipment requests and spending.  Under the initiative the BOP also consolidates like purchases submitted for approval, which permits better pricing on bulk purchases through one of the Department of Defense's Defense Supply Centers.  The Defense Supply Centers primarily purchase items such as food, clothing and textiles, pharmaceuticals, medical supplies, construction items, and other equipment to support the U.S. military.  The centers also use their purchasing power to obtain such items for other federal agencies at a lower cost. |
| 8. Inmate Co-payment | This initiative was implemented in October 2005 and required inmates to pay a $2 fee when requesting certain types of medical evaluations.  The BOP does not charge indigent inmates a co-payment fee.  The BOP also does not charge inmates for certain medical services such as visits related to a chronic medical condition, preventive health visits, or evaluations related to pregnancy.  The initiative was designed to reduce the number of unnecessary inmate initiated medical visits.  A BOP analysis of data for the first year of implementation showed a significant decrease in the number of inmate initiated medical visits. |

| Initiative | Description |
|---|---|
| 9. Medical Coverage | In January 2005, the BOP discontinued the requirement for 24-hour on-site medical coverage at non-medical institutions.  Instead of 24-hour on-site medical coverage, each institution is now required to have a plan in place for providing emergency and urgent care services to inmates consistent with American Correctional Association standards.  The plan should include a team of first responders trained to use the automatic external defibrillator and perform cardiopulmonary resuscitation as clinically indicated.  This change allowed institutions to reassign staff to the day shift when inmates require the most medical care.  According to the BOP, the reduction in premium pay for the 8-hour overnight period that is no longer staffed resulted in significantly reduced staffing costs. |
| 10. Staffing Provider Teams | The BOP has traditionally provided health care to inmates based on a "military" model utilizing the concept of sick call and same-day treatment.  Any available provider evaluated an inmate, and this led to "practitioner shopping" by the inmates, and inconsistency in the approach to treatment of episodic complaints.  In 2005, the BOP began implementing the Patient Care Provider Team concept, where inmates are assigned to a primary provider team that manages both the chronic and episodic care of the inmate.  This approach is designed to improve the consistency of treatment and eliminate the ability of the inmate to consume valuable staff resources by going from provider to provider for treatment for the same complaint.  According to the BOP, implementation of provider teams has reduced duplicate diagnostic tests, consultations, and treatments. |
| 11. Federal Resource Sharing | This is an ongoing initiative through which the BOP has existing contracts with the Department of Veterans Affairs to obtain local medical services at the facility level, such as laboratory services, tele-medicine, HIV tests, and others.  The initiative is designed to contain or reduce costs for these medical services by taking advantage of the "economies of scale" available through the Department of Veterans Affairs that are not available to the BOP or private sector laboratories. |

| Initiative | Description |
|---|---|
| 12. Health Promotion | In 2000, the BOP had a three-person team in its Health Services Division that worked on Health Promotion and Disease Prevention initiatives.  In recent years, the BOP disbanded this team and the functions of promoting health within the inmate population were realigned to appropriate groups within the Health Services or other divisions.  In 2005, the Health Services Division issued its Preventive Health Care Clinical Practice Guidelines outlining risk-based screening for inmates to identify and monitor those at risk for developing serious medical conditions such as diabetes, sequels of HIV infection, and heart disease.  This initiative is designed to promote better health among inmates beginning at admission to the facility and continuing throughout the inmate's incarceration.  This guideline was revised in April 2007. |
| 13. Consolidation Pilot Project with the United States Marshals Service | This project was conducted in FY 2000 at three BOP institutions and was designed to determine the financial, personnel, medical, and other resources that would be necessary for the BOP to assume responsibility for medical services for the United States Marshals Service's inmates housed in BOP facilities.  The project was deemed successful and expanded to include the following BOP institutions:  all existing Federal Medical Centers (FMC) in June 2000; the Brooklyn Metropolitan Detention Center (MDC) in May 2005; and the Guaynabo MDC, Fort Devens FMC, Seagoville FCI, and Atlanta FCI in October 2006.  The Marshals Service reimburses the BOP for expenses incurred by the BOP for providing community-based medical care to the U.S. Marshals Service's prisoners housed at BOP institutions. |
| 14. National Cardiopulmonary Resuscitation and Automated External Defibrillator Contract | This initiative is designed to provide cardiopulmonary resuscitation and automated external defibrillator training and certification to BOP health care staff through a nationally negotiated contract with standardized pricing.  The BOP approved and submitted a Request for Contracting Action in May 2007 and the BOP expects to award the contract early in calendar year 2008. |
| 15. National Medical Air Transportation Contract | This initiative is designed to provide a single nationwide contract for medical air transportation services for all BOP institutions at standardized and best-value pricing.  During FY 2007, the BOP conducted market research and issued a Request for Information.  The BOP plans to award the contract during FY 2008. |
| 16. National Comprehensive Medical Contract and Preferred Provider Organization | This initiative is designed to provide a contract for health care services for all of the BOP's institutions at standardized and best-value pricing.  At the end of FY 2007, the BOP was conducting market research for this initiative. |

| Initiative | Description |
|---|---|
| 17. Catastrophic Case Management | This initiative is designed to:  (1) implement a catastrophic case management system to provide clinical oversight and intervention of complex and specialized care cases, and (2) provide funding reimbursement to the institutions to mitigate the fiscal impact those cases have on the institutions' medical budgets.  As of the end of FY 2007, the BOP had drafted preliminary procedures and protocols for internal review and comment.  The BOP anticipates submitting this initiative to the BOP's Executive Staff for consideration in FY 2008. |
| 18. Mobile Surgery | This initiative is designed to provide a national contract for mobile surgery services at standardized and best-value pricing.  The contract is expected to provide on-site surgical services through a mobile surgical unit in lieu of sending inmates outside of the institutions for surgery.  The BOP formed a workgroup during FY 2007 and identified three institutions in the Southeast Region to pilot this initiative.  Further implementation will be predicated on the success of the pilot, status of existing medical services contracts, and the ability of the contractor to expand the services to other BOP institutions. |
| 19. Magnetic Resonance Imaging, Computerized Axial Tomography, and Mammography | This initiative is designed to provide a national contract for magnetic resonance imaging, computerized axial tomography, and mammogram services at standardized and best-value pricing.  The BOP began market research during FY 2007. |
| 20. Staffing and Recruiting | Through this initiative begun in FY 2007, the BOP is attempting to identify novel, unique, and unconventional strategies to recruit and retain health care workers, with the understanding that there is and will continue to be shortages of trained and qualified health care workers in the United States and worldwide. |

**Source:** Data provided by BOP officials

# APPENDIX III

## Medical Services Selected for Testing from the BOP's Preventive Health Care Clinical Practice Guideline

| Medical Service | Applicability |
|---|---|
| 1. The Inmate History, Part 1 of Form 360, was completed by the inmate during intake screening. | All inmates. |
| 2. The Medical Assessment, Part 2 of Form 360 was completed by the medical practitioner during intake screening. | All inmates. |
| 3. New inmates were tested for tuberculosis (TB), or transferred inmates were confirmed for TB testing within 48 hours of entering the institution. | All inmates. |
| 4. Inmates were given a rapid plasma reagin test during intake screening to test for syphilis. | All female inmates and male inmates with identified risk factors. |
| 5. Inmates were given a test for chlamydia during intake screening. | All females inmates under age 25 with identified risk factors. |
| 6. Inmates were given a Measles, Mumps, and Rubella vaccine during intake screening. | All female inmates of child-bearing-age if not received as an adult. |
| 7. Inmates were given a complete physical examination within 14 days of arriving at the institution to include:  (1) medical and mental assessments, (2) dental assessment, and (3) appropriate laboratory and diagnostic tests.  Also, the completion of the physical examination was signed off on the Standard Form 88 by the institution Clinical Director. | All inmates. |
| 8. Inmates had received or refused a current pneumococcal immunization. | All inmates age 65 or over and inmates under age 65 with identified risk factors. |
| 9. Inmates had received or refused an annual influenza immunization. | All inmates over age 50. |
| 10. Inmates had received or refused a current Measles, Mumps, and Rubella vaccination. | All inmates born after 1956. |
| 11. Inmates had received or refused a current tetanus vaccination. | All inmates every 10 years. |
| 12. Inmates had received or refused a current Hepatitis A vaccine. | All inmates with identified risk factors. |
| 13. Inmates had received or refused a current Hepatitis B test. | All inmates with identified risk factors. |
| 14. Inmates had received or refused a current Hepatitis C test. | All inmates with identified risk factors. |

| Medical Service | Applicability |
|---|---|
| 15. Inmates had received or refused an HIV-1 test. | All inmates with identified risk factors. |
| 16. Inmates had received or refused an HIV-2 test. | All inmates with identified risk factors. |
| 17. Inmates tested for TB annually (past positive determination or X-ray if confirmed past positive). | All inmates. |
| 18. Inmates with chronic care conditions were evaluated every 6 months. | All inmates with chronic care conditions. |
| 19. Inmates had their cholesterol and high-density lipoproteins checked once every 5 years. | All male inmates age 35 and over, all female inmates age 45 and over, and all other inmates age 20 and over with identified risk factors. |
| 20. Inmates had received a calculation of their risk for cardiovascular disease every 5 years. | All diabetic inmates age 40 and over, all male inmates age 40 and over, and all female inmates age 45 and over. |
| 21. Inmates had received a fasting plasma glucose test for diabetes every 3 years. | All inmates age 45 and over with identified risk factors. |
| 22. Inmates had been checked for hypertension by having their blood pressure checked either annually or every 3 years, as applicable. | Annually - All inmates age 50 or over. Every 3 Years – All inmates under age 50. |
| 23. Inmates had been checked for obesity by receiving a calculation of their body mass index either annually or every 3 years, as applicable. | Annually - All inmates age 50 or over. Every 3 Years – All inmates under age 50. |
| 24. Inmates had received a fecal occult blood test to check for colorectal cancer as recommended. | All inmates age 50 and over. |
| 25. Inmates had received a vision screening as recommended. | All inmates age 65 and over. |
| 26. Inmates had received a hearing screening as recommended. | All inmates age 65 and over and all other inmates in an occupational risk assignment. |
| 27. Inmates had received an abdominal ultrasound test to check for an abdominal aneurysm. | All male inmates with a history of smoking and age 65 or over. |
| 28. Inmates had received a papanicolaou test (Pap smear) to test for cervical cancer either annually or every 3 years, as applicable. | Annually - All female inmates under age 31. Every 3 Years – All female inmates age 31 to 65. |

74

| Medical Service | Applicability |
|---|---|
| 29. Inmates received a mammogram to check for breast cancer either annually or every 2 years, as applicable. | Annually – Offered to all female inmates and given to all female inmates age 40 and over with identified risk factors.<br><br>Every 2 Years – All female inmates age 40 and over without identified risk factors. |
| 30. Inmates received bone density screening to check for osteoporosis as recommended. | All female inmates age 60 to 64 with identified risk factors and all female inmates age 65 and over. |

**Source:** BOP Preventive Health Care Clinical Practice Guideline

# APPENDIX IV

## Sample Methodology

The population was defined as the Federal Prison inmates in multiple federal facilities at five different locations.  The defined population contained 14,026 inmates (sampling units) in multiple BOP facilities located in the following five BOP locations.

- Atlanta, Georgia

- Carswell, Texas

- Lee County, Virginia

- Terre Haute, Indiana

- Victorville, California

Considering that the inmate health care administration could vary from location to location, we employed a stratified random sampling design to provide effective coverage and to obtain precise estimates of the statistic. In addition, the characteristics of the population that affect the test questions are the inmate age, gender, and facility type.  Incorporating these additional variables into the sampling plan, a multi-stage stratified sample design was employed.  The primary strata was BOP facility locations.  The secondary strata was facility type.  The last strata was age groups.  The sample allocation considered to different strata was proportional to the population sizes.  The details of sample sizes, sample allocation to different locations, and the test result statistics are presented in the body of the report.

APPENDIX V

## BOP Institutions and Inmates Housed
## As of November 29, 2007[28]

| Institution | State | Care Level | Inmates |
|---|---|---|---|
| 1. ALDERSON FPC | WV | 2 | 1,141 |
| 2. ALLENWOOD LOW FCI | PA | 2 | 1,388 |
| 3. ALLENWOOD MED FCI | PA | 2 | 1,431 |
| 4. ALLENWOOD USP | PA | 2 | 1,129 |
| 5. ASHLAND FCI | KY | 2 | 1,233 |
| ASHLAND-CAMP | KY | 2 | 325 |
| 6. ATLANTA USP | GA | 2 | 2,108 |
| ATLANTA-CAMP | GA | 2 | 506 |
| 7. ATWATER USP | CA | 1 | 1,126 |
| ATWATER-CAMP | CA | 1 | 129 |
| 8. BASTROP FCI | TX | 2 | 1,218 |
| BASTROP-CAMP | TX | 2 | 186 |
| 9. BEAUMONT LOW FCI | TX | 2 | 1,861 |
| 10. BEAUMONT MED FCI | TX | 2 | 1,707 |
| 11. BEAUMONT USP | TX | 2 | 1,496 |
| BEAUMONT USP-CAMP | TX | 2 | 538 |
| 12. BECKLEY FCI | WV | 2 | 1,602 |
| BECKLEY-CAMP | WV | 2 | 417 |
| 13. BENNETTSVILLE FCI | SC | 2 | 1,650 |
| BENNETTSVILLE-CAMP | SC | 2 | 139 |
| 14. BIG SANDY USP | KY | 2 | 1,483 |
| BIG SANDY-CAMP | KY | 2 | 130 |
| 15. BIG SPRING FCI | TX | 2 | 1,616 |
| BIG SPRING-CAMP | TX | 2 | 181 |
| 16. BROOKLYN MDC | NY | 2 | 2,565 |

[28]  As of November 29, 2007, the BOP housed an additional 33,354 inmates in privately managed, contracted, or other facilities.  Some BOP locations incorporate more than one BOP institution.  For instance, the BOP has two facilities at its Ashland, Kentucky, location:  Ashland FCI and Ashland-CAMP.

| Institution | State | Care Level | Inmates |
|---|---|---|---|
| 17. BRYAN FPC | TX | 2 | 971 |
| 18. BUTNER FMC | NC | 4 | 956 |
| 19. BUTNER LOW FCI | NC | 3 | 1,308 |
| 20. BUTNER MED I FCI | NC | 3 | 725 |
| BUTNER-CAMP | NC | 3 | 314 |
| 21. BUTNER MED II FCI | NC | 3 | 1,245 |
| 22. CANAAN USP | PA | 2 | 1,513 |
| CANAAN-CAMP | PA | 2 | 125 |
| 23. CARSWELL FMC | TX | 4 | 1,540 |
| CARSWELL-CAMP | TX | 4 | 257 |
| 24. CHICAGO MCC | IL | 2 | 730 |
| 25. COLEMAN I USP | FL | 2 | 1,627 |
| 26. COLEMAN II USP | FL | 2 | 1,635 |
| 27. COLEMAN LOW FCI | FL | 2 | 2,017 |
| 28. COLEMAN MED FCI | FL | 2 | 1,727 |
| COLEMAN MED FCI-CAMP | FL | 2 | 489 |
| 29. CUMBERLAND FCI | MD | 2 | 1,160 |
| CUMBERLAND-CAMP | MD | 2 | 297 |
| 30. DANBURY FCI | CT | 2 | 1,248 |
| DANBURY-CAMP | CT | 2 | 193 |
| 31. DEVENS FMC | MA | 4 | 993 |
| DEVENS-CAMP | MA | 4 | 121 |
| 32. DUBLIN FCI | CA | 2 | 1,140 |
| DUBLIN-CAMP | CA | 2 | 333 |
| 33. DULUTH FPC | MN | 2 | 812 |
| 34. EDGEFIELD FCI | SC | 2 | 1,647 |
| EDGEFIELD-CAMP | SC | 2 | 542 |
| 35. EL RENO FCI | OK | 2 | 1,115 |
| EL RENO-CAMP | OK | 2 | 262 |
| 36. ELKTON FCI | OH | 2 | 1,860 |
| ELKTON-FSL | OH | 2 | 581 |

| Institution | State | Care Level | Inmates |
|---|---|---|---|
| 37. ENGLEWOOD FCI | CO | 2 | 905 |
| ENGLEWOOD-CAMP | CO | 2 | 158 |
| 38. ESTILL FCI | SC | 2 | 1,118 |
| ESTILL-CAMP | SC | 2 | 304 |
| 39. FAIRTON FCI | NJ | 2 | 1,437 |
| FAIRTON-CAMP | NJ | 2 | 113 |
| 40. FLORENCE ADMAX USP | CO | 2 | 484 |
| FLORENCE USP-CAMP | CO | 2 | 534 |
| 41. FLORENCE FCI | CO | 2 | 1,208 |
| 42. FLORENCE HIGH USP | CO | 2 | 987 |
| 43. FORREST CITY FCI | AR | 2 | 2,021 |
| FORREST CITY FCI-CAMP | AR | 2 | 310 |
| 44. FORREST CITY MED FCI | AR | 2 | 1,666 |
| 45. FORT DIX FCI | NJ | 2 | 2,051 |
| FORT DIX-CAMP | NJ | 2 | 413 |
| 46. FORT WORTH FCI | TX | 3 | 1,754 |
| 47. GILMER FCI | WV | 2 | 1,708 |
| GILMER-CAMP | WV | 2 | 131 |
| 48. GREENVILLE FCI | IL | 2 | 1,192 |
| GREENVILLE-CAMP | IL | 2 | 315 |
| 49. GUAYNABO MDC | RQ | 2 | 1,357 |
| 50. HAZELTON USP | WV | 2 | 1,651 |
| HAZELTON-CAMP | WV | 2 | 130 |
| HAZELTON-FEMALE CAMP | WV | 2 | 622 |
| 51. HERLONG FCI | CA | 1 | 923 |
| HERLONG-CAMP | CA | 1 | 122 |
| 52. HONOLULU FDC | HI | 2 | 641 |
| 53. HOUSTON FDC | TX | 2 | 1,010 |
| 54. JESUP FCI | GA | 2 | 1,101 |
| JESUP-CAMP | GA | 2 | 152 |
| JESUP-FSL | GA | 2 | 639 |

81

| Institution | State | Care Level | Inmates |
|---|---|---|---|
| 55. LA TUNA FCI | TX | 2 | 1,060 |
| LA TUNA-CAMP | TX | 2 | 242 |
| LA TUNA-FSL (EL PASO) | TX | 2 | 411 |
| 56. LEAVENWORTH USP | KS | 2 | 1,602 |
| LEAVENWORTH-CAMP | KS | 2 | 404 |
| 57. LEE USP | VA | 1 | 1,523 |
| LEE USP-CAMP | VA | 1 | 131 |
| 58. LEWISBURG USP | PA | 2 | 1,531 |
| LEWISBURG-CAMP | PA | 2 | 571 |
| 59. LEXINGTON FMC | KY | 4 | 1,476 |
| LEXINGTON-CAMP | KY | 4 | 297 |
| 60. LOMPOC FCI | CA | 2 | 1,538 |
| 61. LOMPOC USP | CA | 2 | 1,785 |
| LOMPOC USP-CAMP | CA | 2 | 504 |
| 62. LORETTO FCI | PA | 2 | 1,305 |
| LORETTO-CAMP | PA | 2 | 150 |
| 63. LOS ANGELES MDC | CA | 2 | 953 |
| 64. MANCHESTER FCI | KY | 1 | 1,115 |
| MANCHESTER-CAMP | KY | 1 | 513 |
| 65. MARIANNA FCI | FL | 2 | 1,215 |
| MARIANNA-CAMP | FL | 2 | 297 |
| 66. MARION USP | IL | 2 | 891 |
| MARION-CAMP | IL | 2 | 304 |
| 67. MCCREARY USP | KY | 2 | 511 |
| MCCREARY-CAMP | KY | 2 | 136 |
| 68. MCKEAN FCI | PA | 2 | 1,247 |
| MCKEAN-CAMP | PA | 2 | 320 |
| 69. MEMPHIS FCI | TN | 2 | 1,202 |
| MEMPHIS-CAMP | TN | 2 | 337 |
| 70. MIAMI FCI | FL | 2 | 1,100 |
| MIAMI FCI-CAMP | FL | 2 | 385 |
| 71. MIAMI FDC | FL | 2 | 1,696 |

| Institution | State | Care Level | Inmates |
|---|---|---|---|
| 72. MILAN FCI | MI | 2 | 1,479 |
| 73. MONTGOMERY FPC | AL | 2 | 911 |
| 74. MORGANTOWN FCI | WV | 2 | 1,118 |
| 75. NEW YORK MCC | NY | 2 | 752 |
| 76. OAKDALE FCI | LA | 2 | 1,338 |
| 77. OAKDALE FDC | LA | 2 | 497 |
| OAKDALE FDC-CAMP | LA | 2 | 152 |
| 78. OKLAHOMA CITY FTC | OK | 2 | 1,541 |
| 79. OTISVILLE FCI | NY | 2 | 1,094 |
| OTISVILLE-CAMP | NY | 2 | 118 |
| 80. OXFORD FCI | WI | 2 | 1,084 |
| OXFORD-CAMP | WI | 2 | 206 |
| 81. PEKIN FCI | IL | 2 | 1,153 |
| PEKIN-CAMP | IL | 2 | 303 |
| 82. PENSACOLA FPC | FL | 2 | 685 |
| 83. PETERSBURG FCI | VA | 2 | 1,312 |
| PETERSBURG FCI-CAMP | VA | 2 | 346 |
| 84. PETERSBURG MED FCI | VA | 2 | 1,828 |
| 85. PHILADELPHIA FDC | PA | 2 | 1,181 |
| 86. PHOENIX FCI | AZ | 2 | 1,080 |
| PHOENIX-CAMP | AZ | 2 | 325 |
| 87. POLLOCK USP | LA | 1 | 1,494 |
| POLLOCK-CAMP | LA | 1 | 133 |
| 88. RAY BROOK FCI | NY | 2 | 1,220 |
| 89. ROCHESTER FMC | MN | 4 | 873 |
| 90. SAFFORD FCI | AZ | 1 | 804 |
| 91. SAN DIEGO MCC | CA | 2 | 994 |
| 92. SANDSTONE FCI | MN | 1 | 1,224 |
| 93. SCHUYLKILL FCI | PA | 2 | 1,317 |
| SCHUYLKILL-CAMP | PA | 2 | 308 |
| 94. SEAGOVILLE FCI | TX | 2 | 1,908 |
| SEAGOVILLE-CAMP | TX | 2 | 170 |

| Institution | State | Care Level | Inmates |
|---|---|---|---|
| 95. SEATAC FDC | WA | 2 | 976 |
| 96. SHERIDAN FCI | OR | 2 | 1,355 |
| SHERIDAN-CAMP | OR | 2 | 499 |
| 97. SPRINGFIELD USMCFP | MO | 4 | 1,117 |
| 98. TALLADEGA FCI | AL | 2 | 995 |
| TALLADEGA-CAMP | AL | 2 | 367 |
| 99. TALLAHASSEE FCI | FL | 2 | 1,249 |
| 100. TERMINAL ISLAND FCI | CA | 3 | 1,063 |
| 101. TERRE HAUTE FCI | IN | 3 | 1,226 |
| TERRE HAUTE FCI-CAMP | IN | 3 | 399 |
| 102. TERRE HAUTE USP | IN | 3 | 1,530 |
| 103. TEXARKANA FCI | TX | 2 | 1,444 |
| TEXARKANA-CAMP | TX | 2 | 354 |
| 104. THREE RIVERS FCI | TX | 1 | 1,157 |
| THREE RIVERS-CAMP | TX | 1 | 362 |
| 105. TUCSON FCI | AZ | 3 | 778 |
| 106. TUCSON USP | AZ | 3 | 775 |
| TUCSON-CAMP | AZ | 3 | 123 |
| 107. VICTORVILLE MED I FCI | CA | 2 | 1,513 |
| 108. VICTORVILLE MED II FCI | CA | 2 | 965 |
| VICTORVILLE MED II-CAMP | CA | 2 | 242 |
| 109. VICTORVILLE USP | CA | 2 | 1,485 |
| 110. WASECA FCI | MN | 2 | 1,080 |
| 111. WILLIAMSBURG FCI | SC | 1 | 1,622 |
| WILLIAMSBURG-CAMP | SC | 1 | 140 |
| 112. YANKTON FPC | SD | 1 | 859 |
| 113. YAZOO CITY FCI | MS | 1 | 1,863 |
| YAZOO-CAMP | MS | 1 | 137 |
| 114. YAZOO CITY MED FCI | MS | 1 | 1,474 |
| **Total Inmates** | | | **166,794** |

**Source:** BOP website

**APPENDIX VI**

## Summary of BOP Program Statements Related to the Provision of Medical, Dental, and Mental Health Services

The BOP has developed and issued the following program statements that provide BOP policy and guidance related to the provision of medical, dental, and mental health services to BOP inmates.

**P6010.02 Health Services Administration** — requires the BOP to deliver necessary health care to inmates effectively in accordance with proven standards of care without compromising public safety concerns inherent to the BOP's overall mission.

**P6013.01 Health Services Quality Improvement** — requires the BOP to establish an outcome-based quality improvement system in the health care programs at every BOP institution.

**P6031.01 Patient Care** — requires the BOP to effectively deliver medically necessary health care to inmates in accordance with proven standards of care without compromising public safety concerns inherent to the agency's overall mission.  The statement requires every BOP institution to establish a Utilization Review committee chaired by the Clinical Director to review:

- outside medical, surgical, and dental procedures;
- requests for specialist evaluations, in-house or escorted trips to the specialist's office;
- requests for "Limited Medical Value" treatments and procedures;
- retrospective review of all cases sent to the community hospital during hours when no health care provider was on duty at the institution;
- case considerations for extraordinary care;
- concurrent review of inpatients at community hospitals; and
- other services the primary care provider or the Clinical Director have recommended.

**P6031.02 Inmate Copayment Program** — provides that the BOP may under certain circumstances charge an inmate under the BOP's custody, a fee for providing inmate health care services.  However, inmates are not to be denied access to necessary health care because of the inmate's inability to pay the copay fee.

85

**P6270.01 Medical Designations and Referral Services for Federal Prisoners** — specifies procedures and criteria for transporting inmates who require medical care.  The Central Office Medical Designator, Office of Medical Designations and Transportation, makes medical designations, referrals, and denials based on:

- urgency of need;
- cost-effectiveness;
- BOP institution capabilities;
- expected service period, including recuperation;
- current bed space availability;
- security; and
- consultation with BOP physicians at the sending and receiving institutions.

**P6090.01 Health Information Management** — provides guidance for ensuring that accurate and complete health records and qualified health record practitioners are available for delivering health services.

**P6400.02 Dental Services** — requires the BOP to stabilize and maintain the oral health of inmates in BOP institutions.  Dental care is to be conservative, providing necessary treatment for the greatest number of inmates within available resources.  Dental care should be provided to inmates by health care providers, who provide quality care consistent with professional standards.

**P6340.04 Psychiatric Services** — requires the BOP to provide psychiatric services that address the physical, medical, psychological, social, vocational and rehabilitative needs of inmates in the BOP's custody who suffer from mental illnesses and disorders.

**P6360.01 Pharmacy Services** — requires the BOP to provide inmates access to quality, necessary, cost-effective pharmaceutical care.

**P6370.01 Laboratory Services** — provides guidance to ensure that laboratory services will be regularly available to meet the needs of inmates at all BOP institutions.

**P6541.02 Over-the-Counter Medications** — establishes a program allowing inmates improved access to over-the-counter medications.  The statement provides that inmates may buy over-the-counter medications that are available at the institution commissary.  Inmates may also obtain over-the-counter medications at sick call if the inmate does not already have the medication and if:  (1) health services staff determine that the inmate has

86

an immediate medical need which must be addressed before his or her regularly scheduled commissary visit, or (2) the inmate does not have funds to purchase the medication at the commissary.

**P6027.01 Health Care Provider Credential Verification, Privileges, and Practice Agreement Program** — provides that each Health Services Unit will ensure that professional credentials for all health care providers inside the institution are verified at the primary source (the issuer of the credential).  Providers include BOP staff, Public Health Services (PHS) staff, part-time staff, contract and consultant staff, and those who provide a diagnosis or treatment using tele-health.

**P6021.04 Commissioned Officer Student Training Extern Program (COSTEP)** — encourages all BOP institutions to actively consider the COSTEP Program of the PHS as a viable recruitment supplement.  The objectives of using COSTEPs are:

- eligible COSTEP students will be recruited for health care work in BOP facilities, and

- some COSTEP students will return to careers in the BOP after graduation.

**P6190.03 Infectious Disease Management** — provides that the BOP will manage infectious disease in the confined environment of a correctional setting through a comprehensive approach which includes testing, appropriate treatment, prevention, education, and infection control measures.

**P6070.05 Birth Control, Pregnancy, Child Placement and Abortion** — establishes guidance for BOP institutions to provide inmates with medical and social services related to birth control, pregnancy, child placement, and abortion.

**P6590.07 Alcohol Surveillance and Testing Program** — requires the BOP to maintain a surveillance program to deter and detect the illegal introduction or use of alcohol in its institutions.

**P6080.01 Autopsies** — provides that the Warden of a BOP institution may order an autopsy and related scientific or medical tests to be performed when:

- in the event of homicide, suicide, fatal illness or accident, or unexplained death, the Warden determines that the autopsy or test

87

is necessary to detect a crime, maintain discipline, protect the health or safety of other inmates, remedy official misconduct, or defend the United States or its employees from civil liability arising from the administration of the facility; or

- the Warden obtains the written consent of a person (coroner, next-of-kin, the decedent's consent in the case of tissue removed for transplanting) authorized to permit the autopsy or post-mortem operation under the law of the State in which the facility is located.

**P6311.04 Plastic Surgery and Identification Records** — provides that the BOP does not ordinarily perform plastic surgery on inmates to correct preexisting disfigurements (including tattoos) on any part of the body.  In circumstances where plastic surgery is a component of a presently medically necessary standard of treatment (for example, part of the treatment for facial lacerations or for mastectomies due to cancer) or it is necessary for the good order and security of the institution, the necessary surgery may be performed.

**6010.01 Psychiatric Treatment and Medications, Administrative Safeguards for** — provides guidelines for providing administrative safeguards for psychiatric treatment and medication.

**P6060.08 Urine Surveillance and Narcotic Identification** — requires that BOP institutions must establish programs of urine testing for drug use to monitor specific groups or individual inmates who are considered as high risk for drug use, such as those in community activities, those with a history of drug use, and those inmates specifically suspected of drug use.

# APPENDIX VII

## Results of the OIG's Testing of the Provision of Medical Care at BOP Institutions[29]

### United States Penitentiary – Atlanta



| Medical Service Tested | Inmates Tested | Yes / No |
|---|---|---|
| 1. Inmate medical history provided by inmate at intake | 191 | 99% / 1% |
| 2. Medical assessment completed by medical practitioner at intake | 191 | 96% / 3% |
| 3. New inmate tested for tuberculosis or previous test for transferred inmate confirmed, within 48 hours of intake | 191 | 97% / 3% |
| 4. Inmate received a rapid plasma regain test during intake screening to test for syphilis | 34 | 94% / 6% |
| 5. Female inmate tested for Chlamydia | 0 | Test not applicable for any inmates at this facility |
| 6. Female inmate received a measles/ mumps/rubella vaccine | 0 | Test not applicable for any inmates at this facility |
| 7. Inmate received a complete physical within 14 days of intake | 191 | 94% / 5% |
| 8. Inmate received a pneumococcal vaccine | 31 | 90% / 7% |
| 9. Inmate received an annual influenza vaccine | 46 | 83% / 17% |
| 10. Inmate born after 1956 received a measles/ mumps/ rubella vaccine | 167 | 7% / 93% |
| 11. Inmate received a tetanus vaccine in the last 10 years | 191 | 94% / 5% |
| 12. Inmate received a hepatitis A vaccine | 30 | 97% |
| 13. Inmate received a hepatitis B test or vaccine | 50 | 96% / 2% |
| 14. Inmate received a hepatitis C test | 45 | 98% |
| 15. Inmate received an HIV-1 test | 77 | 100% |
| 16. Inmate received an HIV-2 test | 4 | 100% |
| 17. Inmate received a tuberculosis test in the past year | 171 | 99% / 1% |
| 18. Inmate received a chronic care evaluation in the last 6 months | 64 | 95% / 3% |

---

[29] Some percentages in the charts total less than 100 percent because documentation was not available to determine if the test was performed for some inmates.

# United States Penitentiary – Atlanta



| Medical Service Tested | Inmates Tested | Yes / No Results |
|---|---|---|
| 19. Inmate received a cholesterol check in the last 5 years | 135 | 70% Yes / 29% No |
| 20. Inmate received a cardiovascular risk calculation in the last 5 years | 82 | 100% No |
| 21. Inmate received a fasting plasma glucose test in the last 3 years | 67 | 45% Yes / 34% No |
| 22. Inmate received a current blood pressure check | 190 | 95% Yes / 5% No |
| 23. Inmate received a current body mass index calculation | 190 | 4% Yes / 96% No |
| 24. Inmate received a fecal occult blood test | 34 | 12% Yes / 88% No |
| 25. Inmate received a vision screening test | 5 | 100% Yes |
| 26. Inmate received a hearing screening test | 5 | 100% No |
| 27. Inmate received an abdominal ultrasound test | 0 | Test not applicable for any inmates at this facility |
| 28. Female inmate received a papanicolaou test (PAP smear) | 0 | Test not applicable for any inmates at this facility |
| 29. Female inmate received a current mammogram | 0 | Test not applicable for any inmates at this facility |
| 30. Female inmate received a bone density screening test | 0 | Test not applicable for any inmates at this facility |

# United States Penitentiary – Lee



| Medical Service Tested | Inmates Tested | Yes / No |
|---|---|---|
| 1. Inmate medical history provided by inmate at intake | 133 | 99% / 1% |
| 2. Medical assessment completed by medical practitioner at intake | 133 | 99% / 1% |
| 3. New inmate tested for tuberculosis or previous test for transferred inmate confirmed, within 48 hours of intake | 133 | 99% / 1% |
| 4. Inmate received a rapid plasma regain test during intake screening to test for syphilis | 58 | 91% / 7% |
| 5. Female inmate tested for Chlamydia | 0 | Test not applicable for any inmates at this facility |
| 6. Female inmate received a measles/ mumps/rubella vaccine | 0 | Test not applicable for any inmates at this facility |
| 7. Inmate received a complete physical within 14 days of intake | 133 | 90% / 9% |
| 8. Inmate received a pneumococcal vaccine | 2 | 50% |
| 9. Inmate received an annual influenza vaccine | 8 | 50% / 50% |
| 10. Inmate born after 1956 received a measles/ mumps/ rubella vaccine | 127 | 99% |
| 11. Inmate received a tetanus vaccine in the last 10 years | 133 | 27% / 72% |
| 12. Inmate received a hepatitis A vaccine | 43 | 26% / 72% |
| 13. Inmate received a hepatitis B test or vaccine | 40 | 68% / 30% |
| 14. Inmate received a hepatitis C test | 30 | 73% / 23% |
| 15. Inmate received an HIV-1 test | 53 | 74% / 25% |
| 16. Inmate received an HIV-2 test | 4 | 75% |
| 17. Inmate received a tuberculosis test in the past year | 105 | 96% / 3% |
| 18. Inmate received a chronic care evaluation in the last 6 months | 21 | 86% / 10% |

91

# United States Penitentiary – Lee



| Medical Service Tested | Inmates Tested | Yes / No Bar |
|---|---|---|
| 19. Inmate received a cholesterol check in the last 5 years | 69 | 30% / 68% |
| 20. Inmate received a cardiovascular risk calculation in the last 5 years | 46 | 98% |
| 21. Inmate received a fasting plasma glucose test in the last 3 years | 5 | 60% / 40% |
| 22. Inmate received a current blood pressure check | 133 | 90% / 10% |
| 23. Inmate received a current body mass index calculation | 133 | 1% / 99% |
| 24. Inmate received a fecal occult blood test | 17 | 71% / 29% |
| 25. Inmate received a vision screening test | 0 | Test not applicable for any inmates at this facility |
| 26. Inmate received a hearing screening test | 1 | 100% |
| 27. Inmate received an abdominal ultrasound test | 0 | Test not applicable for any inmates at this facility |
| 28. Female inmate received a papanicolaou test (PAP smear) | 0 | Test not applicable for any inmates at this facility |
| 29. Female inmate received a current mammogram | 0 | Test not applicable for any inmates at this facility |
| 30. Female inmate received a bone density screening test | 0 | Test not applicable for any inmates at this facility |

# Federal Correctional Complex – Terra Haute



| Medical Service Tested | Inmates Tested | Yes / No |
|---|---|---|
| 1. Inmate medical history provided by inmate at intake | 248 | 100% |
| 2. Medical assessment completed by medical practitioner at intake | 248 | 100% |
| 3. New inmate tested for tuberculosis or previous test for transferred inmate confirmed, within 48 hours of intake | 248 | 99% |
| 4. Inmate received a rapid plasma regain test during intake screening to test for syphilis | 48 | 98% / 2% |
| 5. Female inmate tested for Chlamydia | 0 | Test not applicable for any inmates at this facility |
| 6. Female inmate received a measles/ mumps/rubella vaccine | 0 | Test not applicable for any inmates at this facility |
| 7. Inmate received a complete physical within 14 days of intake | 248 | 98% / 1% |
| 8. Inmate received a pneumococcal vaccine | 21 | 91% / 9% |
| 9. Inmate received an annual influenza vaccine | 51 | 86% / 14% |
| 10. Inmate born after 1956 received a measles/ mumps/ rubella vaccine | 223 | 1% / 99% |
| 11. Inmate received a tetanus vaccine every 10 years | 248 | 40% / 60% |
| 12. Inmate received a hepatitis A vaccine | 86 | 48% / 52% |
| 13. Inmate received a hepatitis B test or vaccine | 75 | 91% / 9% |
| 14. Inmate received a hepatitis C test | 69 | 96% / 4% |
| 15. Inmate received an HIV-1 test | 89 | 99% / 1% |
| 16. Inmate received an HIV-2 test | 70 | 99% / 1% |
| 17. Inmate received a tuberculosis test in the past year | 215 | 98% / 2% |
| 18. Inmate received a chronic care evaluation in the last 6 months | 102 | 100% |

93

## Federal Correctional Complex – Terra Haute



| Medical Service Tested | Inmates Tested | Yes / No |
|---|---|---|
| 19. Inmate received a cholesterol check in the last 5 years | 187 | 87% / 13% |
| 20. Inmate received a cardiovascular risk calculation in the last 5 years | 98 | 18% / 82% |
| 21. Inmate received a fasting plasma glucose test in the last 3 years | 120 | 95% / 5% |
| 22. Inmate received a current blood pressure check | 248 | 98% / 2% |
| 23. Inmate received a current body mass index calculation | 248 | 36% / 64% |
| 24. Inmate received a fecal occult blood test | 55 | 80% / 20% |
| 25. Inmate received a vision screening test | 21 | 100% |
| 26. Inmate received a hearing screening test | 18 | 78% / 22% |
| 27. Inmate received an abdominal ultrasound test | 4 | 100% |
| 28. Female inmate received a papanicolaou test (PAP smear) | 0 | Test not applicable for any inmates at this facility |
| 29. Female inmate received a current mammogram | 0 | Test not applicable for any inmates at this facility |
| 30. Female inmate received a bone density screening test | 0 | Test not applicable for any inmates at this facility |

94

# Federal Medical Center – Carswell



| Medical Service Tested | Inmates Tested | Yes / No |
|---|---|---|
| 1. Inmate medical history provided by inmate at intake | 127 | 100% |
| 2. Medical assessment completed by medical practitioner at intake | 127 | 100% |
| 3. New inmate tested for tuberculosis or previous test for transferred inmate confirmed, within 48 hours of intake | 127 | 100% |
| 4. Inmate received rapid plasma regain test during intake screening to test for syphilis | 126 | 91% / 9% |
| 5. Female inmate tested for Chlamydia | 24 | 38% / 62% |
| 6. Female inmate received a measles/ mumps/rubella vaccine | 116 | 80% / 19% |
| 7. Inmate received a complete physical within 14 days of intake | 127 | 100% |
| 8. Inmate received a pneumococcal vaccine | 14 | 50% / 50% |
| 9. Inmate received an annual influenza vaccine | 39 | 59% / 41% |
| 10. Inmate born after 1956 received a measles/ mumps/ rubella vaccine | 117 | 80% / 20% |
| 11. Inmate received a tetanus vaccine in the last 10 years | 127 | 80% / 19% |
| 12. Inmate received a hepatitis A vaccine | 25 | 24% / 76% |
| 13. Inmate received a hepatitis B test or vaccine | 87 | 97% / 3% |
| 14. Inmate received a hepatitis C test | 37 | 84% / 16% |
| 15. Inmate received an HIV-1 test | 48 | 92% / 8% |
| 16. Inmate received an HIV-2 test | 1 | 100% |
| 17. Inmate received a tuberculosis test in the past year | 111 | 100% |
| 18. Inmate received a chronic care evaluation in the last 6 months | 84 | 100% |

## Federal Medical Center – Carswell



| Medical Service Tested | Inmates Tested | Yes / No (%) |
|---|---|---|
| 19. Inmate received a cholesterol check in the last 5 years | 72 | Yes 92% / No 8% |
| 20. Inmate received a cardiovascular risk calculation in the last 5 years | 45 | Yes 2% / No 98% |
| 21. Inmate received a fasting plasma glucose test in the last 3 years | 74 | Yes 93% / No 7% |
| 22. Inmate received a current blood pressure check | 127 | Yes 100% |
| 23. Inmate received a current body mass index calculation | 127 | Yes 23% / No 77% |
| 24. Inmate received a fecal occult blood test | 29 | Yes 52% / No 48% |
| 25. Inmate received a vision screening test | 26 | Yes 96% / No 4% |
| 26. Inmate received a hearing screening test | 5 | Yes 20% / No 80% |
| 27. Inmate received an abdominal ultrasound test | 0 | Test not applicable for any inmates at this facility |
| 28. Female inmate received a papanicolaou test (PAP smear) | 123 | Yes 99% / No 1% |
| 29. Female inmate received a current mammogram | 77 | Yes 100% |
| 30. Female inmate received a bone density screening test | 6 | Yes 50% / No 50% |

96

## Federal Correctional Complex – Victorville



| Medical Service Tested | Inmates Tested | Yes | No |
|---|---|---|---|
| 1. Inmate medical history provided by inmate at intake | 345 | 99% | 1% |
| 2. Medical assessment completed by medical practitioner at intake | 345 | 99% | 1% |
| 3. New inmate tested for tuberculosis or previous test for transferred inmate confirmed, within 48 hours of intake | 344 | 100% | |
| 4. Inmate received rapid plasma reagin test during intake screening to test for syphilis | 137 | 91% | 9% |
| 5. Female inmate tested for Chlamydia | 1 | 100% | |
| 6. Female inmate received a measles/ mumps/rubella vaccine | 12 | 83% | 17% |
| 7. Inmate received a complete physical within 14 days of intake | 345 | 92% | 5% |
| 8. Inmate received a pneumococcal vaccine | 25 | 60% | 36% |
| 9. Inmate received an annual influenza vaccine | 66 | 61% | 38% |
| 10. Inmate born after 1956 received a measles/ mumps/ rubella vaccine | 298 | 6% | 94% |
| 11. Inmate received a tetanus vaccine every 10 years | 345 | 32% | 68% |
| 12. Inmate received a hepatitis A vaccine | 79 | 79% | 19% |
| | 91 | 89% | 9% |
| 14. Inmate received a hepatitis C test | 86 | 93% | 5% |
| 15. Inmate received an HIV-1 test | 114 | 95% | 4% |
| 16. Inmate received an HIV-2 test | 51 | 100% | |
| 17. Inmate received a tuberculosis test in the past year | 267 | 98% | 2% |
| 18. Inmate received a chronic care evaluation in the last 6 months | 68 | 99% | 1% |

# Federal Correctional Complex – Victorville



| Medical Service Tested | Inmates Tested | Yes / No |
|---|---|---|
| 19. Inmate received a cholesterol check in the last 5 years | 215 | 64% / 36% |
| 20. Inmate received a cardiovascular risk calculation in the last 5 years | 131 | 2% / 98% |
| 21. Inmate received a fasting plasma glucose test in the last 3 years | 58 | 95% / 5% |
| 22. Inmate received a current blood pressure check | 345 | 96% / 4% |
| 23. Inmate received a current body mass index calculation | 338 | 100% |
| 24. Inmate received a fecal occult blood test | 54 | 20% / 80% |
| 25. Inmate received a vision screening test | 6 | 50% / 50% |
| 26. Inmate received a hearing screening test | 6 | 33% / 67% |
| 27. Inmate received an abdominal ultrasound test | 2 | 100% |
| 28. Female inmate received a papanicolaou test (PAP smear) | 19 | 95% / 5% |
| 29. Female inmate received a current mammogram | 12 | 100% |
| 30. Female inmate received a bone density screening test | 2 | 100% |

98

## APPENDIX VIII

## The BOP's Health Care Performance Measures

| Description | Numerator | Denominator | Target Percentage |
|---|---|---|---|
| **Clinical Management of Hypertension** | Number of hypertensive patients on medication evaluated this reporting quarter with a blood pressure reading of less $\leq 140/\leq 90$ millimeters of mercury | Number of patients being treated for hypertension with medication, for a minimum of 6 months, who are evaluated this reporting quarter | 2004 - 70%<br>2005 – 70%<br>2006 – 70%<br>2007 – 70% |
| **Clinical Management of Lipid Level** | Number of patients on lipid reduction medication, with a history of cardiovascular risk or two cardiac risk factors, with a low density lipoprotein level $\leq 100$ milligrams reported this reporting quarter | Number of patients on lipid reduction medication for a minimum of 6 months, who have lipids measured this reporting quarter and meet requirements listed in the numerator statement | 2004 - 65%<br>2005 – 50%<br>2006 – 50%<br>2007 – 65% |
| **Clinical Management of Diabetes – HbA1C Level** | Number of diabetic patients on insulin or oral medication with an HbA1C level measured 8% or less, as a result of a test this reporting quarter | Number of diabetic patients on insulin or oral medication for a minimum of 6 months with HbA1C level measured this reporting quarter | 2004 - 65%<br>2005 – 65%<br>2006 – 65%<br>2007 – 65% |
| **Clinical Management of HIV/ Ribonucleic Acid Level** | Number of inmates on antiretroviral therapy with HIV/ Ribonucleic Acid levels < 50 cps/ml, as confirmed by ultra-sensitive method this reporting quarter | Number of inmates on antiretroviral therapy with known HIV/ Ribonucleic Acid standard level of < 400 cps/ml who have had the ultra-sensitive method test this reporting quarter < 50 cps/ml, as confirmed by ultra-sensitive method this reporting quarter | 2004 - 60%<br>2005 – 60%<br>2006 – 60%<br>2007 – 85% |

| Description | Numerator | Denominator | Target Percentage |
|---|---|---|---|
| **Completion of Isoniazid Treatment** | Number of inmates on treatment for Latent Tuberculosis Infection who have completed bi-weekly isoniazid therapy during this reporting quarter | Number of inmates previously started on treatment for Latent Tuberculosis Infection who should have completed treatment within this reporting quarter | 2005 – 90%<br>2006 – 90%<br>2007 – 90% |
| **Asthma-related Hospitalization or Mortality** | Number of patients diagnosed with asthma, who are taking chronic asthma medication, and who were not hospitalized, or did not expire from asthma this reporting quarter | Number of patients diagnosed with asthma, who are taking chronic asthma medication, and who were in the institution this reporting quarter | 2005 – 100%<br>2006 – 100%<br>2007 – 98% |
| **Breast Cancer Screening** | Number of females screened by mammography this reporting period | Number of females who require mammography screening this reporting period | 2004 - 50%<br>2005 – 50%<br>2006 – 50%<br>2007 – 50% |
| **Cervical Cancer Screening** | Number of female patients who received screening by PAP this reporting period | Number of female patients who would require screening by PAP | 2004 - 50%<br>2005 – 50%<br>2006 – 50%<br>2007 – 50% |
| **Pregnancy Testing at Intake** | Number of new intake females tested for pregnancy this reporting period | Number of new female intakes (pre-menopausal) arriving in the institution this reporting period | 2004 - 90%<br>2005 – 90%<br>2006 – 90%<br>2007 – 90% |

**APPENDIX IX**

## Types of BOP Institutions

The BOP operates institutions at five different security levels in order to confine offenders in an appropriate manner.  The security levels are based on such features as the presence of external patrols, towers, security barriers, or detection devices; the type of housing within the institution; internal security features; and the staff-to-inmate ratio.  Each institution is given a security designation of either minimum, low, medium, high, or administrative.

**Minimum Security**

Minimum security institutions, also known as Federal Prison Camps (FPC), have dormitory housing, a relatively low staff-to-inmate ratio, and limited or no perimeter fencing.  These institutions are work-oriented and program-oriented.  Many of these institutions are located adjacent to larger institutions or on military bases, where inmates help serve the labor needs of the larger institution or base.

**Low Security**

Low security Federal Correctional Institutions (FCI) have double-fenced perimeters, mostly dormitory or cubicle housing, and strong work and program components.  The staff-to-inmate ratio in these institutions is higher than in minimum security facilities.

**Medium Security**

Medium security FCIs have strengthened perimeters often with double fences and electronic detection systems, mostly cell-type housing, a wide variety of work and treatment programs, an even higher staff-to-inmate ratio than low security FCIs, and even greater internal controls.

**High Security**

High security institutions, also known as United States Penitentiaries (USP), have highly-secured perimeters featuring walls or reinforced fences, multiple-occupant and single-occupant cell housing, the highest staff-to-inmate ratio, and close control of inmate movement.

**Correctional Complexes**

A number of BOP institutions belong to Federal Correctional Complexes (FCC).  At FCCs, institutions with different missions and security levels are located in close proximity to one another.  FCCs increase efficiency through the sharing of services, enable staff to gain experience at institutions that have many security levels, and enhance emergency preparedness by having additional resources within close proximity.

**Administrative**

Administrative facilities are institutions with special missions, such as the detention of pretrial offenders; the treatment of inmates with serious or chronic medical problems; or the containment of extremely dangerous, violent, or escape-prone inmates.  Administrative facilities include Metropolitan Correctional Centers (MCC), Metropolitan Detention Centers (MDC), Federal Detention Centers (FDC), and Federal Medical Centers (FMC), as well as the Federal Transfer Center (FTC), the Medical Center for Federal Prisoners (MCFP), and the Administrative-Maximum (ADX) USP. Administrative facilities are capable of holding inmates in all security categories.

**Satellite Camps**

A number of BOP institutions have a small, minimum-security camp adjacent to the main facility. These camps, often referred to as satellite camps, provide inmate labor to the main institution and to off-site work programs. FCI Memphis has a non-adjacent camp that serves similar needs.

**Satellite Low Security**

The BOP has two FCIs that have a small, low-security satellite facility adjacent to the main institution.  The BOP also has one FCI that has a low-security facility affiliated with, but not adjacent to, the main institution.

**APPENDIX X**

# Department of Justice, Office of the Inspector General Audits of BOP Medical Contracts from August 2004 through March 2007

From August 2004 through March 2007, the OIG issued nine audit reports on BOP contracts for medical services.  The OIG reported on major internal control deficiencies for eight of the nine medical services contract audits.  Deficiencies included weak procedures or processes for calculating discounts, reviewing and verifying invoices and billings, paying bills, and managing the overall administration of the contracts.  As of November 2007, the BOP's Program Review Division said that corrective actions had been implemented for all recommendations in seven of the nine contract audits.  For the other two audits (Correctional Medical Services at Fort Dix, New Jersey and Medical Development International at FCC Butner, North Carolina), the BOP agreed to take corrective actions on the OIG's recommendations, and those actions were either completed or in progress as of November 2007.  The OIG's findings and recommendations for the nine audits are summarized below.

## Parkview Medical Center

In an August 2004 audit report on the BOP's contract with the Parkview Medical Center (PMC), the OIG reported on the purchase of inpatient and outpatient facility and physician services for inmates at the Federal Correctional Complex in Florence, Colorado.[30]  The OIG found that: (1) PMC did not provide documentation to support billings for pharmacy items, (2) PMC billed for prescription drugs that were not on the BOP's approved formulary, (3) PMC did not provide the required Summary Paid Billing Analysis Reports to the BOP each quarter, and (4) the BOP could improve contract administration by better analyzing contract modifications prior to the acceptance of new terms.

The OIG recommended the BOP:

- remedy $424,638 in questioned costs paid to the PMC for unsupported pharmacy items,

---

[30]  Department of Justice, Office of the Inspector General, *The Bureau of Prisons' Contract with the Parkview Medical Center for the Acquisition of Medical Services (J40604c-030)*, Audit Report GR-60-04-008 (August 2004).

- remedy the $94,774 in questioned costs paid to the PMC for drugs not listed in an applicable BOP formulary,

- implement controls to ensure the PMC submits the Quarterly Summary Paid Billing Analysis Report on time, and

- analyze future contract modifications to accurately determine the effect on the contract prior to acceptance.

## Correctional Medical Services

In a September 2004 report on the BOP's contract with Correctional Medical Services (CMS), the OIG reported on the acquisition of comprehensive medical services for inmates at the FCI facility at Fort Dix, New Jersey.[31]

The OIG found that:  (1) CMS did not schedule and provide outpatient institutional and physician services within the time allowed by the contract after receiving a request from the FCI, (2) the BOP had obtained services outside the contract because CMS could not provide agreed-upon services, (3) CMS did not provide a Quality Assurance and Improvement Program and quarterly Summary Paid Billing Analysis Reports to the BOP, (4) CMS did not provide replacement non-Medicare personnel in a timely manner, (5) CMS charged for duplicative services and for services cancelled by the BOP, and (6) CMS billed for Magnetic Resonance Imaging (MRI) services after the MRI portion of the contract had expired.

The OIG recommended the BOP:

- ensure that CMS provides outpatient institutional and physician services in accordance with the terms and conditions of the contract,

- remedy the $9,321,106 paid to the CMS because the government awarded the contract based on services in the CMS's proposal that the CMS did not have the capability to deliver,

- acquire biomedical services from the CMS at the prices set forth in the contract,

---

[31]  Department of Justice, Office of the Inspector General, *Correctional Medical Services' Compliance with the Federal Bureau of Prisons' Contract J21451c-009*, Audit Report GR-70-04-009 (September 2004).

- ensure that the CMS provides a Quality Assurance and Improvement Program and the Summary Paid Billing Analysis Reports in accordance with the contract,

- remedy the $1,600 in duplicative orthopedic examination costs paid to the CMS,
- remedy the $7,096 paid to the CMS for services cancelled by the BOP, and

- remedy the $31,620 that the CMS billed for MRI services after the MRI portion of the contract had expired.

## Medical Development International at the United States Penitentiary and Federal Prison Camp in Leavenworth, Kansas

In a February 2005 report on the BOP's contract with Medical Development International (MDI), the OIG reported on the acquisition of medical services for the United States Penitentiary and Federal Prison Camp in Leavenworth, Kansas.[32] The OIG found that: (1) MDI did not obtain certification of residency forms from all medical providers as required by the contract, (2) the BOP Contracting Officer's Technical Representative did not submit contractor monitoring reports on a quarterly basis as required, and (3) the BOP Contracting Officer's Technical Representative did not use the BOP's rating guidelines on monitoring reports submitted.

The OIG recommended the BOP:

- obtain the required residency certification forms for all medical personnel who provide off-site care for inmates, and

- require the Contracting Officer's Technical Representative to submit contractor monitoring reports in a timely manner and use the rating guidelines when evaluating the contractor's performance.

## Wayne Memorial Hospital

In an April 2005 report on the BOP's contract with the Wayne Memorial Hospital (WMH), the OIG reported on the acquisition of comprehensive

---

[32] Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Contract with Medical Development International for the Acquisition of Medical Services at its Leavenworth, Kansas Facilities (Contract No. DJB40804003)*, Audit Report GR-60-05-003 (February 2005).

inmate medical services provided by WMH to inmates at FCI, Jesup.[33]  The OIG found that:  (1) WMH did not always provide Inmate Discharge Summary Reports in a timely manner, (2) FCI Jesup obtained medical services from providers outside the contract when the contractor was able to provide some of those services, (3) WMH billed and was paid for medical services that were calculated using incorrect billing practices, (4) WMH billed and was paid for medical services that were not supported with adequate documentation, and (5) FCI Jesup paid for medical services with billings that were unsupported.

The OIG recommended the BOP:

- ensure the contract accurately specifies services that are to be provided and other specific terms and conditions of the contract,

- ensure the contractor provides Inmate Discharge Summary Reports in a timely manner,

- remedy more than $76,000 charged to the contract because the contractor used incorrect rates when it prepared the billing statements or because adequate documentation was not maintained to support the billing statements, and

- ensure the FCI strengthens its controls for reviewing and processing invoices for payment.

## Salem Community Hospital

In a June 2005 report on the BOP's Contract with the Salem Community Hospital, the OIG reported on the acquisition of comprehensive medical services for inmates at FCI Elkton facility in Salem, Ohio.[34]  The OIG found that:  (1) the Salem Community Hospital overcharged for services it provided during the first 8 months of the contract by using incorrect rates to calculate invoice discounts, (2) the Salem Community Hospital made additional errors in the discounts charged and in the time charges for

---

[33]  Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Medical Services Contract with Wayne Memorial Hospital, Jesup, Georgia (Contract J30703c-020)*, Audit Report GR-40-05-006 (April 2005).

[34]  Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Contract Number DJB21602-004 with Salem Community Hospital in Salem, Ohio*, Audit Report GR-50-05-012 (June 2005).

operating and recovery room services, and (3) FCI Elkton had no formal written procedures for reviewing and verifying the accuracy of its invoices.

The OIG recommended the BOP:

- direct FCI Elkton to remedy $744 in overcharges paid to Salem Community Hospital,

- direct FCI Elkton to ensure the Salem Community Hospital implemented control procedures to ensure charges and discounts on invoices were correctly calculated,

- direct FCI Elkton to review and revise its review procedures to ensure invoices approved for payment were accurate, and

- direct FCI Elkton to formalize its invoice review procedures in writing.

**Hospital Corporation of America-HealthONE**

In a March 2006 report on the Medical Services contract with the Hospital Corporation of America-HealthONE, L.L.C. (HealthONE), the OIG reported on the acquisition of comprehensive medical services for inmates at the FCI Englewood facility in Littleton, Colorado.[35]  The OIG found that: (1) HealthONE did not submit quarterly Summary Paid Billing Analysis Reports to FCI Englewood as required, (2) the BOP Contracting Officer's Technical Representative could not provide documentation supporting the information reported in the quarterly contractor performance reports, (3) FCI Englewood had no written procedures for monitoring and reviewing of the contractor's billing process, and (4) FCI Englewood had no documentation supporting a review process for exercising each option of the contract.

The OIG recommended the BOP:

- document the criteria used to assess contractor performance and document the quantitative results of the evaluations,

- prepare quarterly statistical reports as required,

---

[35]  Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Contract with* Hospital Corporation of America-HealthONE, L.L.C., Contract No. J40303c-146, Audit Report GR-60-06-006 (March 2006).

- document procedures for verifying the accuracy of the invoices for supplies and services, and

- ensure the contractor submitted quarterly Summary Paid Billing Analysis Reports.

## University of Massachusetts Medical School and the UMass Memorial Health Care, Inc.

In a March 2006 report on the medical services contract with the University of Massachusetts Medical School and the UMass Memorial Health Care, Inc. (collectively UMass), the OIG reported on the contractor's compliance with the contract for providing medical services to inmates at FMC Devens in Ayer, Massachusetts.[36]  The OIG found that:  (1) UMass did not consistently provide services at the location most advantageous to the government, (2) UMass lacked a detailed electronic database containing individual charges which prevented tests of the charges, (3) the FMC was not able to independently verify contract charges based on the Medicare hospital inpatient prospective payment system,  and (4) the contract contained terms and requirements that were unreasonable or imprecisely written and were ignored by both parties.

The OIG recommended the BOP:

- require the contractor to provide detailed data on all contract charges electronically and use this data to analyze and manage contractor performance and costs;

- develop and implement management tools to ensure services were consistently provided at the location most advantageous to the government;

- develop the capability to independently verify contractor charges for inpatient hospital services based on the Medicare inpatient prospective payment system; and

- improve contract administration by requiring the contractor to adhere to all terms and conditions of the contract, and when

---

[36]  Department of Justice, Office of the Inspector General, *The University of Massachusetts Medical School and UMass Memorial Health Care, Incorporated's Compliance with the Federal Bureau of Prisons' Contract DJB20507032*, Audit Report GR-70-06-006 (March 2006).

appropriate, amend the contract to ensure all contract terms were reasonable, clear, and enforceable.

## John C. Lincoln Health Network

In an August 2006 report on the medical services contract with the John C. Lincoln Health Network, the OIG reported on the acquisition of hospital facility services for the United States Penitentiary and the Federal Prison Camp in Phoenix, Arizona (FCI Phoenix).[37] The OIG found that: (1) FCI Phoenix had not formalized in writing the procedures or policies for monitoring and reviewing contractor billings, (2) FCI Phoenix's payments to the contractor were not processed in a manner consistent with the Prompt Payments Act, (3) the BOP Contracting Officer's Technical Representative did not maintain adequate supporting documentation for performance reports, and (4) the BOP Contracting Officer did not review the performance reports in a timely manner.

The OIG recommended the BOP:

- finalize draft procedures for monitoring contractor billing and performance,

- identify procedural hindrances to full compliance with the Prompt Payments Act,

- implement new procedures for documenting supporting justification for evaluative rankings in performance reports,

- implement a policy to define and require a timely review of performance reports by the Contracting Officer, and

- ensure that the Contracting Officer either maintained or had accessed to a comprehensive listing of all contract expenditures to assist in contract monitoring.

## Medical Development International at FCC Butner and FMC Butner

In a March 2007 report on another BOP contract with MDI, the OIG reported on the acquisition of comprehensive medical services provided to

---

[37] Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Contract with the John C. Lincoln Health Network, Contract No.* DJB60803144, Audit Report GR-60-06-009 (August 2006).

inmates at FCC Butner and FMC Butner in Butner, North Carolina.[38]  The OIG found that:  (1) the BOP's procedures for reviewing and approving billing rates were weak; (2) MDI's invoices contained transactions that were not within the service period being billed; (3) MDI billed the BOP for some transactions at a rate higher than specified in the contract; (4) MDI billed the BOP for some services not covered by the contract; (5) the BOP did not sign off on the timesheets submitted by the contractor; (6) MDI submitted timesheets that were either miscalculated, overstated, understated or not supported; (7) MDI billed for transactions where the hours billed were greater than the hours recorded in the institutions' sign-in and out logs; (8) MDI billed for transactions where the hours billed were for MDI contractors whose names did not appear in the sign-in and sign-out logs; and (9) MDI did not provide adequate support for billing statements for "on call" services provided under the contract.

The OIG recommended the BOP:

- remedy the $2,428,345 in questioned costs;

- implement various internal controls to ensure the BOP paid for services allowed by the contract, actually provided by the contractor, and at rates contained in the contract;

- improve contract administration to ensure the contractor adhered to all terms of the contract; and

- include specific terms and requirements for the billing of personnel services in the pricing and billing sections for future medical services contracts.

---

[38]  Department of Justice, Office of the Inspector General, *The Bureau of Prisons' Management of the Medical Services Contract with Medical Development International, Butner, North Carolina, Contract No. DJB10611-00*, Audit Report Number GR-40-07-003 (March 2007).

# APPENDIX XI

## The BOP's Response to the Draft Audit Report



U.S. Department of Justice

Federal Bureau of Prisons

_Office of the Director_                           _Washington, D.C. 20534_

February 19, 2008

MEMORANDUM FOR RAYMOND J. BEAUDET
                ASSISTANT INSPECTOR GENERAL FOR AUDIT
                OFFICE OF THE INSPECTOR GENERAL

FROM:           Harley G. Lappin, Director
                Federal Bureau of Prisons

SUBJECT:        Response to the Office of Inspector General's
                (OIG) Draft Audit Report:  The Federal Bureau of
                Prisons' Efforts to Manage Inmate Health Care

The Bureau of Prisons (Bureau) appreciates the opportunity to
comment on and respond to the recommendations from the OIG's
draft audit report entitled The Federal Bureau of Prisons'
Efforts to Manage Inmate Health Care.

We are requesting OIG's Statement on Internal Controls, Finding
I, Page 55, stating the Bureau "did not provide necessary medical
care to inmates," be removed from the report.  We do not believe
it accurately portrays the state of medical care in the Bureau.
While the Bureau strives for 100% compliance with its policies
and guidance, it is unrealistic to expect such results.  The
audit was based on the Clinical Practice Guideline, "Preventive
Health Care," which was adapted from recommendations of the U.S.
Preventative Services Task Force.  This guideline is a recent
issuance that emphasizes the importance of prevention in order to
avoid disease.  Full implementation is a long-term effort and
discretion is accorded to providers to ascertain medical
priorities within the prevention model.  The Bureau fully
anticipated it would take a period of years to achieve full
implementation.  The Bureau is glad OIG focused on the Bureau's
Preventative Health Care Guidelines because we are proud to have
issued cutting edge guidance.  However, the generalized statement
that the "Bureau is not providing necessary medical care to
inmates" is an unfortunate view which fails to take into account
that while prevention is a desirable goal, in balancing health

111

care needs, the Bureau must place priority on lifesaving measures and care.

Please find below listed the Bureau's response to each individual recommendation:

**Recommendation #1:**  Establish procedures for collecting and evaluating data for each current and future health care initiative to assess whether individual initiatives are cost-effective and producing the desired results.

**Response:**  The Bureau agrees with this recommendation and will establish protocols for collecting and evaluating data.  We are not a stand-alone healthcare service and unlike the private sector, our health services are delivered within the constraints of a correctional environment.

For those initiatives for which we have or can collect hard data, we will make every effort to assess cost-effectiveness.  For example, in our third-party bill adjudication initiative, we will be able to measure cost pre- and post-contracting beginning in FY2008.  For some of our initiatives, it will not be feasible, however, to create or retrieve data to use in cost comparisons. Also, not all initiatives are intended to produce cost savings. Certain initiatives do not generate cost savings, but promote better medical outcomes and continuity of care.

**Recommendation #2:**  Review the medical services that the OIG and the BOP's Program Review Division identified as not always provided to inmates and determine whether those medical services are necessary, or whether the medical service requirement should be removed from the clinical practice guidelines.

**Response:**  The Bureau agrees with this recommendation.  In January 2008 we reviewed all of the Bureau's Clinical Practice Guidelines.  Based on that review, certain guidelines have been identified for revision (http://www.bop.gov/news/medresources.jsp). We will highlight quarterly reports from Program Review Division in on-line training sessions with Health Services staff, the first of which will take place in April 2008.

**Recommendation #3:**  Issue clarifying guidance to the institutions regarding the medical services that BOP decides are necessary for BOP medical providers to perform.

**Response:**  The Bureau agrees with this recommendation and will issue guidance to institutions underscoring the importance of the Clinical Practice Guidelines.  This will be completed by

2

112

April 1, 2008.

**Recommendation #4:**  Strengthen management controls to ensure proper administration of BOP medical contracts by providing guidance and procedures to all BOP institutions for:

    A.    reviewing contractor invoices for accuracy,
    B.    ensuring contractor invoices are supported by adequate documentation,
    C.    ensuring that invoice discounts are properly applied,
    D.    ensuring that contractor performance reports are complete and accurate, and
    E.    ensuring that contractor timesheets are verified by a BOP employee.

**Response:**  The Bureau agrees with this recommendation and will issue guidance to all Bureau Contracting Officers and Health Services Administrators regarding Medical Contract Administration procedures.  Guidance will be completed and distributed by April 1, 2008.

**Recommendation #5:**  Develop a process to use the program summary reports prepared by the Program Review Division to develop or clarify agency-wide guidance on systemic deficiencies found during program reviews.

**Response:**  The Bureau agrees with this recommendation and will issue guidance regarding systemic deficiencies found during program reviews through periodic on-line training sessions, the first of which will begin in May 2008.

**Recommendation #6:**  Ensure initial privileges, practice agreements, or protocols are established for all practitioners, as applicable.

**Response:**  The Bureau agrees with this recommendation and will issue guidance clarifying to institutions the importance of ensuring that applicable privileges, practice agreements, protocols, and peer reviews are handled in a timely manner, and the potential consequences of failure to do so.  Guidance will be issued by April 1, 2008.

**Recommendation #7:**  Ensure privileges, practice agreements, and protocols are reevaluated and renewed in a timely manner.

**Response:**  See response to Recommendation #6.

3

**Recommendation #8:**  Ensure that practitioners are not allowed to practice medicine in BOP institutions without current privileges, practice agreements, or protocols.

**Response:**  See response to Recommendation #6.

**Recommendation #9:**  Ensure that peer reviews of all providers are performed within the prescribed timeframes.

**Response:**  See response to Recommendation #6.

**Recommendation #10:**  Until the training program on accumulating and reporting performance data is implemented, issue guidance to all institutions on how to accumulate and report data for the health care performance measures to ensure consistency in the way institutions collect and report performance data.  Once the training program is fully developed, ensure that appropriate institution staff receive the training.

**Response:**  The Bureau agrees with this recommendation.  Guidance will be issued to all institutions by May 1, 2008, on how to accumulate and report data for the health care performance measures to ensure consistency in the way institutions collect and report performance data.  Data collection and reporting will also be addressed in on-line training.

**Recommendation #11:**  Establish a process for reviewing the health care performance measures reported by institutions that includes actions that will be taken when institutions are not meeting the target performance levels.

**Response:**  The Bureau agrees with this recommendation and has a process in place to assess performance measures.  A memorandum was issued on February 12, 2008, to all Bureau wardens, notifying them of changes to the national performance measures and reiterating the policy requirement to collect and report these measures.  An on-line training session for institution Health Services staff was conducted February 13, 2008, to discuss the changes and the reporting requirements.  The Health Services Division's Office of Quality Management will be collecting and reviewing this data semiannually and reporting to the regional medical directors when institutions are not meeting the expected target levels.  Each regional medical director will ensure that national performance measures are addressed at each institution under his or her oversight.  Regional medical directors will assess target level failures, provide recommendations for improvement, and follow-up during Clinical Director Peer Reviews.

4

If you have any questions regarding this response, please contact
VaNessa P. Adams, Senior Deputy Assistant Director, Program
Review Division, at (202) 616-2099.

5

**APPENDIX XII**

# Office of the Inspector General, Audit Division, Analysis and Summary of Actions Necessary to Close the Report

We provided the draft report to the BOP for review and requested written comments. The BOP's written response is included as Appendix XI of this report. The BOP agreed with all of our recommendations and proposed corrective action appropriate to resolve the recommendations. However, in its only comment on the extensive content of the draft report, the BOP objected to a sentence on page 55 reading "The BOP institutions did not provide necessary medical care to inmates." This sentence was included in the draft report as a very brief summary of Finding 1, which is also referenced on page 55. In response to the BOP's statement, we reviewed our draft report's language on page 55 and revised it to summarize more precisely Finding 1. The revised statement on 55 now reads "The BOP's institutions did not always provide recommended preventative medical services to inmates."

We provide below our analysis of the BOP's response to the recommendations.

1. **Resolved.** We recommended the BOP establish procedures for collecting and evaluating data for each current and future health care initiative to assess whether individual initiatives are cost-effective and producing the desired results. The BOP agreed and stated that it will establish protocols for collecting and evaluating data. The recommendation can be closed when we review the procedures the BOP establishes to assess the cost effectiveness of its initiatives.

2. **Resolved.** We recommended the BOP review the medical services that the OIG and the BOP's Program Review Division identified as not always provided to inmates and determine whether those medical services are necessary, or whether the medical service requirement should be removed from the Clinical Practice Guidelines. The BOP agreed with the recommendation. It stated that in January 2008, it reviewed all of its Clinical Practice Guidelines and identified certain guidelines for revision. The BOP also stated that it will highlight its Program Review Division's quarterly reports in on-line training sessions, with the first session taking place in April 2008. We request that the BOP provide us with a list of guidelines identified for revision and the time frame for accomplishing the revisions. The recommendation can be closed when we review revisions to the Clinical Practice Guidelines.

117

3. **Resolved.**  We recommended the BOP issue clarifying guidance to the institutions regarding the medical services that the BOP decides are necessary for BOP medical providers to perform.  The BOP agreed and stated that by April 2008 it will issue guidance to its institutions underscoring the importance of the Clinical Practice Guidelines.  The recommendation can be closed when we review the BOP's clarifying guidance.

4. **Resolved.**  We recommended the BOP strengthen management controls to ensure proper administration of BOP medical contracts by providing guidance and procedures to all BOP institutions.  The BOP agreed and stated that by April 2008 it will issue guidance to all Bureau Contracting Officers and Health Services Administrators regarding medical contract administration procedures.  The recommendation can be closed when we review the BOP's guidance.

5. **Resolved.**  We recommended the BOP develop a process to use the program summary reports prepared by the Program Review Division to develop or clarify agency-wide guidance on systemic deficiencies found during program reviews.  The BOP agreed and stated that it will issue guidance regarding systemic deficiencies found during program reviews through periodic on-line training sessions, the first of which will begin in May 2008.  The recommendation can be closed when we receive documentation showing the BOP has developed a process and issued guidance.

6. **Resolved.**  We recommended the BOP ensure initial privileges, practice agreements, or protocols are established for all practitioners, as applicable.  The BOP agreed and stated that by April 1, 2008, it will issue guidance clarifying to institutions the importance of ensuring that applicable privileges, practice agreements, protocols, and peer reviews are handled in a timely manner, and the potential consequences of failure to do so.  While we agree that clarified guidance is, in part, appropriate to address this recommendation, it is not clear to us how the issuance of clarified guidance alone will ensure the establishment of privileges, practice agreements, and protocols.  We believe that ensuring the establishment of these items requires a mechanism such as testing during program reviews, submission of periodic certification statements, submission of periodic reports by institutions, or some other appropriate verification technique.  We request that the BOP explain how the implementation of the clarified guidance will be verified.  The

118

recommendation can be closed when we review the BOP's clarifying guidance and documentation for the verification mechanism.

7. **Resolved.** We recommended that the BOP ensure privileges, practice agreements, and protocols are reevaluated and renewed in a timely manner. The BOP agreed and stated that the guidance it plans in response to Recommendation 6 will also address this recommendation. As with Recommendation 6, we agree that clarified guidance is, in part, appropriate to address this recommendation, but it is not clear to us how the issuance of clarified guidance alone will ensure that privileges, practice agreements, and protocols are reevaluated and renewed in a timely manner. We believe a verification technique also is needed for this recommendation, and we request that the BOP explain how the implementation of the clarified guidance will be verified. The recommendation can be closed when we review the BOP's clarifying guidance and documentation for the verification mechanism.

8. **Resolved.** We recommended the BOP ensure that practitioners are not allowed to practice medicine in BOP institutions without current privileges, practice agreements, or protocols. The BOP agreed and stated that the guidance it plans in response to Recommendation 6 will also address this recommendation. As with Recommendation 6, we agree that clarified guidance is, in part, appropriate to address this recommendation, but it is not clear to us how the issuance of clarified guidance alone will ensure that practitioners are not allowed to practice absent current privileges, practice agreements, or protocols. We believe a verification technique also is needed for this recommendation, and we request that the BOP explain how the implementation of the clarified guidance will be verified. The recommendation can be closed when we review the BOP's clarifying guidance and documentation for the verification mechanism.

9. **Resolved.** We recommended the BOP ensure that peer reviews of all providers are performed within the prescribed time frames. The BOP agreed and stated that the guidance it plans in response to Recommendation 6 will also address this recommendation. As with Recommendation 6, we agree that clarified guidance is, in part, appropriate to address this recommendation, but it is not clear to us how the issuance of clarified guidance alone will ensure that peer reviews are performed within the prescribed time frames. We believe a verification technique also is needed for this recommendation, and we request that the BOP explain how the implementation of the clarified guidance will be verified. The recommendation can be closed when we

review the BOP's clarifying guidance and documentation for the verification mechanism.

10. **Resolved.**  We recommended to the BOP that, until the training program on accumulating and reporting performance data is implemented, it issue guidance to all institutions on how to accumulate and report data for the health care performance measures to ensure consistency in the way institutions collect and report performance data. We also recommended that, once the training program is fully developed, the BOP ensure that appropriate institution staff receives the training.  The BOP agreed and stated that by May 1, 2008, it will issue guidance to all institutions on how to accumulate and report data for the health care performance measures to ensure consistency in the way institutions collect and report performance data.  Data collections and reporting will also be addressed in on-line training.  The recommendation can be closed when we review the BOP's guidance to institutions and receive documentation showing that appropriate institution staff have received the on-line training.

11. **Resolved.**  We recommended the BOP establish a process for reviewing the health care performance measures reported by institutions that includes actions that will be taken when institutions are not meeting the target performance levels.  The BOP agreed and stated that it issued a memorandum on February 12, 2008, to all Bureau Wardens, notifying them of changes to the national performance measures and reiterating the policy requirement to collect and report these measures.  An on-line training session for institution Health Services staff was conducted February 13, 2008, to discuss the changes and the reporting requirements.  The BOP stated that the Health Services Division's Office of Quality Management will be collecting and reviewing this data semiannually and reporting to the Regional Medical Directors when institutions are not meeting the expected target levels.  The BOP stated that Regional Medical Directors will ensure that national performance measures are addressed at each institution under their oversight.  The BOP further stated that Regional Medical Directors will assess target level failures, provide recommendations for improvement, and follow-up during Clinical Director peer reviews.  The recommendation can be closed when we review the February 12, 2008, memorandum and documentation for the on-line training conducted on February 13, 2008, showing the subjects covered.

120