



# FOLLOW-UP AUDIT OF THE FEDERAL BUREAU OF PRISONS' EFFORTS TO MANAGE INMATE HEALTH CARE

U.S. Department of Justice
Office of the Inspector General
Audit Division

Audit Report 10-30
July 2010



DEFENDANT'S EXHIBIT

# FOLLOW-UP AUDIT OF THE FEDERAL BUREAU OF PRISONS' EFFORTS TO MANAGE INMATE HEALTH CARE

## EXECUTIVE SUMMARY

The Federal Bureau of Prisons (BOP) is responsible for delivering medically necessary health care to inmates in accordance with proven standards of care. To accomplish this task, the BOP has established policy to hire appropriately trained, skilled, and credentialed staff. The policy identifies lines of authority and accountability to provide for appropriate supervision of health care practitioners. To verify and monitor its health care practitioners' knowledge and skills in providing health care, the BOP implemented its policy for Health Care Provider Credential Verification, Privileges, and Practice Agreement Program. During fiscal year (FY) 2009, the BOP obligated about $865 million for inmate health care.

In February 2008, the Office of the Inspector General (OIG) completed an audit of the BOP's efforts to manage inmate health care. Among other issues, our 2008 audit found that the BOP allowed health care providers to practice medicine without valid authorizations such as privileges, practice agreements, or protocols.[1] In addition, some providers had not had their medical practices evaluated by a peer as required by BOP policy. Allowing practitioners to provide medical care to inmates absent current privileges, practice agreements, or protocols increases the risk that the practitioners may provide medical services without having the qualifications, knowledge, skills, and experience necessary to correctly perform the services. Absent a current peer review, the BOP has a higher risk of providers giving inadequate professional care to inmates. Also, if inadequate professional care goes undetected, the providers may not receive the training or supervision needed to improve the delivery of medical care.

### OIG Audit Approach

We initiated this audit to follow up on the BOP's corrective actions on the recommendations in our 2008 audit report related to maintaining current privileges, practice agreements, protocols, and peer reviews. While performing the follow-up audit, we also assessed the BOP's use of National Practitioner Data Bank (NPDB) reports to ensure health care providers have

---

[1] Privileges and practice agreements authorize the specific clinical or dental services that health care providers may provide to BOP inmates. Protocols contain guidance approved by licensed independent practitioners that must be followed by practitioners other than physicians; dentists; and mid-level practitioners such as graduate physician assistants, nurse practitioners, and unlicensed medical graduates.

i

not been involved in unethical or incompetent practices.  The NPDB is maintained by the Department of Health and Human Services and is a central repository of information about:  (1) malpractice payments made for the benefit of physicians, dentists, and other health care practitioners; (2) licensure actions taken by state medical boards and state boards of dentistry against physicians and dentists; (3) professional review actions primarily taken against physicians and dentists by hospitals and other health care entities, including health maintenance organizations, group practices, and professional societies; (4) actions taken by the Drug Enforcement Administration; and (5) Medicare and Medicaid Exclusions.  The BOP requires its institutions to query the NPDB at the initial appointment of health care providers, and no less than once every 2 years thereafter to identify adverse actions by the providers.

We performed audit work at BOP headquarters, where we interviewed key officials including the BOP Medical Director, the Chief of the BOP's Office of Quality Management, and Program Review Division officials.  We obtained the BOP's updated guidance on its credentialing and peer review processes, as well as updated information on the number of BOP institutions, locations, and inmates served.

To determine the status of privileges, practice agreements, protocols, peer reviews, and NPDB reports for BOP health care practitioners, we sent survey questionnaires to all 115 BOP institutions at 93 BOP locations.[2] Appendix I contains a more detailed description of our audit objectives, scope, and methodology.  Appendix III contains the survey questionnaire that we sent to BOP institutions.

**Results in Brief**

Our 2008 audit found that the BOP needed to ensure its practitioners were properly authorized to provide medical care to inmates, and that peer reviews were performed to ensure medical staff had adequate knowledge and skill to perform medical tasks.  We determined that, in response to recommendations in our 2008 audit which related to BOP's monitoring of its medical staff, the BOP has:  (1) conducted program reviews that included verifying health care provider credentials; (2) directed each institution to verify and assure its providers' credentials and peer reviews were current; and (3) provided additional training to its staff on the requirements for credentialing health care providers and performing peer reviews.

---

[2]  Some BOP locations incorporate more than one BOP institution.  For instance, the BOP has two facilities at its Ashland, Kentucky, location – Ashland FCI and Ashland-CAMP.

In this follow-up audit, we also tested whether the BOP's corrective actions improved the BOP's efforts to maintain current privileges, practice agreements, protocols, and peer reviews for its health care providers.  As shown in Exhibit 1, we found that since our 2008 audit, the BOP had significantly reduced the percentage of practitioners without current privileges, practice agreements, and peer reviews.

However, the percentage of practitioners without current protocols had increased.  This increase occurred because nurses at the Butner, North Carolina, Federal Medical Center did not have protocols as required by the BOP's guidelines.  BOP officials told us the nurses did not need protocols because those nurses were under 24-hour supervision by licensed independent practitioners.

When the nurses at Butner are excluded, the BOP's percentage of practitioners without current protocols decreased from 5 percent to 4 percent.

**Exhibit 1:  2008 and 2010 Audit Results[3]**

| Type of Authorizing Document | 2008 Audit Results | 2010 Audit Results Including Butner's Nurses | Percentage Change Including Butner's Nurses | 2010 Audit Results Excluding Butner's Nurses | Percentage Change Excluding Butner's Nurses |
|---|---|---|---|---|---|
| Practitioners without Current Privileges | 11% | 4% | -64% | 4% | -64% |
| Practitioners without a Current Practice Agreement | 9% | <1% | -89% | <1% | -89% |
| Practitioners without a Current Protocol | 5% | 7% | +40% | 4% | -20% |
| Practitioners without a Current Peer Review | 48% | 13% | -73% | 13% | -73% |

**Source:** Responses by BOP institution officials to OIG survey questionnaire

While the BOP's corrective actions resulted in significant improvements in its credentialing and peer review processes, additional improvements are needed to ensure that all of the BOP's heath care providers are operating with current authorization documents and peer reviews.  Allowing any practitioners to provide medical care to inmates

---

[3]  During the 2008 audit, the BOP institutions reported fewer practitioners that required privileges, practice agreements, protocols, and peer reviews than reported during the 2010 audit.

without current privileges, practice agreements, or protocols increases the risk that the practitioners may provide medical services without having the qualifications, knowledge, skills, and experience necessary to correctly perform the services.

We also found that the BOP institutions maintained current NPDB reports for 96 percent of its health care practitioners.  We concluded that BOP needs to take additional steps to ensure NPDB reports are obtained for all practitioners.  Without current NPDB reports for all its practitioners, the BOP risks not identifying adverse actions against practitioners and employing practitioners who are not suitable for providing proper health care for BOP inmates.

In this report, we make seven recommendations to assist the BOP in ensuring that all health care providers have current privileges, practice agreements, protocols, peer reviews, and NPDB reports, as applicable.

The remaining sections of this Executive Summary provide a further description of our audit findings.

## Results of Our 2008 Audit

Our 2008 audit found 134 practitioners who did not have current privileges, practice agreements, or protocols as shown in the following exhibit.

### Exhibit 2:  BOP Medical Practitioners without Current Privileges, Practice Agreements, or Protocols

| Type of Authorizing Document | Practitioners Requiring Authorizing Document | Practitioners Without Authorizing Document | Percent Without Authorizing Document |
|---|---|---|---|
| Privileges | 680 | 72 | 11% |
| Practice Agreement | 466 | 42 | 9% |
| Protocol | 390 | 20 | 5% |
| Totals | 1,536 | 134 | 9% |

**Source:** Responses by BOP institution officials to OIG survey questionnaire

In our 2008 audit, we attributed the absence of current privileges, practice agreements, or protocols to confusion that existed among BOP officials as to which type of authorization health care providers should have.

Our 2008 audit also found that 430 (48 percent) of the 891 practitioners who required peer reviews had not received a peer review within the previous 2 years, as required by the BOP's Program Statement on

Health Care Provider Credential Verification, Privileges, and Practice Agreement Program.  The BOP officials responsible for more than half of the non-current peer reviews did not provide an explanation for the lack of current peer reviews.  However, the officials responsible for the remaining non-current peer reviews cited the following reasons.

- The officials rely on peer reviewers from the contract providers' non-BOP hospital or medical facility to conduct the peer reviews.

- The officials believed that the peer review requirement did not apply to dental assistants, dental hygienists, or mid-level practitioners such as physician assistants and nurse practitioners.

- The officials relied on other types of performance reviews instead of doing the required peer reviews.

**The BOP's Actions in Response to our 2008 Audit**

In our 2008 audit, we made 11 recommendations regarding the BOP's provision of medical care for inmates, including the following 4 recommendations related to privileges, practice agreements, protocols, and peer reviews.

- Ensure initial privileges, practice agreements, or protocols are established for all practitioners, as applicable.

- Ensure privileges, practice agreements, and protocols are revaluated and renewed in a timely manner.

- Ensure that practitioners are not allowed to practice medicine in BOP institutions without current privileges, practice agreements, or protocols.

- Ensure that peer reviews of all providers are performed within the prescribed time frames.

To address these four recommendations, in June 2008 the BOP issued guidance to its institutions reiterating policy requirements that all health care providers have privileges, practice agreements, protocols, and peer reviews.  The BOP also planned to verify privileges, practice agreements, and protocols on site through health services program reviews, Regional Medical Director and Regional Health Service Administrator visits, and Clinical Director peer reviews.  The BOP required all clinical directors to provide assurance to their respective Regional Medical Director by June 30,

2008, that current privileges, practice agreements, or protocols were in place for all practitioners, as applicable.  In addition, the BOP provided additional training to its institution staff to increase their awareness of the credentialing and peer review requirements.  Based on the BOP's corrective actions, we closed the four recommendations in July 2008.

### Effect of the BOP's Corrective Actions

During this follow-up audit, we evaluated whether the BOP's corrective actions were effective in ensuring that all health care providers were operating under current privileges, practice agreements, or protocols and had received a current peer review, as applicable.  We surveyed BOP officials at all 115 BOP institutions to obtain the date of the latest privilege, practice agreement, protocol, and peer review, as appropriate, for each health care practitioner.  We also asked BOP officials to provide documentation to support the dates provided for the applicable authorizing documents and peer reviews.  In Exhibits 3 through 7, we compare the results of our analyses of privileges, practice agreements, protocols, and peer reviews from our 2008 audit and our 2010 follow-up audit.

As illustrated in Exhibit 3, we found that the BOP significantly reduced the percentage of practitioners without current privileges from 11 percent in our 2008 audit to 4 percent in our current audit.

**Exhibit 3: Status of Privileges for BOP Practitioners**

| | | |
|---|---|---|
| **2010 Audit** | 4% | 96% |
| | 38 | 854 |
| **2008 Audit** | 11% | 89% |
| | 72 | 608 |

☐ **Not Current**
☐ **Current**

**Source:** Responses by BOP institution officials to OIG survey questionnaire

We found that the BOP also significantly reduced the percentage of practitioners without current practice agreements from 9 percent in our 2008 audit to less than 1 percent in our current audit as shown in Exhibit 4.

**Exhibit 4: Status of Practice Agreements for BOP Practitioners**



| | | |
|---|---|---|
| **2010 Audit** | <1% 2 | >99% 558 |
| **2008 Audit** | 9% 42 | 91% 424 |

□ Not Current
▣ Current

**Source:** Responses by BOP institution officials to OIG survey questionnaire

The BOP's percentage of practitioners without current protocols increased from 5 percent in our 2008 audit to 7 percent in our current audit. This increase occurred because the BOP medical center at Butner had 13 nurses without protocols.  BOP officials told us these nurses did not need protocols because supervision by licensed independent practitioners was available 24 hours a day at this facility.  We agree with the BOP's explanation because the protocols are written to guide the non-independent practitioners on dealing with specific medical situations when independent practitioners are not available to provide such guidance.

However, the BOP's current guidelines for protocols do not indicate that protocols are not required for non-independent practitioners when supervision is available 24 hours a day from licensed independent practitioners.  If the BOP changes its policy accordingly and the 13 nurses at Butner are not counted as needing protocols, then the percentage of practitioners without protocols would be 4 percent, or 1 percent less than we found during our 2008 audit.

The exhibit below demonstrates the status of protocols for BOP Practitioners using the current guidelines, including the 13 nurses at Butner as among the percentage of practitioners without required protocols.

vii

**Exhibit 5: Status of Protocols for BOP Practitioners
Including Butner's Nurses**



Source: Responses by BOP institution officials to OIG survey questionnaire

The following exhibit demonstrates the status of protocols for BOP Practitioners after excluding the 13 nurses at Butner from the requirement to have protocols.

**Exhibit 6: Status of Protocols for BOP Practitioners
Excluding Butner's Nurses**



Source: Responses by BOP institution officials to OIG survey questionnaire

As illustrated in Exhibit 7, the most significant reduction of the areas we tested related to peer reviews. We found that the BOP significantly reduced the percentage of practitioners without current peer reviews from 48 percent in our 2008 audit to 13 percent in our current audit.

**Exhibit 7: Status of Peer Reviews for BOP Practitioners**



| | Not Current | Current |
|---|---|---|
| **2010 Audit** | 13% / 162 | 87% / 1080 |
| **2008 Audit** | 48% / 430 | 52% / 461 |

**Source:** Responses by BOP institution officials to OIG survey questionnaire

Although not part of the 2008 audit, in the survey we also asked BOP officials to provide the date and supporting documentation for the latest NPDB report obtained for each practitioner.  We found that the BOP had obtained current NPDB reports for 1,938 (96 percent) of the 2,010 practitioners who required one.

During this audit, BOP officials told us that they were in the process of revising the BOP's Program Statement on Health Care Provider Credential Verification, Privileges, and Practice Agreement Program to further clarify the requirements of the program.  The officials stated that they expect to have a draft of the revised Program Statement completed by the end of FY 2010, and a new publication by FY 2012.  We concluded that in the interim, the BOP should issue clarifying guidance to BOP institutions to further reduce the number of practitioners without current privileges, practice agreements, protocols, peer reviews, and NPDB reports.

## Conclusion and Recommendations

We found that since the 2008 audit, the BOP generally increased its rate of compliance with the controls for monitoring its health care providers' credentials by:  (1) conducting program reviews that included verifying health care provider credentials, (2) directing each institution to verify and assure its practitioners' credentials and peer reviews were current, and (3) providing training to its staff on credentialing health care practitioners. However, additional improvements are needed to help ensure that all practitioners have current authorizing documents and peer reviews.  BOP officials recognize that their credentialing and peer review policy is not clear, and the BOP is in the process of revising its Program Statement on Health Care Provider Credential Verification, Privileges, and Practice Agreement Program to ensure the requirements of the program are understood by its staff.

ix

Allowing practitioners without current privileges, practice agreements, or protocols to provide medical care to inmates increases the risk that the practitioners may provide medical services without having the qualifications, knowledge, skills, and experience necessary to correctly perform the services. In addition, the BOP could be subjected to liability claims by inmates if improper medical services are provided by these practitioners.

In this report, we make seven recommendations to help the BOP ensure that its health care practitioners have current privileges, practice agreements, protocols, peer reviews, and NPDB reports. Five of the recommendations relate to providing interim guidance to BOP institutions to clarify the requirements for each of the five areas above. One recommendation was made to ensure the BOP's revised Program Statement incorporates the requirements contained in the interim clarifying guidance. A final recommendation was primarily made to ensure the steps followed during the BOP's program reviews of institutions are effective in identifying practitioners without current privileges, practice agreements, protocols, peer reviews, and NPDB reports.

x

# TABLE OF CONTENTS

**Page**

**INTRODUCTION** ......................................................... 1
    Health Care Responsibilities............................................ 1
    The Provision of Health Care Services ........................... 2
    Prior Audit ................................................................ 3
    OIG Audit Objectives and Approach ............................. 6

**FINDING AND RECOMMENDATIONS**.............................. 8

    **IMPROVEMENTS IN THE BOP'S CREDENTIALING AND PEER REVIEW PROCESSES** ............................................. 8
    2008 Audit Results.................................................... 8
    The BOP's Response to Our 2008 Audit Recommendations ................. 10
    The Effects of the BOP's Corrective Actions on Improving the BOP's
        Processes for Granting Privileges, Practice Agreements, and
        Protocols, and for Performing Peer Reviews ................................ 11
    Program Reviews ...................................................... 20
    Institution Certification of Compliance............................ 22
    National Practitioner Data Bank.................................... 24
    Conclusion ............................................................... 26
    Recommendations..................................................... 27

**STATEMENT ON COMPLIANCE WITH LAWS AND REGULATIONS** ...... 29

**STATEMENT ON INTERNAL CONTROLS**........................... 31

**ABBREVIATIONS** ..................................................... 32

**APPENDIX I – Audit Objectives, Scope, and Methodology** .............. 33

**APPENDIX II – BOP Institutions and Inmates Housed as of
    March 25, 2010** ....................................................... 34

**APPENDIX III – OIG Survey Questionnaire Sent to BOP
    Institutions**........................................................... 40

**APPENDIX IV – The BOP's Response to the Draft Audit Report** ....... 44

**APPENDIX V – Office of the Inspector General, Audit Division,
    Analysis and Summary of Actions Necessary to Close the
    Report**................................................................... 49

# INTRODUCTION

The Federal Bureau of Prisons (BOP) is responsible for confining federal offenders in prisons and community-based facilities.  As of March 25, 2010, the BOP housed 172,105 inmates in 115 BOP managed institutions at 93 locations.  In addition, the BOP housed 38,279 inmates in privately managed, contracted, or other facilities.[4]

The BOP institutions include Federal Correctional Institutions, United States Penitentiaries, Federal Prison Camps, Metropolitan Detention Centers, Federal Medical Centers, Metropolitan Correctional Centers, Federal Detention Centers, the United States Medical Center for Federal Prisoners, and the Federal Transfer Center.  When multiple institutions are co-located, the group of institutions is referred to as a Federal Correctional Complex.  Some institutions are located within federal correctional complexes that contain two or more institutions.  Appendix II contains a list of the BOP institutions.

**Health Care Responsibilities**

As part of the BOP's responsibility to house offenders in a safe and humane manner, it seeks to deliver to its inmates medical care with appropriately trained, skilled, and credentialed staff.

According to BOP's Program Statement on Health Services Administration, the BOP's responsibility for delivering health care to inmates is divided among the BOP headquarters, regional offices, and local institution officials.[5]

- **Director of BOP**:  The Director has overall authority to provide for the care and treatment of persons within the BOP's custody.  The Director has delegated this authority to the Assistant Director, Health Services Division.

- **Assistant Director, Health Services Division**:  The Assistant Director, Health Services Division, is responsible for directing and administering all activities related to the physical and psychiatric care of inmates.  The Assistant Director has delegated this authority

---

[4]  This audit focused only on health care providers providing care to inmates housed in Bureau of Prison facilities.

[5]  BOP Program Statement P6010.02, *Health Services Administration*, January 15, 2005.

1

as it pertains to clinical direction and administration to the BOP Medical Director.

- **Medical Director**:  The Medical Director is the final health care authority for all clinical issues and is responsible for all health care delivered by BOP health care practitioners.

- **Regional Health Services Administrators**:  The Regional Health Services Administrators in the BOP's six regional offices are responsible for responding to health care problems at all institutions within their region.  The Administrators also advise the Regional Director and Deputy Regional Director in all matters related to health care delivery.

- **Institution Officials**:  The responsibility for the delivery of health care to inmates at the institution level is divided among various officials, staff, contractors, and others.  Each institution has a Health Services Unit responsible for delivering health care to inmates.  The organization of the unit varies among institutions depending upon security levels and missions, but each unit ordinarily has a Clinical Director and a Health Services Administrator who report to the Warden or Associate Warden.  The Clinical Director is responsible for oversight of all clinical care provided at the institution.  The Health Services Administrator implements and directs all administrative aspects of the Health Services Unit at the institution.  Both the Clinical Director and the Health Services Administrator have responsibilities related to the supervision and direction of health services providers at the institution.

## The Provision of Health Care Services

The BOP provides health care services to inmates primarily through in-house medical providers employed by the BOP or assigned to the BOP from the Public Health Service and through contracted medical providers. Our audit covered both in-house and contracted medical providers.

### In-house Medical Providers

The Health Services Units at each of the BOP's 115 institutions provide routine, ambulatory medical care.  These units provide care for patients with moderate and severe illnesses, including hypertension and diabetes, as well as care for patients with serious medical conditions, such as Human Immunodeficiency Virus infection and Acquired Immunodeficiency

2

Syndrome.  Health Services Unit outpatient clinics provide diagnostic and other medical support services for inmates needing urgent and ambulatory care.  The units are equipped with examination and treatment rooms, radiology and laboratory areas, dental clinics, pharmacies, administrative offices, and waiting areas.  The units are staffed by a combination of BOP health care employees and Public Health Service personnel consisting of physicians, dentists, physician assistants, mid-level practitioners, nurse practitioners, nurses, pharmacists, psychiatrists, laboratory technicians, x-ray technicians, and administrative personnel.  At each institution, the Clinical Director directs the clinical care of inmates and is the privilege granting authority; however, in institutions with a Credential Committee, Primary Care Provider Teams, or more than one physician, the Clinical Director may delegate this authority to another licensed independent practitioner.

As part of its internal health care network, the BOP operates several medical referral centers that provide advanced care for inmates with chronic or acute medical conditions.  The centers provide hospital and other specialized services to inmates, including full diagnostic and therapeutic services and inpatient specialty consultative services.  Inpatient services are available only at medical referral centers.  BOP medical personnel refer inmates to the centers or an outside community care provider when the inmates have health problems beyond the capability of the Health Services Unit.

*Contracted Medical Providers*

When the BOP's internal resources cannot fully meet inmates' health care needs, the BOP awards comprehensive and individual contracts to supplement its in-house medical services.  Comprehensive contracts provide a wide range of services and providers, while individual contracts usually provide specific specialty services.

**Prior Audit**

In February 2008, the Office of the Inspector General (OIG) completed an audit of the BOP's efforts to manage inmate health care.[6]  Our 2008 audit examined the growth of inmate health care costs over the previous 7 years and found that the BOP had kept this growth at a reasonable level compared to national health care cost data reported by the Departments of Health and Human Services and Labor.  However, while the BOP had implemented cost

---

[6]  Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons Efforts to Manage Inmate Health Care,* Audit Report Number 08-08 (February 2008).

3

containment strategies over the previous several years to provide health care to inmates in a more effective and efficient manner, it generally did not maintain analytical data to assess the impact that individual initiatives have had on health care costs.

Our audit also found that BOP institutions did not always provide recommended preventive medical services to inmates. The audit determined that BOP institutions did not consistently provide inmates with the medical services recommended by BOP guidelines. Not providing appropriate medical services could lead to exacerbation of inmate medical conditions, higher costs for health care, medical-related complaints and lawsuits from inmates, and BOP liability for lack of adequate medical care.

Additionally, we determined that the BOP allowed some health care providers to practice medicine without valid authorizations. Allowing practitioners to provide medical care to inmates without current privileges, practice agreements, or protocols increases the risk that they may provide medical services without having the qualifications, knowledge, skills, and experience necessary to correctly perform the services.

The OIG audit also found that 48 percent of health care providers did not have their practices peer-reviewed to ensure the quality of their medical care as required by BOP policy. Without a current peer review the BOP has a higher risk of providers giving inadequate professional care to inmates.

Prior OIG audits of BOP medical contracts had identified contract-administration deficiencies in the review of health care costs, such as inadequate review and verification of contractor invoices and inadequate supporting documentation for billings. Subsequent to these audits, the BOP took action to address individual deficiencies at the institutions audited. However, our 2008 audit found that other BOP institutions still lacked appropriate controls in these same areas, which indicated the existence of systemic weaknesses that were not being addressed by the BOP.

The BOP monitors its health care providers by performing program reviews of institution operations, reviewing medical provider skills and qualifications and providing authorization documents based on the review results, and requiring institutions to accumulate and submit data on health-related performance measures to BOP headquarters. In our 2008 audit, we determined that the BOP methods to accumulate and report health-related performance measures were inconsistent, and that the data was not analyzed to evaluate the performance of BOP institutions. While the BOP had corrected deficiencies at the specific institutions where its program reviews found weaknesses, it did not develop and issue guidance to correct

systemic deficiencies found during the reviews.  We concluded that the BOP should issue guidance to correct systemic deficiencies identified through program reviews.

The OIG made 11 recommendations to help the BOP correct the deficiencies found during the 2008 audit.  The BOP agreed with the recommendations and took corrective actions that included:

- awarding a contract for adjudicating medical claims at one of the BOP's medical facilities, and making plans to implement the claims adjudication process BOP-wide and use data provided by the contractor to conduct cost-analyses of medical claims;

- revising its Clinical Practice Guidelines and scheduling other guidelines for revision in 2009 and 2010;

- issuing guidance to institutions underscoring the importance of the Clinical Practice Guidelines;

- issuing guidance to BOP Health Service Administrators, Business Administrators, and Contracting Officers regarding medical contract administration procedures;

- issuing guidance to wardens and clinical directors reiterating policy requirements that all health care providers have privileges, practice agreements, and protocols in place;

- issuing guidance to wardens and clinical directors reiterating the requirements for performing peer reviews of health care providers; and

- providing on-line training to advise and educate clinicians and administrators regarding findings in the BOP's Program Summary Report.

Based on the BOP's actions, we closed 10 of the 11 recommendations. We continue to follow-up with the BOP on the remaining open recommendation that the BOP establish procedures for collecting and evaluating data for each current and future health care initiative to assess whether individual initiatives are cost-effective and producing the desired results.  Once we receive acceptable documentation showing the BOP has completed a cost benefit analysis to determine if bill adjudication provides savings to the BOP regarding medical billing, we can close the remaining recommendation.

**OIG Audit Objectives and Approach**

The OIG initiated this follow-up audit to determine BOP's progress in implementing the four recommendations in our 2008 report relating to the credentialing and peer review process for BOP health care providers.  The four recommendations were:

1. Ensure initial privileges, practice agreements, and protocols are established for all practitioners, as applicable.

2. Ensure privileges, practice agreements, and protocols are reevaluated and renewed in a timely manner.

3. Ensure that practitioners are not allowed to practice medicine in BOP institutions without current privileges, practice agreements, or protocols.

4. Ensure that peer reviews of all providers are performed within the prescribed time frames.

We decided to follow up on these recommendations because deficiencies in the credentialing and peer review of BOP's health care providers could result in BOP using practitioners who lack the necessary qualifications or skills to deliver appropriate medical care.

In addition to following up on four recommendations from our 2008 audit, we also evaluated whether the BOP was obtaining current National Practitioner Data Bank (NPDB) reports for its health care providers to ensure the providers have not been involved in unethical or incompetent practices. The NPDB was established by the Health Care Quality Improvement Act of 1986 to protect the public by restricting the ability of unethical or incompetent practitioners to move from state to state without disclosure or discovery of previously damaging or incompetent performance.  The NPDB is a central repository of information about:  (1) malpractice payments made for the benefit of physicians, dentists, and other health care practitioners; (2) licensure actions taken by state medical boards and state boards of dentistry against physicians and dentists; (3) professional review actions primarily taken against physicians and dentists by hospitals and other health care entities, including health maintenance organizations, group practices, and professional societies; (4) actions taken by the Drug Enforcement Administration; and (5) Medicare/Medicaid Exclusions Information is collected from private and government entities, including the Armed Forces, located in the 50 states and all other areas under U.S. jurisdiction.  The BOP

is required to query the NPDB at initial appointment of health care providers, and no less than once every 2 years to identify adverse actions by its health care providers.

In the Finding and Recommendations section of this report, we discuss in detail the corrective actions the BOP took in response to the four credentialing and peer review recommendations, and the results of our testing to determine whether those actions improved the BOP's credentialing and peer reviewing of health care providers.  In addition, we discuss the BOP's actions to identify adverse actions by its health care providers through current queries of the NPDB.

# FINDING AND RECOMMENDATIONS

## IMPROVEMENTS IN THE BOP'S CREDENTIALING AND PEER REVIEW PROCESSES

This follow-up audit found that the BOP had implemented corrective actions on the four recommendations we made in our 2008 report to strengthen the BOP's credentialing and peer review processes for its health care providers. These corrective actions significantly increased the percentage of BOP health care providers with current privileges, practice agreements, and peer reviews, while the percentage for protocols remained about the same. However, we found that some BOP health care providers were not operating under current privileges, practice agreements, or protocols, as applicable, and that current peer reviews had not been performed for some providers. While the BOP's program reviews of institution health care practices identified instances where privileges or practice agreements were not current, the reviews failed to identify many of the non-current privileges, practice agreements, and protocols that we found existed at the time BOP conducted its reviews. In addition, we found that current NPDB reports were not maintained for some BOP health care providers and BOP's program reviews failed to identify any of the non-current NPDB reports.

### 2008 Audit Results

Our 2008 audit found that while the BOP used numerous mechanisms to monitor its health care providers, some of its health care providers did not have current privileges, practice agreements, protocols, and peer reviews.

The BOP's Program Statement on Health Care Provider Credential Verification, Privileges, and Practice Agreement Program provides that the BOP:  (1) grants clinical privileges to licensed independent practitioners based on the practitioner's qualifications, knowledge, skills, and experience; (2) establishes practice agreements between its licensed independent practitioners and its non-independent practitioners, such as nurse

practitioners and physician assistants;[7] (3) establishes protocols that must be followed by other health care providers, such as clinical nurses and emergency medical technicians; and (4) performs peer reviews of all providers who function under clinical privileges and practice agreements.[8] Further, this program statement prohibits independent practitioners from practicing medicine within the BOP until they have been granted privileges to do so by an authorized BOP official.  It also prohibits non-independent practitioners from providing health care within the BOP until a practice agreement has been established.  The program statement requires the BOP's other health care providers, such as clinical nurses and emergency medical technicians, to work under protocols approved by licensed independent practitioners.  Our 2008 audit found 134 practitioners who did not have current privileges, practice agreements, or protocols as shown in the following exhibit.

**Exhibit 8:  BOP Medical Practitioners without Current Privileges, Practice Agreements, or Protocols**

| Type of Authorizing Document | Practitioners Requiring Authorizing Document | Practitioners Without Authorizing Document | Percent Without Authorizing Document |
|---|---|---|---|
| Privileges | 680 | 72 | 11% |
| Practice Agreement | 466 | 42 | 9% |
| Protocol | 390 | 20 | 5% |
| Totals | 1,536 | 134 | 9% |

**Source:** Responses by BOP institution officials to OIG survey questionnaire

Based on the responses we received from BOP institution officials regarding why the practitioners did not have current privileges, practice agreements, or protocols, we believe that confusion existed among the officials as to which type of authorization different health care providers should have.  Allowing practitioners to provide medical care to inmates without current privileges, practice agreements, or protocols increases the risk that the practitioners may provide medical services without having the

---

[7]  Licensed independent practitioners are medical providers authorized by a current and valid state license to independently practice medicine, dentistry, optometry, or podiatry.  Non-independent practitioners are graduate physician assistants (certified or non-certified), dental assistants, dental hygienists, nurse practitioners, and unlicensed medical graduates who must be supervised by a physician while providing medical care or be operating under a protocol approved by a licensed independent practitioner.  A nurse practitioner is a registered nurse who has completed advanced education and training in the diagnosis and management of common medical conditions, including chronic illnesses. Unlike clinical nurses, nurse practitioners can prescribe medications.

[8]  BOP Program Statement P6027.01, *Health Care Provider Credential Verification, Privileges, and Practice Agreement Program*, January 15, 2005.

9

qualifications, knowledge, skills, and experience necessary to correctly perform the services.

Our 2008 audit also found that 430 (48 percent) of the 891 practitioners who required peer reviews had not received a peer review within the previous 2 years. The officials responsible for more than half the non-current peer reviews did not provide an explanation for the lack of peer reviews. The officials responsible for the remaining non-current peer reviews cited the following reasons.

- The officials rely on peer reviewers from the contract providers' non-BOP hospital or medical facility to conduct peer reviews.

- The officials mistakenly believed that the peer review requirement did not apply to dental assistants, dental hygienists, or mid-level practitioners such as physician assistants and nurse practitioners.

- The officials relied on other types of performance reviews instead of doing the required peer reviews.

Without current peer reviews, the BOP has a higher risk of not detecting circumstances where providers may not be giving adequate medical care to inmates. If inadequate professional care goes undetected, the provider may not receive the training or supervision needed to improve the delivery of medical care. Moreover, inadequate care by a practitioner without a current peer review also increases the risk of BOP liability arising from any formal complaints or medical malpractice suits filed by inmates.

**The BOP's Response to Our 2008 Audit Recommendations**

Our 2008 audit made four recommendations to strengthen the BOP's controls for monitoring its health care providers' credentials. Our recommendations and the steps that the BOP took to implement those recommendations are explained below.

As noted above, three of the four recommendations related to improving the BOP's process for granting privileges, practice agreements, and protocols to health care providers:

- Ensure initial privileges, practice agreements, or protocols are established for all practitioners, as applicable.

10

- Ensure privileges, practice agreements, and protocols are reevaluated and renewed in a timely manner.

- Ensure that practitioners are not allowed to practice medicine in BOP institutions without current privileges, practice agreements, or protocols.

To address these recommendations, on June 4, 2008, the BOP issued guidance to its wardens and clinical directors reiterating policy requirements that all health care providers have privileges, practice agreements, and protocols in place. In addition, the BOP planned to verify privileges, practice agreements, and protocols on site through health services program reviews, Regional Medical Director and Regional Health Service Administrator visits, and Clinical Director peer reviews. The guidance required that all clinical directors provide assurance to their respective Regional Medical Director by June 30, 2008, that their clinicians have privileges, practice agreements, or protocols in place. In addition, the BOP provided additional training to its institution staff to increase their awareness of the credentialing requirements. Based on the BOP's corrective actions, we closed these recommendations in July 2008.

The remaining recommendation was for the BOP to ensure that peer reviews of all providers are performed within the prescribed timeframes. To address this recommendation, on June 4, 2008, the BOP issued guidance to its wardens and clinical directors explaining that all health care providers who are privileged must have at least one external peer review conducted every 2 years. The guidance also reiterated that providers working under practice agreements must have a peer review conducted at least every 2 years by a peer at the facility. The guidance also stated that the Regional Medical Directors would conduct external peer reviews for all licensed independent practitioners in conjunction with the scheduled Clinical Director peer reviews. In addition, the BOP provided additional training to its institution staff to increase their awareness of the peer review requirements. Based on the BOP's corrective actions, we closed this recommendation in July 2008.

**The Effects of the BOP's Corrective Actions on Improving the BOP's Processes for Granting Privileges, Practice Agreements, and Protocols, and for Performing Peer Reviews**

In this audit, we evaluated whether the BOP's corrective actions were effective in ensuring that all health care providers were operating under current privileges, practice agreements, and protocols, as applicable, and had received a current peer review, as applicable. To perform this

evaluation, we sent a survey questionnaire to all 115 BOP institutions at 93 BOP locations.  Appendix III contains the survey questionnaire that we sent to BOP institutions.  In the survey, we asked BOP officials to provide us the date of the latest privilege, practice agreement, or protocol, as appropriate, for each health care practitioner providing medical care at the facility or through tele-health.[9]  We also asked the BOP officials to provide a copy of the applicable authorizing document as support for the date the applicable authority was granted.  We analyzed the survey results based on guidelines established by the BOP in its Program Statement on Health Care Provider Credential Verification, Privileges, and Practice Agreement Program.

The BOP grants clinical privileges to its in-house and contracted licensed independent practitioners.  Clinical privileges are the specific duties that a health care provider is allowed to provide to BOP inmates.  The following authorities are assigned to grant institution-specific clinical privileges.

- The BOP Medical Director grants privileges for institution physicians designated as the Clinical Director, including a physician who is appointed as Acting Clinical Director while the permanent position is vacant.  The BOP Medical Director also grants privileges for Clinical Specialty Consultants and Chief Dental Officers.  The Medical Director delegated privilege-granting authority for the Chief of Psychiatry at BOP institutions to the BOP's Chief Psychiatrist.

- The institution's Clinical Director grants privileges for other licensed independent practitioners who deliver medical health care at the institution, including contractors, consultants, and those involved in tele-health.

- The BOP Chief Dental Officer grants privileges for all institution Chief Dental Officers.

- The institution Chief Dental Officer grants privileges for institution dentists.

BOP policy states that clinical privileges can be granted for a period of not more than 2 years, and that newly employed physicians should be granted privileges for a period of 1 year.  Independent practitioners are

---

[9]  Tele-health is a method of providing health care from a remote location using technology such as video conferencing modified to include peripheral devices that produce images of diagnostic quality.

12

prohibited from practicing medicine within the BOP until they have been granted privileges to do so by an authorized BOP official.

The individual BOP institutions establish practice agreements between licensed independent practitioners and non-independent practitioners. Practice agreements delegate specific clinical or dental duties to non-independent practitioners under a licensed independent practitioner's supervision and are valid for no more than 2 years. Non-independent practitioners include graduate physician assistants, nurse practitioners, and unlicensed medical graduates who must be directly supervised by a licensed independent practitioner. BOP policy prohibits non-independent practitioners from providing health care within the BOP until a practice agreement has been established. The BOP's other health care providers, such as clinical nurses and emergency medical technicians, must work under protocols approved by licensed independent practitioners when they are not being directly supervised by the licensed practitioners.

BOP policy requires that health care providers who are privileged or are working under a practice agreement must have at least one peer review every 2 years. A peer is defined as another provider in the same discipline (physician, dentist, mid-level practitioner, or others) who has firsthand knowledge of the provider's clinical performance. Using a sample of the provider's primary patient load, the peer reviewer should evaluate the professional care the provider has given and comment on the provider's:

- actual clinical performance;

- appropriate utilization of resources;

- participation in, and results of, performance improvement activity;

- clinical judgment; and

- technical skills.

Based on the survey responses and the supporting documentation provided to us by the BOP institutions, we concluded that the BOP's corrective actions to the recommendations we made in 2008 resulted in significant improvements in the numbers of BOP medical staff with current privileges, practice agreements, and peer reviews as shown in the following exhibit.

13

**Exhibit 9:  2008 and 2010 Audit Results**

| Type of Authorizing Document | 2008 Audit Results | 2010 Audit Results | Percentage Change |
|---|---|---|---|
| Practitioners without Current Privileges | 11% | 4% | -64% |
| Practitioners without a Current Practice Agreement | 9% | <1% | -89% |
| Practitioners without a Current Protocol | 5% | 7% | +40% |
| Practitioners without a Current Peer Review | 48% | 13% | -73% |

**Source:** Responses by BOP institution officials to OIG survey questionnaires

*Privileges*

As shown in Exhibit 9, the BOP reduced the percentage of practitioners without current privileges from 11 percent in our 2008 audit to 4 percent in our current audit.  Based on data provided by the BOP during the 2008 audit, 72 of the 680 practitioners who required privileges were not operating under current privileges.  Based on the BOP supplied data during this follow-up audit, 38 of 892 practitioners were not operating under current privileges.  In addition, we found that one newly hired practitioner was granted privileges for a 2-year period, but the BOP guidance requires that newly hired practitioners be granted privileges for only a 1-year period.

Only one institution official provided a reason for why a practitioner's privilege was not current.  The official explained that the privilege was late because the practitioner was on extended sick leave and had not returned to duty.  The official commented that the practitioner's privilege would be completed upon his return to work.

During our testing of privileges, we observed that other health care providers, such as nurses, pharmacists, and emergency medical technicians were granted privilege type documents giving them authority to perform medical services.  These health care providers had not used either form that is required to request clinical privileges – the "Application for Appointment to Medical Staff form BP-S601.63, or the "Application for Dental Privileges" form BP-S603.063.  While the BOP indicated on the granting documents that the practitioners were being given privileges, the documents appeared to be practice agreements or protocols instead of privilege granting documents.  BOP policy states that only licensed independent practitioners will apply for and be granted clinical privileges.  To use a document with the term privilege for a practitioner who is not a licensed independent practitioner could possibly lead to a misunderstanding of the authority granted the

14

practitioner.  Therefore, it is important that BOP officials understand the term privilege and do not describe practice agreements or protocols as privileges.

*Practice Agreements*

As shown in Exhibit 9, the BOP reduced the percentage of practitioners without current practice agreements from 9 percent in our 2008 audit to less than 1 percent in our current audit.  Based on data provided by the BOP during the 2008 audit, 42 of the 466 practitioners who required practice agreements were not operating under current practice agreements.  Based on the BOP supplied data during this follow-up audit, 2 of 560 practitioners were not operating under current practice agreements.  Institution officials did not provide an explanation for why the practitioners did not have current practice agreements.

*Protocols*

As shown in Exhibit 9, the percentage of practitioners without current protocols increased from 5 percent in our 2008 audit to 7 percent in our current audit.  Based on data provided by the BOP during the 2008 audit, 20 of the 390 practitioners who required protocols did not have them.  Based on the BOP supplied data during this follow-up audit, 34 of 484 practitioners did not have approved protocols.  Of the 34 practitioners without approved protocols, 13 were for nurses at the Federal Medical Center in Butner, North Carolina.  According to BOP officials, protocols are for use by non-independent practitioners during emergency and after-hour situations when a licensed independent practitioner may not be there to supervise the non-independent practitioner.  The BOP officials stated that since the medical center at Butner is a facility staffed with licensed independent practitioners 24 hours a day, then protocols are not necessary or used for non-independent practitioners at the medical center.  If the 13 nurses at the Butner Medical Center are removed from consideration, then the percentage of practitioners without protocols drops to 4 percent (21 of 471), and would be a 1 percent reduction from the 2008 audit.

15

**Exhibit 10:  2008 and 2010 Audit Results for Protocols**

| Type of Authorizing Document | 2008 Audit Results | 2010 Audit Results Including Butner's Nurses | Percentage Change Including Butner's Nurses | 2010 Audit Results Excluding Butner's Nurses | Percentage Change Excluding Butner's Nurses |
|---|---|---|---|---|---|
| Practitioners without a Current Protocol | 5% | 7% | +40% | 4% | -20% |

**Source:** Responses by BOP institution officials to OIG survey questionnaires

The BOP's Program Statement on Health Care Provider Credential Verification, Privileges, and Practice Agreement Program does not indicate that protocols are only required for emergency or after-hour situations where non-independent practitioners are not under the supervision of licensed independent practitioners.  Instead, the program statement indicates that health care providers, such as clinical nurses, emergency medical technicians, or any others that a local governing body deems appropriate, must work under guidance of licensed independent practitioner approved protocols while delivering health care inside the institution.  If the BOP Medical Director agrees that protocols are not necessary at medical centers where licensed independent practitioners are on staff 24 hours a day to supervise the non-independent practitioners, then the BOP needs to revise its Program Statement on Health Care Provider Credential Verification, Privileges, and Practice Agreement Program to reflect this policy.

*Peer Reviews*

As shown in Exhibit 9, the BOP reduced the percentage of practitioners without current peer reviews from 48 percent in our 2008 audit to 13 percent in our current audit.  Based on data provided by the BOP during the 2008 audit, 430 of the 891 practitioners who required peer reviews had not had a current peer review performed.  Based on the BOP supplied data during this follow-up audit, there were 1,408 practitioners who required peer reviews every 2 years.  Of the 1,408 practitioners, 152 had not been with the BOP for at least 2 years, and therefore did not yet require a peer review. We could not determine if 14 additional practitioners required a peer review because the BOP did not provide us the practitioners' employment dates. For the remaining 1,242 practitioners, we found that 162 (13 percent) had not received a current peer review.  For 141 of these 162 practitioners, the BOP provided no data or documentation to indicate that a peer review had been performed.

Of the 162 providers who had not received a current peer review, BOP officials identified 77 of the practitioners as contract employees.  The

remaining 85 we refer to as BOP staff, but may also include some contractors.[10]  For the BOP staff, BOP institution officials responsible for more than half of the non-current peer reviews did not provide an explanation.  The officials responsible for the remaining non-current peer reviews cited the following reasons:

- a record of the peer reviews was discarded after the institution's Program Review was completed;

- peer review was pending;

- peer review was not required because the practitioner is functioning in an administrative position as Health Services Administrator, Infectious Disease Coordinator, or Improving Organization Performance Coordinator, but the position requires that the practitioner be granted a practice agreement; and

- peer review was not performed, but a quarterly performance evaluation for the dental hygienist was completed.

Some institution officials provided peer review dates on the survey spreadsheet, but did not provide evidence showing that the peer reviews were completed.  Without such evidence, we did not count these peer reviews as completed.

For the 77 contract employees, BOP officials responsible for maintaining the credential portfolios did not provide sufficient evidence to indicate that a peer review had been performed.  The BOP officials responded to the column for the date of the latest peer review by: (1) recording N/A for Not Applicable, (2) drawing a line through the column, or (3) leaving the column blank.

BOP policy requires evidence of periodic peer review for contractors. However, BOP officials at the institutions and the BOP Central Office explained to us that one of the primary reasons for the lack of peer reviews for contract employees was that the hospitals where the practitioners worked would not release the information due to confidentiality concerns.  In an attempt to obtain the contractor's peer reviews we received the following types of documents or responses.

---

[10]  Some institutions did not identify contract personnel.  Therefore, we were unable to differentiate between BOP staff and contract staff.

17

- The BOP institution provided an insert of bylaws from the contract hospital that stated peer review functions are contained in the credentialing policy.

- BOP officials told us that they did not have a copy of the peer review information for the contract employee because the private hospital that performed the peer review would not release the information to other institutions, including the BOP.

- BOP officials stated that the practitioner has a solo practice and did not get a peer review by a practitioner from another office.

- BOP officials voiced concern that some BOP clinical directors had not been completing peer reviews.

- BOP officials provided us letters of reference in place of documents indicating a peer review had been performed.

We observed that clinical directors at some BOP institutions conducted peer reviews of the institution's contract physicians. However, at other institutions, the clinical directors relied on the contractor facility for peer reviews of contract staff and therefore could not provide documentation that peer reviews had been performed for contract physicians.

While the BOP has made significant improvements with peer reviews since our initial audit, it is important that BOP officials obtain evidence that peer reviews are performed for all health care providers, including contract providers, and that evidence is maintained in the providers' credential portfolios to show the peer reviews were completed. As a result of the comments and actions listed above, we believe that institution officials remain unsure of who should have a peer review, what constitutes a peer review, and what documentation should be maintained for peer reviews in the credential portfolio.

Peer reviews provide the assurance that a practitioner has the knowledge and skill to conduct medical services. BOP's Chief, Office of Quality Management told us that all licensed independent practitioners who work for a medical facility accredited by the Joint Commission for Accreditation of Healthcare Organizations (JCAHO) are required to have a peer review. The official stated that we could be sure that if a contract physician has been granted privileges and is from a JCAHO accredited hospital, that the physician has had a peer review. The official further stated that if a medical facility is JCAHO accredited, a copy of that medical facility's accreditation report should be maintained at the institution. We did not test

18

whether the institutions' contract physicians were from JCAHO approved hospitals or medical groups, or whether the institutions maintained a copy of the JCAHO accredited medical facility reports.

In our judgment, such tests would not provide reliable evidence that peer reviews were completed for the institutions' contracted physicians. BOP does not require that contract providers come from JCAHO accredited facilities. Moreover, even if the contractor is from a JCAHO accredited facility, it is still possible that providers are not in compliance with the JCAHO peer review policy. The BOP's Program Statement on Health Care Provider Credential Verification, Privileges, and Practice Agreement Program requires that all practitioners operating under privileges or practice agreements have peer reviews and that evidence of such peer reviews be maintained in the practitioner's credentialing portfolio.

BOP officials told us that the policy on peer reviews is outdated. The BOP is currently in the process of updating its Program Statement on Health Care Provider Credential Verification, Privileges, and Practice Agreement Program to clarify the requirements of the credentialing and peer review processes. For example, the BOP intends to include a sample peer review template for use when conducting peer reviews. BOP conducted a pilot with the sample template at the Regional Medical Director level and found it to be successful. We believe the sample template for staff peer reviews will help both the BOP staff and contract physicians with the process. Officials are currently drafting the revised policy and hope to have a completed draft by the end of FY 2010, and a new publication by FY 2012.

In another initiative to clarify peer reviews, the Chief, Office of Quality Management told us that a national wavier to the policy requiring non-independent practitioners to have a peer review has been submitted though the Medical Director's office to the President of the union. The official stated that the JCAHO does not require peer reviews for these individuals, and therefore, BOP is requesting that this requirement be excluded until new policy is published. If the JCAHO does not require these practitioners to have peer reviews and the union agrees to the policy waiver, then we agree that the BOP should not require the peer reviews and the BOP should revise its Program Statement on Health Care Provider Credential Verification, Privileges, and Practice Agreement Program to eliminate this requirement. Mid-level providers and dental hygienists accounted for 32 percent of the practitioners who did not have a current peer review.

**Program Reviews**

BOP's Program Statement on Management Control and Program Review Manual requires that the BOP's Program Review Division perform a comprehensive review of each program or operation at each BOP institution in accordance with published program review guidelines.[11]  The Program Review Division monitors health care providers through its program reviews conducted of institution Health Services Units.  The program reviews are generally conducted once every 3 years, or more frequently if the reviews identify overall performance that is less than a certain level.  Program Review Guideline G6000I.05 for Program Area: Health Services provides the review steps for the Program Review Division to complete when performing a program review of the health services function at a BOP institution, including the following specific steps to verify the credentials of health care providers.

- Review all staff and contract credential files for 10 licensed independent practitioners to determine if:

    a. the license has been verified as current, valid, and unrestricted;

    b. documentation of professional education has been verified;

    c. post-graduate training has been verified;

    d. all past and pending actions taken against a practitioner's license or registration, and any malpractice history have been documented; and

    e. NPDB queries have been verified as initiated, current, and renewed every 2 years.

- Using the same files from above, review 10 staff and contract credential files for licensed independent practitioners (20 at complexes) to determine if peer reviews have been completed and clinical privileges have been granted and approved every 2 years.

- Review 10 staff and contract mid-level practitioner, dental hygienist, and dental assistant credential files (20 at complexes) to determine if the practitioners' peer reviews have been completed,

---

[11]  BOP Program Statement P1210.23, *Management Control and Program Review Manual*, August 21, 2002.

and practice agreements are complete, accurate, and renewed every 2 years.

- Review 10 medical records (20 at complexes) of after-hours encounters performed by registered nurses or emergency medical technicians to determine if performance is within the scope of individual licensure/certification and that emergencies are covered by protocols approved by a licensed independent practitioner.

During FYs 2008 and 2009, the Program Review Division conducted program reviews of health care practices at 66 BOP institutions. We reviewed the resulting reports and determined that the program reviews identified some instances of non-current privileges and practice agreements. However, as shown below, the reviews did not identify deficiencies that we found existed at the time of the program reviews.

- We found 38 instances where privileges were not current at 17 BOP institutions.  Only 1 of the 66 program reviews conducted by the BOP identified an issue with privileges not being current.  For 12 of the 17 institutions where we found privileges that were not current, the non-current privileges existed at the time of the program reviews, but were not detected by the program reviews.

- We found two instances where practice agreements were not current at two BOP institutions.  Six of the 66 program reviews identified an issue with practice agreements not being current. However, for the two institutions where we found practice agreements that were not current, the non-current practice agreements existed at the time of the program reviews, but were not detected by the program reviews.

- We found 34 instances where protocols were not current at 11 BOP institutions. However, 13 of the 34 instances were for the Butner Medical Center and as discussed previously, the BOP officials believed these 13 nurses did not need protocols because licensed independent practitioners were on staff 24 hours a day to supervise their work.  None of the 66 program reviews identified an issue with protocols not being current.  Excluding Butner, for 5 of the remaining 10 institutions where we found protocols that were not current, the non-current protocols existed at the time of the program reviews, but were not detected by the program reviews.

The most likely reason that the program reviews did not detect the non-current privileges, practice agreements, and protocols that we identified

is because the program reviews looked at data for only a sample of practitioners while we reviewed data for all practitioners.

## Institution Certification of Compliance

On June 4, 2008, the BOP issued a directive to its wardens and clinical directors reiterating that all providers, whether BOP, Public Health Service, or consultants, are to have current clinical privileges at all times when providing patient care.  To ensure that institutions complied with this policy, the directive required that all clinical privileges, practice agreements, and protocols be reviewed on site through health services program reviews, Regional Medical Director and Regional Health Service Administrator visits, and Clinical Director peer reviews.  The directive further instructed clinical directors to provide assurance of compliance to their respective Regional Medical Directors by June 30, 2008.

For this follow-up audit, we tested the institutions' compliance with the June 4, 2008 directive.  In the survey questionnaire we sent to the 93 BOP institution locations, we asked the following question.

Did you provide assurance to your Regional Medical Director by June 30, 2008, stating that your institution is in compliance with the June 4, 2008, directive requiring that all clinicians have privileges, practice agreements, or protocols in place to practice medicine?

If the institution Clinical Director responded "Yes," we asked for a copy of the documentation provided to the Regional Medical Director assuring the institution's compliance.  If the Clinical Director responded "No", or "N/A" for Not Applicable, we asked for an explanation.  As shown in Exhibit 11, 73 of the 93 institutions indicated that they had provided the required assurance of compliance to the Medical Director by June 30, 2008.

**Exhibit 11:  Institution Responses to the Question
"Did you provide assurance of compliance to the
Medical Director by June 30, 2008"**



**Source:** Responses by BOP institution officials to OIG
survey questionnaire

For the 20 institutions that responded No, Not Applicable, Unknown, or that did not answer, no explanations were provided.  Of the 73 institutions that answered "Yes," only 27 provided documentation to support that they provided assurance to the Medical Director by the June 30, 2008, deadline.

We attempted to obtain copies of the assurance memoranda submitted by the institutions but learned that the institutions were not required to keep them.  All six Regional Medical Directors reported their region's compliance with the directive to the BOP's Central Office.  The BOP's Office of Quality Management maintained each region's assurance memorandum.  A BOP official told us that each Regional Medical Director reported that all institutions in their region were in compliance.  We obtained the assurance memoranda for five of the six regions (South Central Region, Southeast Region, Western Region, Mid-Atlantic Region, and the Northeast Region).  The North Central Region's memorandum was not readily available.  However, in a March 9, 2010, memorandum to us, the North Central Region's Medical Director stated that on or about July 9, 2008, he received the last of the certification memoranda from the institutions in his region, and that he recalled sending an electronic mail confirmation to the Central Office.

We analyzed the results of our testing of the institutions' compliance with maintaining current privileges, practice agreements, and protocols to gauge whether all the institutions were in compliance as certified by the Regional Medical Directors.  Our analyses identified eight BOP institutions, spread among five of the six BOP regions that had practitioners without

23

current privileges, practice agreements, or protocols as of June 30, 2008. Therefore, based on documents provided by the institutions, the certifications made by the five regions were not accurate.

**National Practitioner Data Bank**

In our 2008 audit, we did not test the BOP's use of the National Practitioner Data Bank (NPDB) for monitoring its health care providers. The BOP's Program Statement on Health Care Provider Credential Verification, Privileges, and Practice Agreement Program requires the BOP to participate in the NPDB, which is operated by the Department of Health and Human Services (HHS). The BOP participates in the NPDB through an inter-agency agreement with the HHS. For each health care provider, the BOP is required to query the NPDB at initial appointment, and no less than once every 2 years thereafter to identify adverse actions by its health care providers. The BOP's policy requires institutions to maintain copies of the NPDB results in the credential portfolio for each practitioner.

In our survey questionnaire sent to the 93 BOP institution locations, we asked the following question related to the NPDB.

Has the BOP obtained a NPDB report (initial report if newly hired or required every-2-year report) on each health care provider practicing at your institution as of November 20, 2009?

Of the 93 institution locations, 87 answered "Yes" and 6 answered "No." For the institution officials answering "Yes," we asked them to submit the date and copy of the latest NPDB report for each practitioner as applicable. Based on the data and support documentation submitted by the BOP institution officials, we performed an analysis to determine if the NPDB report on each health care provider was current. In our analysis we considered a NPDB Report dated after November 19, 2007, to be current because it was within 2 years of when we sent out the survey on November 20, 2009. If the NPDB Report date was blank, we considered it not current because the BOP did not indicate one had been done. If the NPDB Report date was before November 20, 2007, we considered it not

24

current because it was not within 2 years of when we sent the survey out on November 20, 2009.[12]

Our analysis showed that the BOP had obtained current NPDB reports for 1,938 (96 percent) of the 2,010 health care providers who required one. For the 72 practitioners without current reports, documentation submitted by the institutions showed that:

- NPDB reports obtained for 24 practitioners were more than 2 years old, and

- the institution either did not provide a date of the last NPDB report obtained or did not submit documentation to show that an NPDB report had been obtained for 48 practitioners.

We asked the institutions why an NPDB report was not obtained. Only 3 of the 34 institutions that had not obtained current NPDB reports for some of its practitioners provided an explanation for not obtaining the report. The three responses were:

- The report has not been obtained because of a delay in obtaining needed information from the practitioner to perform the report query.

- The report is pending. An NPDB report was obtained but contained erroneous information.

- The report was not obtained. Instead, the institution relied on a letter from the contractor stating that the report query was done.

We also noted that none of the BOP's 66 program reviews identified an issue with the NPDB reports not being current. For 22 of the 34 locations where we found NPDB reports that were not current, the non-current NPDB reports existed at the time of the program reviews at these locations, but were not detected by the program reviews.

While the BOP had a 96 percent compliance rate with conducting the NPDB report on its practitioners, it is important that the BOP obtain the NPDB reports for all health care providers who require the NPDB report. The NPDB provides insight into the professional competence or conduct of an

---

[12]  If the institution officials provided a date that was different from the date on the supporting documentation, then we used the date on the supporting documentation. If the officials provided a date but no supporting documentation, we did not count the report as obtained by the BOP because no support was provided.

individual regarding suitability for appointment by the BOP.  Adverse actions identified by the NPDB reports include:  (1) malpractice payments made for the benefit of physicians, dentists, and other health care practitioners; (2) licensure actions taken by state medical boards and state boards of dentistry against physicians and dentists; (3) professional review actions primarily taken against physicians and dentists by hospitals and other health care entities, including health maintenance organizations, group practices, and professional societies; and (4) drug-related actions taken by the Drug Enforcement Administration.  If the BOP does not obtain current NPDB reports for all its practitioners, it may not identify adverse actions against its practitioner and the BOP risks employing practitioners that are not suitable for providing proper health care for BOP inmates.

**Conclusion**

Our 2008 audit found significant numbers of BOP health care providers who were operating without current privileges, practice agreements, or protocols, as applicable.  The audit also found significant numbers of BOP health care providers who had not received a current peer review. Subsequent to that audit, the BOP took the following actions to help ensure its practitioners have current privileges, practice agreements, protocols, and peer reviews.

- The BOP issued guidance to its wardens and clinical directors reiterating policy requirements that all health care providers have privileges, practice agreements, and protocols in place.

- The BOP verified privileges, practice agreements, and protocols on site through health services program reviews, Regional Medical Director and Regional Health Service Administrator visits, and Clinical Director peer reviews.

- The BOP required all clinical directors provide assurance to their respective Regional Medical Director by June 30, 2008, that their clinicians had privileges, practice agreements, or protocols in place.

- The BOP issued guidance to its wardens and clinical directors explaining that all health care providers who are privileged must have at least one external peer review conducted every 2 years. The guidance also reiterated that providers working under practice agreements must have a peer review conducted at least every 2 years by a peer at the facility.  The guidance also stated that the Regional Medical Directors would conduct external peer reviews for

all licensed independent practitioners in conjunction with the scheduled Clinical Director peer reviews.

This follow-up audit found that, as a result of the BOP's actions, BOP institutions had significantly reduced the number of health care providers without current privileges, practice agreements, protocols, and peer reviews. However, the BOP needs to take additional actions to ensure full compliance with the credentialing guidelines for all its health care providers.

To further improve its credentialing and peer review processes, the BOP is revising its Program Statement on Health Care Provider Credential Verification, Privileges, and Practice Agreement Program to ensure the requirements of the program are clear to its staff. However, the revised Program Statement is not expected to be published until FY 2012. Consequently, we believe that the BOP should take interim steps to improve its processes until the revised Program Statement is published.

Allowing practitioners to provide medical care to inmates without current privileges, practice agreements, or protocols increases the risk that the practitioners may provide medical services without having the qualifications, knowledge, skills, and experience necessary to correctly perform the services. In addition, the BOP could be subjected to liability claims by inmates if improper medical services are provided by these practitioners.

In addition to having some practitioners without current privileges, practice agreements, protocols, and peer reviews, we also found that the BOP institutions did not maintain current NPDB reports for about 4 percent of their practitioners. The NPDB reports identify whether or not a practitioner has received any adverse actions. Failure to obtain the NPDB reports for all practitioners places the BOP at risk of employing practitioners who are not suitable for providing proper health care for BOP inmates.

## Recommendations

We recommend that the BOP:

1. Issue interim guidance to institution officials clarifying the term privilege and explaining that practice agreements and protocols should not be identified as privilege granting documents.

27

2. Issue interim guidance to institution officials clarifying the type authorization (privileges, practice agreements, and protocols) that each type practitioner should receive to ensure that the practitioners receive the correct type of authorizing document.

3. Issue interim guidance to institution officials clarifying the use of protocols in medical centers or other BOP facilities where licensed independent practitioners are on duty 24 hours a day to supervise non-independent practitioners.

4. Issue interim guidance to institution officials clarifying the type of documentation that should be maintained in the practitioner credentials portfolio to support the completion of peer reviews for contracted health care providers.

5. Issue interim guidance to institution officials reiterating the requirement to query the National Practitioner Data Bank for each practitioner at initial appointment, and at least once every 2 years thereafter to identify adverse actions against the practitioners.

6. Ensure that the revised Program Statement on Health Care Provider Credential Verification, Privileges, and Practice Agreement Program incorporates the interim guidance established as a result of Recommendations 1 through 5.

7. Reevaluate the program review steps used to asses compliance with the requirements of the BOP's Program Statement on Health Care Provider Credential Verification, Privileges, and Practice Agreement Program to help ensure the program reviews identify:

   • practitioners without current privileges, practice agreements, protocols, peer reviews, and NPDB reports; and

   • institutions that inappropriately certified compliance with the requirements of the program statement.

# STATEMENT ON COMPLIANCE WITH
# LAWS AND REGULATIONS

As required by the *Government Auditing Standards* we tested, as appropriate given our audit scope and objective, selected transactions, records, procedures, and practices, to obtain reasonable assurance that the BOP's management complied with federal laws and regulations for which noncompliance, in our judgment, could have a material effect on the results of our audit.  The BOP's management is responsible for ensuring compliance with federal laws and regulations applicable to the BOP.  In planning our audit, we identified the following laws and regulations that concerned the operations of the auditee and that were significant within the context of the audit objective.

- U.S. Constitution's Eighth Amendment

- 45 C.F.R. PART 60 – National Practitioner Data Bank for Adverse Information on Physicians and Other Health Care Practitioners

In the United States Supreme Court case, *Estelle v. Gamble*, the U.S. Supreme Court concluded that an inmate's right to medical care is protected by the U.S. Constitution's Eighth Amendment guarantee against cruel and unusual punishment.[13]  The U.S. Supreme Court concluded that "deliberate indifference" – purposefully ignoring serious medical needs of prisoners – constitutes the inappropriate and wrongful infliction of pain that the Eighth Amendment forbids.  The BOP has implemented multiple guidelines in the form of Program Statements to help it ensure inmates are houses in a safe and humane manner.  We tested BOP guidelines in the following Program Statements.

- BOP's Program Statement P6027.01 on Health Care Provider Credential Verification, Privileges, and Practice Agreement Program.

- BOP Program Statement P1210.23 on Management Control and Program Review Manual.

- BOP Program Statement P6010.02, Health Services Administration.

Our audit included examining, on a test basis, the BOP's compliance with the aforementioned laws, regulations, and implementing Program

---

[13] *Estelle* v. *Gamble*, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

Statements that could have a material effect on the BOP's operations, through obtaining BOP official's responses to our survey questionnaire, interviewing BOP management officials, and analyzing the survey responses. As noted in the Finding and Recommendations section of this report, we found that the BOP substantially complied with the laws, regulations, and Program Statements cited above, but could make improvements to ensure that all its health care providers had current privileges, practice agreements, protocols, peer reviews, and NPDB reports, as applicable.

# STATEMENT ON INTERNAL CONTROLS

As required by the *Government Auditing Standards* we tested as appropriate, internal controls significant within the context of our audit objective.  A deficiency in an internal control exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to timely prevent or detect:  (1) impairments to the effectiveness and efficiency of operations, (2) misstatements in financial or performance information, or (3) violations of laws and regulations.  Our evaluation of the BOP's internal controls was *not* made for the purpose of providing assurance on its internal control structure as a whole.  The BOP's management is responsible for the establishment and maintenance of internal controls.

As noted in the Finding and Recommendations section of this report, we identified deficiencies in the BOP's internal controls that are significant within the context of the audit objective and based upon the audit work performed that we believe adversely affects the BOP's ability to ensure that all its health care providers have current privileges, practice agreements, protocols, peer reviews, and NPDB reports, as applicable.

Because we are not expressing an opinion on the BOP's internal control structure as a whole, this statement is intended solely for the information and use of the auditee.  This restriction is not intended to limit the distribution of this report, which is a matter of public record.

# ABBREVIATIONS

| | |
|---|---|
| **BOP** | Federal Bureau of Prisons |
| **FCI** | Federal Correctional Institution |
| **FDC** | Federal Detention Center |
| **FMC** | Federal Medical Center |
| **FPC** | Federal Prison Camp |
| **FSL** | Federal Satellite Low |
| **FTC** | Federal Transfer Center |
| **FY** | Fiscal Year |
| **HHS** | Department of Health and Human Services |
| **JCAHO** | Joint Commission on Accreditation of Healthcare Organizations |
| **MCC** | Metropolitan Correctional Center |
| **MDC** | Metropolitan Detention Center |
| **MED** | Medium Security |
| **N/A** | Not Applicable |
| **NPDB** | National Practitioner Data Bank |
| **OIG** | Office of the Inspector General |
| **USMCFP** | United States Medical Center for Federal Prisoners |
| **USP** | United States Penitentiary |

**APPENDIX I**

## Audit Objectives, Scope, and Methodology

**Objectives**

The objective of this audit was to determine whether the BOP established and updated privileges, practice agreements, or protocols for all practitioners as applicable; and established current peer reviews of all providers as required.

**Scope and Methodology**

We performed the audit in accordance with *Government Auditing Standards* and included tests and procedures necessary to accomplish the objectives. We performed the audit from October 26, 2009, to February 24, 2010. We conducted fieldwork at the BOP headquarters in Washington, D.C. We also obtained data from all 93 BOP institution locations through the use of a survey questionnaire discussed below.

To determine whether the BOP established and updated its medical services providers' privileges, practice agreements, or protocols we:

- surveyed all 115 BOP institutions at 93 locations through a questionnaire to determine if current privileges, practice agreements, and protocols were maintained for each health care practitioner, as applicable;

- evaluated the BOP's process for verifying and certifying that health care providers' credentials were current;

- assessed whether the BOP's Program Review process for monitoring its health care providers is capable of detecting deficiencies in practitioners' credentials at the institutions.

To determine whether the BOP established current peer reviews for all its providers, we surveyed all 115 BOP institutions at 93 locations through a questionnaire to determine if current peer reviews were maintained for each health care practitioner, as applicable.

In addition, we also used the survey questionnaire to determine if the BOP queried the National Practitioner Data Bank to identify adverse actions against its medical service providers.

33

APPENDIX II

## BOP Institutions and Inmates Housed
## As of March 25, 2010[14]

| Institution | State | Inmates |
|---|---|---|
| 1. ALDERSON FPC | WV | 1,110 |
| 2. ALLENWOOD LOW FCI | PA | 1,402 |
| 3. ALLENWOOD MEDIUM SECURITY (MED) FCI | PA | 1,444 |
| 4. ALLENWOOD USP | PA | 1,049 |
| 5. ASHLAND FCI | KY | 1,251 |
| ASHLAND-CAMP | KY | 297 |
| 6. ATLANTA USP | GA | 1,920 |
| ATLANTA-CAMP | GA | 480 |
| 7. ATWATER USP | CA | 1,146 |
| ATWATER-CAMP | CA | 117 |
| 8. BASTROP FCI | TX | 1,352 |
| BASTROP-CAMP | TX | 179 |
| 9. BEAUMONT LOW FCI | TX | 1,955 |
| 10. BEAUMONT MED FCI | TX | 1,632 |
| 11. BEAUMONT USP | TX | 1,490 |
| BEAUMONT USP-CAMP | TX | 527 |
| 12. BECKLEY FCI | WV | 1,814 |
| BECKLEY-CAMP | WV | 404 |
| 13. BENNETTSVILLE FCI | SC | 1,630 |
| BENNETTSVILLE-CAMP | SC | 118 |
| 14. BIG SANDY USP | KY | 1,473 |
| BIG SANDY-CAMP | KY | 107 |
| 15. BIG SPRING FCI | TX | 1,569 |
| BIG SPRING-CAMP | TX | 160 |
| 16. BROOKLYN MDC | NY | 2,624 |

---

[14]   As of March 25, 2010, the BOP housed an additional 38,279 inmates in privately managed, contracted, or other facilities.  Some BOP locations incorporate more than one BOP institution.  For instance, the BOP has two facilities at its Ashland, Kentucky, location – Ashland FCI and Ashland-CAMP.

| Institution | State | Inmates |
|---|---|---|
| 17. BRYAN FPC | TX | 849 |
| 18. BUTNER FMC | NC | 986 |
| 19. BUTNER LOW FCI | NC | 1,443 |
| 20. BUTNER MED I FCI | NC | 772 |
| BUTNER-CAMP | NC | 317 |
| 21. BUTNER MED II FCI | NC | 1,583 |
| 22. CANAAN USP | PA | 1,441 |
| CANAAN-CAMP | PA | 128 |
| 23. CARSWELL FMC | TX | 1,393 |
| CARSWELL-CAMP | TX | 229 |
| 24. CHICAGO MCC | IL | 627 |
| 25. COLEMAN I USP | FL | 1,538 |
| 26. COLEMAN II USP | FL | 1,536 |
| 27. COLEMAN LOW FCI | FL | 1,899 |
| 28. COLEMAN MED FCI | FL | 1,771 |
| COLEMAN MED FCI-CAMP | FL | 447 |
| 29. CUMBERLAND FCI | MD | 1,237 |
| CUMBERLAND-CAMP | MD | 261 |
| 30. DANBURY FCI | CT | 1,117 |
| DANBURY-CAMP | CT | 223 |
| 31. DEVENS FMC | MA | 1,050 |
| DEVENS-CAMP | MA | 114 |
| 32. DUBLIN FCI | CA | 1,107 |
| DUBLIN-CAMP | CA | 296 |
| 33. DULUTH FPC | MN | 881 |
| 34. EDGEFIELD FCI | SC | 1,616 |
| EDGEFIELD-CAMP | SC | 463 |
| 35. EL RENO FCI | OK | 1,202 |
| EL RENO-CAMP | OK | 273 |
| 36. ELKTON FCI | OH | 1,884 |
| ELKTON-FSL | OH | 587 |
| 37. ENGLEWOOD FCI | CP | 960 |

| Institution | State | Inmates |
|---|---|---|
| ENGLEWOOD-CAMP | CO | 171 |
| 38. ESTILL FCI | SC | 1,144 |
| ESTILL-CAMP | SC | 301 |
| 39. FAIRTON FCI | NJ | 1,419 |
| FAIRTON-CAMP | NJ | 112 |
| 40. FLORENCE ADMAX USP | CO | 438 |
| FLORENCE USP-CAMP | CO | 531 |
| 41. FLORENCE FCI | CO | 1,218 |
| 42. FLORENCE HIGH USP | CO | 944 |
| 43. FORREST CITY FCI | AR | 1,943 |
| FORREST CITY FCI-CAMP | AR | 311 |
| 44. FORREST CITY MED FCI | AR | 1,540 |
| 45. FORT DIX FCI | NJ | 4,195 |
| FORT DIX-CAMP | NJ | 384 |
| 46. FORT WORTH FCI | TX | 1,764 |
| 47. GILMER FCI | WV | 1,671 |
| GILMER-CAMP | WV | 123 |
| 48. GREENVILLE FCI | IL | 1,245 |
| GREENVILLE-CAMP | IL | 277 |
| 49. GUAYNABO MDC | PR | 1,416 |
| 50. HAZELTON USP | WV | 1,434 |
| HAZELTON-CAMP | WV | 116 |
| HAZELTON-FEMALE CAMP | WV | 447 |
| 51. HERLONG FCI | CA | 1,472 |
| HERLONG-CAMP | CA | 111 |
| 52. HONOLULU FDC | HI | 774 |
| 53. HOUSTON FDC | TX | 886 |
| 54. JESUP FCI | GA | 1,205 |
| JESUP-CAMP | GA | 155 |
| JESUP-FSL | GA | 578 |

36

| Institution | State | Inmates |
|---|---|---|
| 55. LA TUNA FCI | TX | 1,184 |
| LA TUNA-CAMP | TX | 297 |
| LA TUNA-FSL (EL PASO) | TX | 471 |
| 56. LEAVENWORTH USP | KS | 1,623 |
| LEAVENWORTH-CAMP | KS | 420 |
| 57. LEE USP | VA | 1,495 |
| LEE USP-CAMP | VA | 125 |
| 58. LEWISBURG USP | PA | 1,224 |
| LEWISBURG-CAMP | PA | 541 |
| 59. LEXINGTON FMC | KY | 1,745 |
| LEXINGTON-CAMP | KY | 293 |
| 60. LOMPOC FCI | CA | 1,397 |
| 61. LOMPOC USP | CA | 1,488 |
| LOMPOC USP-CAMP | CA | 473 |
| 62. LORETTO FCI | PA | 1,286 |
| LORETTO-CAMP | PA | 143 |
| 63. LOS ANGELES MDC | CA | 1,018 |
| 64. MANCHESTER FCI | KY | 1,205 |
| MANCHESTER-CAMP | KY | 444 |
| 65. MARIANNA FCI | FL | 1,208 |
| MARIANNA-CAMP | FL | 284 |
| 66. MARION USP | IL | 1,001 |
| MARION-CAMP | IL | 278 |
| 67. MCCREARY USP | KY | 1,533 |
| MCCREARY-CAMP | KY | 128 |
| 68. MCKEAN FCI | PA | 1,236 |
| MCKEAN-CAMP | PA | 268 |
| 69. MEMPHIS FCI | TN | 1,404 |
| MEMPHIS-CAMP | TN | 274 |
| 70. MIAMI FCI | FL | 1,126 |
| MIAMI FCI-CAMP | FL | 333 |
| 71. MIAMI FDC | FL | 1,581 |

| Institution | State | Inmates |
|---|---|---|
| 72. MILAN FCI | MI | 1,560 |
| 73. MONTGOMERY FPC | AL | 923 |
| 74. MORGANTOWN FCI | WV | 1,251 |
| 75. NEW YORK MCC | NY | 781 |
| 76. OAKDALE FCI | LA | 1,445 |
| 77. OAKDALE FDC | LA | 842 |
|     OAKDALE FDC-CAMP | LA | 139 |
| 78. OKLAHOMA CITY FTC | OK | 1,532 |
| 79. OTISVILLE FCI | NY | 1,156 |
|     OTISVILLE-CAMP | NY | 111 |
| 80. OXFORD FCI | WI | 1,098 |
|     OXFORD-CAMP | WI | 193 |
| 81. PEKIN FCI | IL | 1,239 |
|     PEKIN-CAMP | IL | 307 |
| 82. PENSACOLA FPC | FL | 660 |
| 83. PETERSBURG FCI | VA | 1,159 |
|     PETERSBURG FCI-CAMP | VA | 333 |
| 84. PETERSBURG MED FCI | VA | 2,011 |
| 85. PHILADELPHIA FDC | PA | 1,028 |
| 86. PHOENIX FCI | AZ | 1,015 |
|     PHOENIX-CAMP | AZ | 274 |
| 87. POLLOCK MED FCI | LA | 888 |
| 88. POLLOCK USP | LA | 1,418 |
|     POLLOCK-CAMP | LA | 230 |
| 89. RAY BROOK FCI | NY | 1,236 |
| 90. ROCHESTER FMC | MN | 958 |
| 91. SAFFORD FCI | AZ | 1,300 |
| 92. SAN DIEGO MCC | CA | 1,107 |
| 93. SANDSTONE FCI | MN | 1,385 |
| 94. SCHUYLKILL FCI | PA | 1,203 |
|     SCHUYLKILL-CAMP | PA | 299 |

| Institution | State | Inmates |
|---|---|---|
| 95. SEAGOVILLE FCI | TX | 1,860 |
| SEAGOVILLE-CAMP | TX | 157 |
| 96. SEATAC FDC | WA | 817 |
| 97. SHERIDAN FCI | OR | 1,272 |
| SHERIDAN-CAMP | OR | 474 |
| 98. SPRINGFIELD USMCFP | MO | 1,138 |
| 99. TALLADEGA FCI | AL | 983 |
| TALLADEGA-CAMP | AL | 345 |
| 100. TALLAHASSEE FCI | FL | 1,201 |
| 101. TERMINAL ISLAND FCI | CA | 1,020 |
| 102. TERRE HAUTE FCI | IN | 1,164 |
| TERRE HAUTE FCI-CAMP | IN | 343 |
| 103. TERRE HAUTE USP | IN | 1,763 |
| 104. TEXARKANA FCI | TX | 1,365 |
| TEXARKANA-CAMP | TX | 328 |
| 105. THREE RIVERS FCI | TX | 1,187 |
| THREE RIVERS-CAMP | TX | 384 |
| 106. TUCSON FCI | AZ | 758 |
| 107. TUCSON USP | AZ | 1,036 |
| TUCSON-CAMP | AZ | 125 |
| 108. VICTORVILLE MED I FCI | CA | 1,472 |
| 109. VICTORVILLE MED II FCI | CA | 1,474 |
| VICTORVILLE MED II-CAMP | CA | 263 |
| 110. VICTORVILLE USP | CA | 1,526 |
| 111. WASECA FCI | MN | 1,066 |
| 112. WILLIAMSBURG FCI | SC | 1,608 |
| WILLIAMSBURG-CAMP | SC | 126 |
| 113. YANKTON FPC | SD | 832 |
| 114. YAZOO CITY FCI | MS | 1,839 |
| YAZOO-CAMP | MS | 135 |
| 115. YAZOO CITY MED FCI | MS | 1,632 |
| **Total Inmates** | | **172,105** |

## APPENDIX III

## OIG Survey Questionnaire Sent to BOP Institutions

**FOLLOW-UP ON THE FEDERAL BUREAU OF PRISON'S EFFORTS TO MANAGE INMATE HEALTH CARE**

**INSTITUTION HEALTH CARE QUESTIONNAIRE**

*If your facility is part of a Federal Corrections Complex (FCC), or is a camp located within an institution, please combine and submit only one questionnaire.*

## GENERAL INFORMATION

1. Institution Name(s): _____

2. a.  Part of a Federal Correctional Complex (FCC)?

        ☐ YES    ☐ NO

    b.  If answer is YES, please provide the FCC Name:
_____

3. Name of Warden: _____

4. a.  Name of Health Services Administrator (HSA):_____

    b. HSA's Phone # _____

5. Name of Clinical Director (CD): _____

## MONITORING HEALTH CARE PROVIDERS

When answering questions 6 through 11 please consider everyone (BOP employees, PHS employees working for BOP, and contract providers) who, as of November 20, 2009, was practicing health care inside your institution, or who was providing a diagnosis or recommending treatment using tele-health, including all physicians; dentists; mid-level practitioners (MLP); other licensed independent practitioners (LIP), including contract/consultants; and other health care providers, such as clinical nurses, emergency medical

40

technicians, or any others that a local governing body deems appropriate for needing privileges, practice agreements, or protocols.

6. Has BOP performed any documented evaluations (staff assistance visits, peer reviews, program reviews, or any other reviews) of your health care providers (either through contract or in-house) since the beginning of October 1, 2007?

☐ YES   ☐ NO   ☐ N/A

If answer is YES, please provide a copy of the evaluations performed.

7. Do all health care providers practicing at your institution as of November 20, 2009, possess current privileges, practice agreements, or protocols?

☐ YES   ☐ NO

If answer is NO, please provide documentation of the reason the provider does not
possess a current privilege, practice agreement, or protocol.

8. Has the BOP obtained a National Practitioner Data Bank (NPDB) report (initial report if newly hired or required every-two-year report) on each health care provider practicing at your institution as of November 20, 2009?

☐ YES   ☐ NO

If answer is NO, please provide documentation of the reason why such reports were not obtained.

9. Has your institution received any adverse reports from the National Practitioner Data Bank on any health care providers practicing at your institution as of November 20, 2009?

☐ YES   ☐ NO

10. Did you provide assurance to your Regional Medical Director by June 30, 2008, stating that your institution is in compliance with the June 4, 2008, directive requiring that all clinicians have privileges, practice agreements, or protocols in place to practice medicine?

☐ YES   ☐ NO   ☐ N/A

41

If answer is YES, please provide a copy of documentation provided to the Regional Medical Director assuring institution's compliance.  If answer is NO, or NA, please explain.

Please complete the attached Excel spreadsheet.  For each practitioner you list on the attachment please provide a copy of the last documents in each of the following categories:  peer review, privilege granting document, practice agreement, protocol document, and National Practitioner Data Bank report, as applicable.  For contract providers, you do not need to provide a copy of the last peer review if it is not maintained at your institution.  Instead, as required by BOP Program Statement P6027.01, please provide the evidence maintained at the institution to show the last peer review was completed.

Attachment

**Attachment**

# Institution Name(s)*:

_____

*If part of an FCC, or a camp located within an institution, please combine and submit only one questionnaire.*

Please complete this Excel spreadsheet for everyone (BOP employees, PHS employees working for BOP, and contract providers) who, as of November 20, 2009, was practicing health care inside your institution, or who was providing a diagnosis or recommending treatment using tele-health, including all physicians; dentists; mid-level practitioners (MLP); other licensed independent practitioners (LIP), including contract/consultants; and other health care providers, such as clinical nurses, emergency medical technicians, or any others that a local governing body deems appropriate for needing privileges, practice agreements, or protocols.

For each practitioner you list, please provide a copy of the last document in each of the following categories: peer review, privileges granting document, practice agreement, protocol document, and National Practitioner Data Bank report, as applicable. For contract providers, you do not need to provide a copy of the last peer review if it is not maintained at your institution. Instead, as required by BOP Program Statement P6027.01, please provide the evidence maintained at the institution to show the last peer review was completed. Please use additional lines as needed.

| Practitioner Type (Physician, Dentist, MLP, LIP, etc.) Position | Practitioner Name | Date BOP Employment Began[1] | Date of Last Peer Review | Date of Last Privilege Document | Date of Last Practice Agreement | Date of Last Protocol Document | Date of Last National Practitioner Data Bank Report |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

[1] For BOP employees, this should be the date the employee was hired by the BOP. For PHS employees, this should be the date the employee began his or her duty assignment with the BOP. For contract providers this should be the date the contract providers

**APPENDIX IV**

## The BOP's Response to the Draft Audit Report

Office of the Director                                  Washington, DC 20534

June 18, 2010

MEMORANDUM FOR RAYMOND J. BEAUDET
                    ASSISTANT INSPECTOR GENERAL FOR AUDIT
                    OFFICE OF THE INSPECTOR GENERAL

FROM:           Harley G. Lappin, Director
                Federal Bureau of Prisons

SUBJECT:        Response to the Office of Inspector General's
                (OIG) Draft Audit Report:  Follow-up Audit of the
                Federal Bureau of Prisons' Efforts to Manage
                Inmate Health Care

The Bureau of Prisons appreciates the opportunity to comment on
and respond to the recommendations from the OIG's draft audit
report entitled Follow-up Audit of the Federal Bureau of Prisons'
Efforts to Manage Inmate Health Care.

Please find below listed the Bureau's response to each individual
recommendation:

**Recommendation #1:**  Issue interim guidance to institution
officials clarifying the term privilege and explaining that
practice agreements and protocols should not be identified as
privilege granting documents.

**Initial Response:**  The Bureau agrees with this recommendation and
has drafted an interim guidance memorandum to institution Chief
Executive Officers (CEOs) that clarifies the term "privileging"
and denotes that privileges are issued solely for Licensed
Independent Practitioners (LIPs).  Health Services Units (HSUs)
do not issue privileges to non-independent practitioners (Mid-

44

Level Practitioners (MLPs), nurses, technicians, etc.}. The guidance memorandum also indicates that Health Services Administrators (HSAs) are responsible for developing and implementing internal policies, procedures, and a system of monitoring to assure that all employed and contracted LIPs who deliver services within the institution are issued privileges biennially. While the projected date for dissemination of the guidance memorandum is July 1, 2010, an in-person training will be conducted with all Bureau HSAs on June 30, 2010, at the National Clinical Director (CD)/HSA Conference.

**Recommendation #2:** Issue interim guidance to institution officials clarifying the type authorization (privileges, practice agreements, and protocols) that each type practitioner should receive to ensure that the practitioners receive the correct type of authorizing document.

**Initial Response:** The Bureau agrees with this recommendation and has drafted an interim guidance memorandum to institution CEOs that defines non-independent practitioners as a mid-level practitioner or MLP (i.e., a physician assistant, nurse practitioner, unlicensed foreign medical graduate), nurse, or technician (paramedic/EMT, laboratory, radiology, medical, dental). The guidance further specifies that HSUs issue "practice agreements" for MLPs and develop protocols for nurses and technicians. HSAs are responsible for developing and implementing internal policies, procedures, and a system of monitoring to assure that all employed and contracted MLPs who deliver services within the institution are issued a practice agreement biennially, and nurses and technicians are issued protocols that the HSU leaders review and revise annually. While the projected date for dissemination of the guidance memo is July 1, 2010, an in-person training will be conducted with all Bureau HSAs on June 30, 2010, at the National CD/HSA Conference.

**Recommendation #3:** Issue interim guidance to institution officials clarifying the use of protocols in medical centers or other Bureau facilities where licensed independent practitioners are on duty 24 hours a day to supervise non-independent practitioners.

**Initial Response:** The Bureau agrees with this recommendation and has drafted an interim guidance memorandum to institution CEOs stating that P6027.01 requires clinical nurses, paramedics/emergency medical technicians, and any other clinicians which a local governing body deems appropriate, to practice in accordance with the institution's LIP-approved

2

(physician or dentist) protocols when delivering health care.
The presence of an LIP on site does not supersede the requirement
to have written nursing or technician protocols that standardize
clinical practice for all employed and contracted non-independent
nurses and technicians, especially protocols related to medical
emergency response. The Bureau's Chief Nurse and Medical
Referral Center Directors of Nursing convened in May 2010 to
coordinate the development of evidence-based national nursing
protocols; however, until national protocols are published (2011
or 2012), CEOs are directed to have HSUs continue to use existing
LIP-approved protocols to guide local practice. While the
projected date for dissemination of the guidance memorandum is
July 1, 2010, an in person training will be conducted with all
Bureau HSAs on June 30, 2010, at the National CD/HSA Conference.

**Recommendation #4:**  Issue interim guidance to institution
officials clarifying the type of documentation that should be
maintained in the practitioner credentials portfolio to support
the completion of peer reviews for contracted health care
providers.

**Initial Response:**  The Bureau agrees with this recommendation and
has drafted an interim guidance memorandum to institution CEOs
explaining that P6027.01, permits institutions that contract with
LIPs working in a Joint Commission accredited hospital or group
practice to establish an agreement that the hospital or group
practice conducts the peer review. However, past Bureau practice
has shown that this proxy peer review has generally not
approximated the necessary evidence of a medical record review
and/or direct observation of technical skills required for peer
review of an employed Bureau LIP. Although the Bureau is in the
process of revising P6027.01 to require more substantive peer
review criteria in a standardized template (publication projected
for 2012), the institution's HSU must continue to conduct peer
reviews of its contracted LIPs internally by record review,
collaboratively with its contract facilities, or through setting
up a separate short-term contract with a peer specialist to
perform a peer assessment through a de-identified medical record
case review. Regardless of the method used, the documentation of
contractor peer reviews should approximate the biennial peer
review conducted for Bureau employed LIPs, and a copy of the
completed peer review maintained in the respective provider's
credential portfolio. Specific criteria include assessment of
clinical performance (e.g., physical examination supports the
diagnosis and treatment), use of resources, application of

3

clinical judgment, timeliness of care and follow-up, and
communication with the Bureau primary care physician including
written reports. HSAs are responsible for developing and
implementing internal policies, procedures, and a system of
monitoring to assure that all contracted LIPs have biennial peer
reviews that approximate the peer review conducted for employed
Bureau LIPs.  While the projected date for dissemination of the
guidance memorandum is July 1, 2010, an in-person training will
be conducted with all Bureau HSAs on June 30, 2010, at the
National CD/HSA Conference.

**Recommendation #5:**  Issue interim guidance to institution
officials reiterating the requirement to query the National
Practitioner Data Bank for each practitioner at initial
appointment, and at least once every 2 years thereafter to
identify adverse actions against the practitioners.

**Initial Response:**  The Bureau agrees with this recommendation and
has drafted an interim guidance memorandum to institution CEOs
that policy requires all Bureau institutions to conduct a
National Practitioner Data Bank (NPDB) query on all health care
practitioners at the time of initial appointment and subsequently
every 2 years to assure that there are no restrictions on their
license or other state-granted authority to deliver care within
their scope of professional practice (see P6027.01, pages 15-19).
A copy of the results of the NPDB query must be filed in the
credential portfolio.  HSAs at all institutions must have written
internal policies, procedures, and a system to monitor completion
of the NPDB queries for all health care providers identified in
P6027.01.  While the projected date for dissemination of the
guidance memorandum is July 1, 2010, an in-person training will
be conducted with all Bureau HSAs on June 30, 2010, at the
National CD/HSA Conference.

**Recommendation #6:**  Ensure that the revised Program Statement on
Health Care Provider Credential Verification, Privileges, and
Practice Agreement Program incorporates the interim guidance
established as a result of Recommendations 1 through 5.

**Initial Response:**  The Bureau agrees with this recommendation and
is drafting the revision of P6027.01 (projected publication date
of 2012) and will incorporate the interim guidance outlined in
the responses to Recommendations 1 through 5.

**Recommendation #7:**  Reevaluate the program review steps used to
assess compliance with the requirements of the Bureau's Program

4

47

Statement on Health Care Provider Credential Verification,
Privileges, and Practice Agreement Program to help ensure the
program reviews identify:

- practitioners without current privileges, practice
  agreements, protocols, peer reviews, and NPDB reports;
  and

- institutions that inappropriately certified compliance
  with the requirements of the program statement.

**Initial Response:**   The Bureau agrees with this recommendation and
has conducted the reevaluation of the program review steps to
assess P6027.01 compliance by Program Review Division (PRD) and
Health Services Division personnel during the week of
May 17, 2010.   Program Review teams will continue to pull a
sample of ten credential portfolios for employed, contracted, and
telehealth providers in an effort to identify LIP and non-
independent practitioners who do not meet the required
credentialing criteria (license, professional education, post-
graduate education, past adverse actions that restrict practice,
NPDB queries, privileges for LIPs, practice agreements for
MLPs/dental hygienists/dental assistants, protocols for
nurses/technicians, and peer reviews for LIPs).   PRD will
physically review credential portfolios and will not substitute
an institution's certification of compliance in lieu of the
physical review of portfolios.

If you have any questions regarding this response, please contact
VaNessa P. Adams, Assistant Director, Program Review Division, at
(202) 616-2099.

5

**APPENDIX V**

# OFFICE OF THE INSPECTOR GENERAL
## ANALYSIS AND SUMMARY OF ACTIONS
## NECESSARY TO CLOSE THE REPORT

The OIG provided a draft of this audit report to the BOP.  The BOP's response is incorporated in Appendix IV of this final report.  The following provides the OIG analysis of the response and summary of actions necessary to close the report.

1. **Resolved.**  The BOP concurred with our recommendation to issue interim guidance to institution officials clarifying the term privilege and explaining that practice agreements and protocols should not be identified as privilege granting documents.  The BOP plans to disseminate interim guidance in the form of a memorandum on July 1, 2010, and conduct in-person training with all Bureau Health Service Administrators on June 30, 2010, at the National Clinical Director/Health Service Administrators Conference.  This recommendation can be closed when we receive documentation that the BOP has issued the interim guidance memorandum and conducted the planned training.

2. **Resolved.**  The BOP concurred with our recommendation to issue interim guidance to institution officials clarifying the type authorization (privileges, practice agreements, and protocols) that each type practitioner should receive to ensure the correct type of authorizing document.  The BOP plans to disseminate interim guidance in the form of a memorandum on July 1, 2010, and conduct in-person training with all Bureau Health Service Administrators on June 30, 2010, at the National Clinical Director/Health Service Administrators Conference.  This recommendation can be closed when we receive documentation that the BOP has issued the interim guidance memorandum and conducted the planned training.

3. **Resolved.**  The BOP concurred with our recommendation to issue interim guidance to institution officials clarifying the use of protocols in medical centers or other Bureau facilities where licensed independent practitioners are on duty 24 hours a day to supervise non-independent practitioners.  The BOP plans to disseminate interim guidance in the form of a memorandum on July 1, 2010, and conduct in-person training with all Bureau Health Service Administrators on June 30, 2010, at the National Clinical Director/Health Service Administrators Conference.  This recommendation can be closed when we receive documentation that the

49

BOP has issued the interim guidance memorandum and conducted the planned training.

4. **Resolved.** The BOP concurred with our recommendation to issue interim guidance to institution officials clarifying the type of documentation that should be maintained in the practitioner credentials portfolio to support the completion of peer reviews for contracted health care providers. The BOP plans to disseminate interim guidance in the form of a memorandum on July 1, 2010, and conduct in-person training with all Bureau Health Service Administrators on June 30, 2010, at the National Clinical Director/Health Service Administrators Conference. This recommendation can be closed when we receive documentation that the BOP has issued the interim guidance memorandum and conducted the planned training.

5. **Resolved.** The BOP concurred with our recommendation to issue interim guidance to institution officials reiterating the requirement to query the National Practitioner Data Bank for each practitioner at initial appointment, and at least once every 2 years thereafter to identify adverse actions against the practitioners. The BOP plans to disseminate interim guidance in the form of a memorandum on July 1, 2010, and conduct in-person training with all Bureau Health Service Administrators on June 30, 2010, at the National Clinical Director/Health Service Administrators Conference. This recommendation can be closed when we receive documentation that the BOP has issued the interim guidance memorandum and conducted the planned training.

6. **Resolved.** The BOP concurred with our recommendation to ensure that the revised Program Statement on Health Care Provider Credential Verification, Privileges, and Practice Agreement Program incorporates the interim guidance outlined in the responses to Recommendations 1 through 5. The BOP agreed to incorporate the interim guidance outlined in the responses to Recommendations 1 through 5 into the revised Program Statement projected for publication in 2012. This recommendation can be closed when we receive the revised Program Statement on Health Care Provider Credential Verification, Privileges, and Practice Agreement Program.

7. **Resolved.** The BOP concurred with our recommendation to reevaluate the program review steps used to assess compliance with the requirements of the Bureau's Program Statement on Health Care Provider Credential Verification, Privileges, and Practice Agreement Program. The BOP stated that it has completed its reevaluation of the program review steps used by the Program Review Division to assess compliance with P6027.01. As a result of the reevaluation, the BOP determined that

50

Program Review teams will continue to pull a sample of 10 credential portfolios in an effort to identify practitioners who do not meet the required credentialing criteria.  However, the BOP stated that it will now physically review credential portfolios and will no longer substitute an institution's certification of compliance in lieu of the physical review of portfolios.  This recommendation can be closed when we receive the BOP's guidance incorporating a physical review of credential portfolios by the Program Review Division to certify compliance with the Bureau's Program Statement on Health Care Provider Credential Verification, Privileges, and Practice Agreement Program.

51